

# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3100

OFFICE OF THE PROVOST AND
VICE PRESIDENT OF ACADEMIC AFFAIRS

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

January 23, 2024

**Electronic Mail to jennifer.smith@famu.edu,**
**and CERTIFIED MAIL** ████████ **5737 6000**
**Return Receipt Requested**

Re:    **CONFIDENTIAL**
       **Notice of Dismissal of Employment**

Jennifer M. Smith
████████████████
████████████████



Dear Professor Smith:

After reviewing all documentation and considering the totality of circumstances related to this matter, the University's decision to dismiss you from employment remains in effect. Pursuant to Florida A&M University Board of Trustees (University) Regulation 10.205, you are hereby notified that your current employment with the University will end at the close of business on Tuesday, January 30, 2024. You will remain on Administrative Leave with Pay until this date. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. The reason for this employment action has been outlined in the "Notice of Intent to Dismiss from Employment" delivered to you on December 5, 2023.

You may choose to appeal this employment action pursuant to University Regulation 10.206, which is attached for your review. Your request to appeal must be provided to Dr. Reginald Perry, Interim Associate Provost for Academic and Faculty Affairs, within 30 days after receipt of this Notice of Dismissal of Employment.

If you haven't already done so, please call to arrange the return of all University equipment and property which you may have in your possession or control to Reginald Green, Associate Dean for Student Services and Administration at the College of Law. University equipment or property shall include any and all keys, cellular phone(s), iPads, laptop computers, electronic devices, computer passwords, flash drives, data files, both hardcopy and computer records. Any University equipment or property that you may have offsite of FAMU's campus should have already been returned to the University.

J. Smith
January 23, 2024
Page 2

In addition, you should contact Human Resources, Benefits and Leave Sections, regarding your insurance coverage options and any leave payments for which you are due, and finalize the exit interview process when applicable. You may also be required to file a final Financial Disclosure Form with the Florida Commission on Ethics within sixty (60) days after leaving employment, pursuant to Section 112.3145(1)(b) and (c), Florida Statutes. Failure to timely file this form may result in a fine. A copy of the form and mailing instructions are available from the website of the Florida Commission on Ethics at https://ethics.state.fl.us.

Sincerely,

*Allyson Watson*

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs

Attachments:  University Regulation 10.206, Predetermination Conference Panel
Recommendation

cc:  Deidre Keller, Dean, College of Law
Reginald Green, Associate Dean, College of Law
Terrisa Brown, Interim Assistant Vice President, Human Resources



# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3100

*Excellence With Caring*

**Personal and Confidential**

January 12, 2023

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs
Florida Agricultural and Mechanical University
Tallahassee, FL 32307

Dear Provost Watson:

Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.

FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."

The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". After careful and thorough deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.

In conclusion, the diligent efforts of our panel have now been completed.

Sincerely,

Bryan F. Smith, J.D.
University Ombudsman and Associate Vice President for Student Affairs

Cc:    Dr. Reginald Perry, Interim Associate Provost for Academic Affairs
       Attorney Andrea Nelson, School of Business and Industry
       Attorney Patricia West, FAMU Developmental Research School

**Regulations of
Florida A&M University**



**10.206**     **Complaint Procedures for Tenured or Permanent Status Employees.**

(1) Purpose – The purpose of this regulation~~rule~~ is to promote a prompt and efficient procedure for the investigation and resolution of complaints filed by Faculty or Administrative and Professional employees of the University who have tenure or permanent status or who may file a complaint pursuant to Regulation 10.206.~~Rule 6C3-10.233, F.A.C.~~ The provisions of this regulation~~Rule~~ are not applicable to University Support Personnel System employees who may file a complaint pursuant to Regulation 10.303.~~Rule 6C3-10.338, F.A.C.~~

(2) All problems should be resolved, whenever possible, before the filing of a complaint and open communication is encouraged so that resort to the formal complaint procedure will not normally be necessary. Therefore, informal resolution of complaints is encouraged.

(3) Burden of Proof – The burden of proof shall be on the University in disciplinary complaints. In all other complaints, except disciplinary complaints, the burden of proof shall be on the complainant.

(4) Resort to Other Procedures – If prior to seeking resolution of a dispute by filing a complaint under this rule, a complainant seeks resolution of the matter in any other forum, administrative or judicial, the University shall have no obligation to entertain or proceed further with the matter pursuant to this rule. Further, SINCE IT IS NOT INTENDED THAT THE COMPLAINT PROCEDURE BE A DEVICE FOR APPELLATE REVIEW, the response of the President or President's designee to a recommended order of a presiding officer acting pursuant to Chapter 120, F.S., or to other individuals or groups having appropriate jurisdiction in any other procedure shall not be an act or omission giving rise to a complaint under this regulation~~rule~~.

(5) Time Limits – All time limits contained in this rule may be extended by mutual agreement of the parties. Upon failure of the University or its representative to provide a decision within the time limits provided in this rule, the complainant may appeal to the next appropriate step.

Upon the failure of the complainant or counsel to file an appeal within the time limits provided in this rule, the complaint shall be deemed to have been resolved at the prior step.

(6) Definitions.

(a) The term "complaint" is the allegation by the employee that any condition affecting the employee's terms and conditions of employment is unjust, inequitable, or creates a problem. An employee shall not have the right to file a complaint concerning evaluations of performance, unless the employee alleges that the evaluation is based on factors other than performance.

(b) The term "complainant" shall mean the employee whose rights have been directly affected by an act or omission and who has filed a complaint.

(c) The term "days" shall mean calendar days.

(d) The term "counsel" shall mean a lawyer or other qualified representative.

(e) The term "presiding officer" shall mean the person, either a Division of Administrative Hearing (DOAH) hearing officer or the President or President's designee, who conducts a hearing under the Formal Procedure below.

(f) The term "party" shall mean the University or the complainant.

(g) The term "substantial interest" shall mean an act or omission involving tenure, termination, suspension, or other discipline for just cause, nonrenewal of employment contract, salary and layoff.

(7) Step One – All complaints shall be filed with the person designated by the President or President's designee as Step One Representative for the unit of the University, in which the complainant performs the complainant's duties, within 30 days following the act or omission giving rise thereto, or the date on which the complainant knew or reasonably should have known of such act or omission if that date is later. The complainant may, in the written complaint which is filed, request the postponement of any action in processing the complaint formally for a period of up to 30 days, during which period efforts to resolve the complaint informally shall be made. Upon the complainant's written request, an additional 30-day extension should be liberally granted unless to do so would impede resolution of the complaint. Upon the request, the Step One representative shall, during such postponement period(s) arrange an informal conference between the appropriate administrator and complainant. The complainant may at any time terminate a postponement period by giving written notice to the Step One Representative that the complainant wishes to proceed with the

Step One meeting provided for below. If the initial postponement period, or any extension thereof, expires without such written notice, the complaint shall be deemed informally resolved to the complainant's satisfaction and need not be processed further. The Step One Representative shall conduct a meeting no sooner than seven and no later than 15 days following (1) receipt of the complaint if no postponement is requested, or (2) receipt of written notice that the complainant wishes to proceed with the Step One meeting. In advance of the Step One meeting, the complainant shall have the right upon request to a copy of any identifiable documents relevant to the complaint. At the Step One meeting, the complainant shall have the right to present any evidence in support of the complaint. The Step One Representative shall issue a written decision, stating the reasons therefore, within 30 days following the conclusion of the meeting. In the event the decision at Step One refers to documents not requested or presented by the complainant, copies of such documents shall be attached to the decision.

(8) Step Two – If the complaint is not satisfactorily resolved at Step One, the complainant may file a written request for review with the appropriate Vice President or representative within 30 days following receipt of the Step One decision. The appropriate Vice President or representative and the complainant shall schedule a meeting for the purpose of reviewing the matter no sooner than seven and no later than 15 days following receipt of the request for review. The meeting shall afford the complainant or counsel an opportunity to present written and/or oral evidence opposing the University's act or omission including a written statement challenging the grounds upon which such act or omission is justified. If the issue involves a substantial interest of the complainant, the complainant may use the provisions of Step Three below. If the issue does not involve a substantial interest of the complainant, the Step Two decision shall be final and binding. The Step Two decision shall be in writing and be issued within 90 days of the meeting. The record of the Step Two meeting shall only consist of:

(a) The notice of the University's act or omission, and the grounds therefor:

(b) Evidence received or considered;

(c) All written statements submitted by parties to the complaint and by any other persons;

(d) A complete record of any ex parte communication made relative to the complaint, along with the disposition thereof; and If after the Step Two decision has been issued, and the complaint is not related to a substantial interest, no further review of the

complaint is required. However, if the complaint is related to a substantial interest and the complaint has not been resolved to the satisfaction of the complainant, the complainant may, within 30 days of the receipt of the Step Two decision, file a request for a hearing pursuant to Step Three below, which is written to comply with the requirements of Section 120.57(1), F.S.

(9) Step Three: Formal Procedure – Either the President of the University or President's designee, or a hearing officer assigned by the Division of Administrative Hearings (DOAH) shall conduct the hearing at this step. If the University elects to use a DOAH hearing officer, it shall notify the Division within 10 days of the receipt of the request for the hearing. A notice of the hearing shall be sent to all parties at least 14 days before it is to take place. The notice shall include: (1) A statement of time, place, and nature of the hearing; (2) A statement of the legal authority and jurisdiction under which the hearing is to be held; (3) A reference to the particular section(s) of the statutes and rules involved; (4) A short and plain statement of the matters asserted by the University and by all parties of record at the time notice is given. If any party is unable to state the matters in sufficient detail at the time the initial notice is given, the notice may be limited to a statement of the issues involved, and thereafter, upon timely written application, a more definite and detailed statement shall be furnished not less than three days prior to the date set for the hearing.

(a) Rights of the parties under the Formal Procedure:

1. To respond to allegations and evidence;

2. To present evidence and argument on all issues;

3. To conduct cross-examination and submit rebuttal evidence;

4. To submit proposed findings of facts and orders;

5. To be represented by counsel;

6. To file exceptions to any order or hearing officer's recommended order.

(b) The University shall accurately and completely preserve all testimony in the proceedings before the President or DOAH hearing officer and, upon the request of any party of the complaint, shall make full or partial transcript available at no more than actual cost.

(c) After a hearing conducted under this subsection, the presiding officer shall submit a recommended order to all parties. Each party shall have 10 days in which to submit written exceptions to the recommended order. The University may adopt the

recommended order in the final order or may reject or modify the findings therein, except that the findings of fact of a DOAH hearing officer may be modified or rejected only after a review of the complete record and must be accompanied by a statement that such findings were not based upon competent substantial evidence or that the proceedings on which the findings were based did not comply with essential evidence or that the proceedings on which the findings were based did not comply with essential requirements of law.

(d) The record for purposes of Step Three shall consist only of:

1. All notices, pleadings, motions, and intermediate rulings;

2. Evidence received or considered;

3. A statement of matters officially recognized;

4. Questions and proffers of proof and objections and rulings thereon;

5. Proposed findings and exceptions;

6. Any decision, opinion, proposed or recommended order, or report by the presiding officer;

7. All staff memoranda or data submitted to the hearing officer during the hearing or prior to its disposition, after notice of the submission to all parties, except communications by advisory staff as permitted under Section 120.66(1), F.S., if such communications are public records;

8. All matters placed on the record after an ex parte communication made to DOAH hearing officer pursuant to Section 120.66(2), F.S.; and

9. The official transcript.

(e) The final order shall be issued within 90 days of the final date on which written exceptions to the recommended order must be received by the University. The final order shall be in writing and include separately stated findings of fact and conclusions of law.

*Specific Authority 1001.74, 1001.75 FS. Law Implemented 1001.74, 1001.75 FS. History-New 6-27-96.*

# FLORIDA A&M UNIVERSITY BOARD OF TRUSTEES
## FACULTY (NON-UNIT)
### EMPLOYMENT CONTRACT

*MGB.*

This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution and laws of the State of Florida as constitutionally permissible, and the regulations, policies and procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated. The performance of any obligations by FAMU under this Employment Contract shall be subject to and contingent upon the availability of funds appropriated by the Florida Legislature or appropriate funding agency. Neither this employment contract nor any action or commitment taken pursuant to it, is final or binding upon the parties until, and unless, the signature of the University President or President's designee, as approving authority and the signature of the Employee have been affixed and the employment contract has been returned to the appropriate authority as specified herein.

**Employee Name: Jennifer M Smith**
Position Title: Professor
Position: 19255000
Appt. Status: Regular
Division: Academic Affairs
Dept. Name: College Of Law - Instruction
Pay Dept.: 230200
Ann. Salary Rate:  $140,012.50
Tenure Status: Tenured

Employee ID: ▓▓▓▓▓
Class Code: 9001
FTE: 1
Budgeted Wks: 40
College/Sch: College of Law
Admin. Code: 99 No Administrative Function
Work Dept.: 230200
Bi-wkly Rate:  $7,000.62
Amount Required:  $140,012.50



**PLAINTIFF'S EXHIBIT 8**

Appointment Dates: August 07, 2023 to May 10, 2024

Special Conditions: _____

Employment will cease on the date indicated and no further notice of cessation of employment is required for the following categories of employees:

(1)Employees holding visiting appointments; (2) those appointed for less than one academic year; or (3) those with less than five years of continuous service who are on soft money.

Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU.

All outside employment activities; financial interests and other conflicts of interest under the provisions of FAMU Regulation 10.122 and 10.110 or FAMU Policy No. 2005.14 of the agreement must be reported on the Outside Employment/Conflict of Interest Activities form and/or statement of Financial Interest form as appropriate.

This Employment Contract supersedes any and all prior agreements, contracts, understandings, and communications between the Employee and FAMU, whether written or oral, expressed or implied, relating to the subject matter of this Employment Contract and is intended as a complete and final expression of the terms of the Employment Contract between FAMU and the Employee and shall not be changed or subject to change orally.

This offer of employment will be withdrawn and not processed for payroll if this employment contract is not signed and returned to the appropriate authority within twenty (20) days from the date of offer.

_____
**Signature of President/Provost/Vice President**

*Jennifer Smith*
_____
**Signature of Employee**

4/12/2023
_____
**Date of Signature**

4/14/2023
_____
**Date of Signature**

Employee's best contact number: (▓▓   )▓▓▓   -▓▓▓   _____

VPAA: 2016-March-8



# FLORIDA AGRICULTURAL AND MECHANICAL UNIVERSITY COLLEGE OF LAW FACULTY HANDBOOK



PLAINTIFF'S
EXHIBIT

9

## PREFACE

Approved January 3, 2020 by

Dr. Maurice Edington, Provost and Vice President for Academic Affairs

Effective Date January 8, 2020

(Original Approved November 7, 2003)

## RESERVATION OF UNIVERSITY'S RIGHTS

This Faculty Handbook is intended only to provide information for the guidance of Florida Agricultural and Mechanical University College of Law ("COL"). The information is subject to change, and the COL reserves the right to depart without notice from any policy or procedure referred to in this Handbook. This Handbook is not intended to and should not be regarded as a contract between the COL and any faculty member or other person. Policies and regulations referring to students are contained in the Student Handbook.

## ABA ACCREDITATION

The Dean of the COL is fully informed as to the Standards and Rules of Procedure for the Approval of Law Schools by the American Bar Association. The Administration and the Dean are determined to devote all necessary resources and in other respects to take all necessary steps to present a program of legal education that will maintain accreditation by the American Bar Association.

## UNIVERSITY APPROVAL

The information, procedure, and rules contained herein are subject to approval by the University President or the Provost and Vice President for Academic Affairs.

- Provide a process to receive reports from each of the student organizations.

14. Student Conduct Disciplinary Committee

This committee is responsible for processing non-academic misconduct. The committee shall be comprised of three faculty members; and student members, serving for one year and elected by the student body or appointed by the SBA president; and the Associate Dean for Student Services & Administration. This committee's responsibilities include, but are not limited to, the following:

- Ensure fair and orderly proceedings regarding allegations of student misconduct;
- Provide policy, procedures, and guidance on student disciplinary issues;
- Enforce the Student Code of Conduct; and
- Report regularly to the faculty, and as otherwise required.

15. Committee Reports

All committees shall report regularly to the faculty and submit a written report to the faculty at least once each semester. One comprehensive report shall be submitted at the end of each academic year. Any committee files and notes shall be submitted to the incoming chairs of faculty committees at the beginning of each academic year.

16. Committee Appointments

- The Dean will annually appoint the membership of all standing committees, after giving each faculty member an opportunity to express a preference for assignment. Only tenured, full-time faculty members may be appointed to the Retention, Promotion and Tenure Committee. The Dean must appoint at least three (3) faculty members to each committee and should attempt to appoint at least five (5) faculty members.
- The faculty will elect members of any committee involving review of the Dean's performance.
- The Dean will appoint committee chairs from the full-time faculty. However, the Dean Search Committee, and any committee involving review of the Dean's performance, will select their own chairs.
- Students may sit on faculty committees, except the Admissions Committee; Budget Committee; the Retention, Promotion, and Tenure

## C.   STUDENT MISCONDUCT

The Student Code of Academic Conduct is outlined in the Student Handbook. Faculty allegations of student misconduct not covered by the Student Code of Conduct should be referred to the Associate Dean for Student Services and Administration.

# VIII. STANDARDS FOR FACULTY

## A. PROFESSOR

The rank of Professor is to be accorded to persons who have achieved excellence in teaching, scholarship and research, and service. Scholarship sufficient to evidence such excellence should include substantial publication, such as publication of articles of high quality in recognized professional journals, or the substantial equivalent, as in publishing books. For a publication to be considered substantial, it must be a minimum of 12,000 words in length. The rank should normally be reserved for persons with at least seven (7) years of full-time teaching experience and at least five (5) years in rank as an Associate Professor.

## B. ASSOCIATE PROFESSOR

The rank of Associate Professor is to be accorded to persons who have substantially demonstrated high quality in teaching, scholarship & research, and service. Scholarship sufficient to evidence such excellence should include publication of articles of high quality in recognized professional journals or the substantial equivalent. For a publication to qualify as a publication sufficient for promotion, it must be a minimum of 12,000 words in length. The rank should normally be reserved for persons having at least three (3) years of full-time teaching experience and at least (3) three years in rank as an Assistant Professor.

## C. ASSISTANT PROFESSOR

The rank of Assistant Professor is the entry-level rank for members of the faculty of the COL. It is to be accorded to persons holding the LL.B. or J.D. degree with an excellent academic record and offering evidence of potential for accomplishment and promise of achievement in teaching, scholarship and research, and service.

## D. DISTINGUISHED PROFESSOR

The rank of Distinguished Professor of Law is to be accorded persons of substantial and acknowledged accomplishments and excellence such as Judges, Legislators, Practitioners, Scholars, Diplomats, Government Officers of legal callings, and former full professors of law at FAMU or full professors at other ABA accredited law schools, who teach on a full-time basis. This rank is not one subject to consideration for promotion or tenure.

## E. INSTRUCTOR FACULTY

Instructor faculty members are comprised of instructional, non-tenured, and non-tenure earning faculty members.

## IX.  STANDARDS OF TEACHING, SCHOLARSHIP AND RESEARCH, AND SERVICE

The COL Standards of Teaching, Scholarship and Research, and Service are applicable to the following groups: tenured faculty members, tenure earning faculty members and distinguished professors.

### A. TEACHING

Teaching effectiveness includes effectiveness in presenting knowledge, information, and ideas by means or methods such as lecture, discussion, assignment and recitation, demonstration, simulation courses, law clinics, and field placements. Each faculty member will be evaluated and the evaluation shall include consideration of effectiveness in imparting knowledge and skills, effectiveness in stimulating students' critical thinking and/or creative abilities, the development or revision of curriculum and course structure, and adherence to accepted standards of professional behavior in meeting responsibilities to students.

The evaluator may consider class notes, syllabi, student exams and assignments, and any other materials relevant to the faculty member's teaching assignment. The teaching evaluation must consider any relevant materials submitted by the faculty member, including the results of peer evaluations of teaching, and may not be based solely on student evaluations when this additional information has been made available to the evaluator.

**Effective teaching is usually correlated with the following traits:**

- command of the subject matter
- familiarity with advances and developments in the areas taught
- ability to organize materials and present them with force and logic
- ability to capture the students' attention
- ability to arouse curiosity in the students toward further and more independent learning
- ability to stimulate students in creative work
- ability to prepare a sound and effective examination or other instruments to measure student comprehension and achievement
- sound judgment in grading, and maintaining a high standard of achievement and fairness

## B. RESEARCH AND SCHOLARSHIP

Appraisal of accomplishment in research and scholarship shall be based on a close reading of published articles or works and obtaining the professional opinions and independent review of recognized authorities in the field of the published articles or works. Articles must be a minimum of 12,000 words in length. A commitment must be demonstrated to original research and legal scholarship and must result in a demonstrated ability to produce and publish scholarly work of high quality. The ability to critically analyze, synthesize, and expound sophisticated factual and legal subjects shall be shown. Participation on panels, in conferences, lectureships, preparation of statutes and codes, book reviews, and other evidence of scholastic commitment and recognized ability shall be considered and weighed as such works may merit.

## C. SERVICE

Each faculty member is expected to render substantial service, apart from teaching (as herein defined) to the COL, University, profession, community and/or state, without remuneration. Service may encompass any manner of contribution of one's professional knowledge and skills to the improvement of the COL, the University, the law, government, the administration of justice, or the legal profession. Among the kinds of service that may be considered are the following:

- advising student organizations
  serving on special law school committees (in addition to the general service on standing committees on which all faculty members are expected to serve as a part of general governance)
- serving on University committees
- serving on committees or projects of a Bar Association and other professional groups
- organizing or participating in symposia or other academically oriented events at the College or at other higher education institutions
- participating in law-oriented community activities
- participating in continuing legal education programs
- providing pro-bono legal work
  assisting governmental units, public officials, and public interest oriented Non-Government Organizations (NGOs)

the legal profession, or the community in matters that touch on the law. Factors employed to determine sufficient service are outlined on page 53.

## E. STANDARDS FOR TENURE

1. **Scholarship:** By the time a candidate is considered for tenure, he/she must personally produce, since joining the faculty, a record of scholarship that contains, at a minimum, three (3) substantial and analytical scholarly works of high quality. If the candidate was a lateral hire and had credit for at least one article, then he/she must personally produce, since joining the faculty, a record of scholarship that contains, at a minimum, two (2) substantial and analytical scholarly works of high quality.

For the purposes of this standard, a "substantial" scholarly work is normally equivalent to a major law review article. The entire body of scholarship should be of sufficient length, scope, and quality to demonstrate (a) that the candidate has the capacity to produce high-quality work as previously described, and (b) that the candidate will continue to produce published scholarship throughout his/her academic career.

Absent extraordinary circumstances, in measuring production of scholarly works for tenure, it is expected that by the time the candidate is considered for tenure by the faculty, at least two (2) of the candidate's scholarly works must be completely published. The additional scholarly work (for a total of at least three (3)) must be published or have a contract for publication when the application is submitted. Scholarly work will be reviewed internally and externally.

2. **Teaching:** Faculty members shall be highly effective teachers as measured by the standards for effective teaching set forth on page 52.

3. **Service:** Faculty members shall have engaged in a consistent pattern of service to the COL, the University, profession, community and/or state, without remuneration consistent with the standards set forth on page 53.

4. **Tenure in the University:** A faculty employee who has been granted tenure by the BOT shall have the status of permanent member of the faculty and be on the continuing employment of the University until he/she:

- Resigns
- Retires
- Dies

# STUDENT HANDBOOK
# 2022-2023

PLAINTIFF'S
EXHIBIT

10

Florida Agricultural and Mechanical University College of Law

FAMU | COLLEGE OF LAW

# Florida A&M University College of Law

This Handbook supersedes all preceding Handbooks and any other documents or provisions relating to provisions contained within unless specifically authorized or exempted by the Dean of the College of Law.

All students are responsible for knowing and adhering to the guidelines and regulations contained in this Handbook.

Revised July 2022

# STUDENT CODE OF CONDUCT

## Introduction

The College of Law recognizes its obligation to Florida A&M University and to the legal profession as a whole to ensure that the degree of Juris Doctor (J.D.) is conferred not only to those who successfully complete our program of legal education but to those who fully and completely meet the standards of academic achievement, integrity, and professionalism.

Students at the College of Law are members of both the law school community and the larger University community. The College of Law adopts as its Honor Code the University's Code of Conduct now and as might be later amended. As such, the University's Student Code of Conduct shall govern all academic and non-academic misconduct that are not expressly addressed or covered by the College of Law Student Handbook.

All students should review and be knowledgeable about FAMU Regulation 2.012 – 2.013. University Student Code of Conduct before beginning classes. Entering students will be asked to sign statements saying that they have read, understand, and will abide by the Student Code of Conduct of the Florida A&M University and the Rules and Regulations.

Matriculation in the College of Law constitutes de facto acceptance of this Code of Conduct and the policies and procedures involved in administering the Code of Conduct. A copy of each student's signed Student Code of Conduct Agreement will be retained in his or her permanent educational record.

## Implementation of the Code

The College of Law is principally responsible for implementing and administering this Code of Conduct and is responsible for:

* gathering relevant evidence,
* meeting with the accused student(s),
* presenting the matter to the Student Disciplinary Committee (SDC), and * ensuring   that   the student complies with the decisions of the Committee.

To facilitate the process, the University has made the following designations: Associate Dean for

Student Services and Administration – Conduct Officer

Director of Student of Affairs – Conduct Officer

Law School Dean – Appellate Hearing Officer

# Regulation of Florida A&M University – 2.012 Student Code of Conduct

(1)     The Student Code of Conduct ("Code") applies the principles and freedoms found in University Regulation 2.013, Due Process, Other Rights, and Responsibilities, by promoting responsible freedom for all students. This Code seeks to apply the principle of responsible freedom as it guides the conduct of Florida A&M University ("University") students. The responsibility to know and abide by the Code ultimately lies with the student. The Student Code of Conduct supersedes all other means of disciplining or removing students for behaviors prohibited by the University.

(2)     As members of the University community, students enjoy the rights and privileges that accrue to such membership including, but not limited to, academic freedom and participation in the decision- making processes of the University. Additionally, students are subject to the obligations and duties that accompany this membership and are responsible for compliance with the requirements of law and University regulations, policies, and procedures. It is incumbent upon members of the University community to notify the appropriate student conduct body or officials of a violation of this Regulation, to encourage all to comply with them, and assist in their enforcement by providing relevant information as witnesses when called upon to do so. Accordingly, all purported violations of the Code shall be referred to the University Conduct Officer (Director of Student Conduct and Conflict Resolution). Students, faculty, staff, stakeholders, or other individuals with knowledge, may report violations of the Code, in writing, to the Office of Student Conduct and Conflict Resolution.

(3)     The University has zero tolerance for a violation of any provisions of the Code, as well as the Anti- Hazing Regulation 2.028 and Alcoholic Beverages Regulation 3.021. "Zero tolerance" means that given the factual circumstances of the purported violation, the charged student may be removed from University Housing and receive a penalty up to suspension or expulsion from the University.

(4)     Due process protections, in accordance with University Regulation 2.013, will be appropriately accorded the charged student.

(5)     Information Briefing. If the Conduct Officer or his/her designee believes after a review of the purported violations that the information has merit, the student will be issued, in writing, an Administrative Request to Appear at an information briefing before the Conduct Officer or his/her designee. At the information briefing, the Conduct Officer or his /her designee will explain to the student the elements of due process that will be afforded.

(a)     University conduct proceedings may be instituted against a student charged with a violation of the law that is also a violation of the Code. The University reserves the right to proceed under the Code with a hearing and the possible imposition of a sanction prior to, concurrent with, or subsequent to civil litigation, criminal arrest, and/or criminal prosecution.

(b)  With the exception of extenuating circumstances, the University will proceed with an alleged violation of the Code prior to any final disposition of the Courts.

(c)  Determinations made or sanctions imposed under the Code shall not be subject to change because criminal or civil charges arising out of the same facts giving rise to violation of University rules and regulations were dismissed, reduced, or resolved in favor of or against the charged student.

(d)  Any admission of guilt, responsibility or statement against the student's interest made by a student at off-campus proceedings shall be conclusive for University purposes.

(e)  A verdict of guilty, a plea of guilty, a plea of no contest *(nolo contendere)* or similar plea in a court of law by a charged student will operate as a conclusive finding that the student is "Responsible" for the purpose of student conduct proceedings.

(f)  Prior to the issuance of the outcome letter, the University may amend the violation(s) based on information obtained through an outside proceeding when that information is relevant to activity adversely affecting the University community.

(g)  The University will cooperate fully with law enforcement agencies in any criminal prosecution to the extent permitted by law.

(h)  The University conduct proceedings are closed to the public.

## Jurisdiction

(6)  **Jurisdiction.** Discipline may be imposed for offenses against the Code occurring at any of the following locations or activities:

(a)  University campus;

(b)  University owned or controlled property;

(c)  University premises, including, but not limited to, fraternities, sororities, and organizations' property;

(d)  Activities sponsored by the University wherever they may occur;

(e)  Activities officially approved by the University that are conducted by University certified organizations wherever they may occur; or

(f)  Activities occurring off campus, including non-university related activities.

## Definitions

(7)  **Definitions.**

(a)  <u>Business Day</u> - A day of normal business operation as designated by the University.

(b)  <u>Charged Student</u> – The student charged with violations of this Code.

(c) <u>Club and/or Organization</u> - Any number of students who have complied with the University requirements for certification. The term "club or organization" also will refer to student.

(d) <u>Complainant</u> - An individual who reportedly experienced gender-based misconduct regardless of whether the individual participates in the disclosure or review of that report by the University at any point.

(e) <u>Educational sanctions</u> – Work assignments, essays, presentations, or other related educational assignments.

(f) <u>Expulsion</u> – A student shall be deprived of his/her opportunity to re-enter the University. The student is permanently separated from the University.

(g) <u>Faculty member</u> - Any person hired by the University to conduct classroom instruction and/or research activities or who is otherwise considered by the University to be a member of its faculty.

(h) <u>Hearing body</u> - Any person or persons who have been authorized by the University to determine whether a student has violated the Code and to recommend sanctions that may be imposed when a Code violation has been committed.

(i) <u>Judicial hold</u> - This prevents the student from conducting business at the University (i.e. any form of registration or obtaining transcripts).

(j) <u>Mediation</u> - The process in which all parties voluntarily agree to meet with an impartial mediator to communicate their concerns and needs to each other and to reach their own agreement on the resolution of the case. The participants are responsible for keeping their agreement or renegotiating if necessary. In the event the participants do not agree to mediate or mediate but do not reach a full and final resolution, the case will be referred back for conduct action. Breach of a mediated agreement may result in a follow up mediation session or the matter may be referred back through the conduct process.

(k) <u>Mediator</u> – Any neutral member of the University community who has been trained in conflict resolution to assist parties in reaching a mutual agreement to resolve their differences. The Mediator shall not have personal connections with either party or have prior knowledge of the disagreement.

(l) <u>Not Responsible</u> - The charged student has not been found Responsible or did not accept Responsibility for the alleged violation(s) of a provision(s) of the Code.

(m) <u>Preponderance of Evidence</u> - The information presented supports the finding that it is more likely than not that the violation occurred.

(n) <u>Probation</u> – An indication that the student's conduct violated the Code and requires the withdrawal of special privileges, participation in inter-collegiate activities, and other activities including, but not limited to, band participation. Special privileges mean the student may not be elected to office or represent the University in any other capacity during the period of probation. If the student is holding an office, he/she must vacate the office for the term of probation. The penalty of probation may also include a specified monetary fine from $100.00 to $350.00.

(o)     <u>Reporter</u> – Any person who submits a report alleging that a student has violated this Code.

(p)     <u>Reprimand</u> – A formal rebuke and official recognition by letter to the student of misconduct as charged by the University. The reprimand may be written or oral.

(q)     <u>Respondent</u> – A student who is reported to have engaged in gender-based misconduct. The term may also include an individual whose identity is unknown and there is reason to believe that they may be a student, or the Complainant or Reporter is a student.

(r)     <u>Responsible</u> - The charged student has been found Responsible or accepted Responsibility for violating a provision(s) of the Code.

(s)     <u>Restitution</u> – Compensation for loss, or damage to University property. This may be in the form of monetary or material replacement.

(t)     <u>Sanction</u> - A penalty imposed upon a student after the student has admitted that he/she is Responsible or has been determined Responsible by the Conduct Officer or a hearing body for violating a provision(s) of the Code.

(u)     <u>Student</u> - Any person admitted, enrolled, or registered for study at the University. This includes persons not officially registered or enrolled for a particular term but who are eligible to enroll or are associated with the University because he/she has not completed a course or program. The term "student" will also refer to student clubs and organizations.

(v)     <u>Suspension</u> – Separation of the student from the University for a definite period of time. The duration of the period of suspension shall not exceed five years and shall be in direct proportion to the degree of seriousness attached to the misconduct. Readmission for suspensions exceeding one (1) year is conditioned upon the recommendation of an ad hoc review board appointed by the President or Vice President for Student Affairs.

(w)     <u>University</u> - The Florida A&M University whose main campus is located in Tallahassee, Florida and any of its satellite or branch campuses.

(x)     <u>University/Community service</u> – Specified areas of service for the benefit of the community or the University allocated to the student.

(y)     <u>University official</u> - Any person employed by the University performing his/her assigned employment responsibilities.

(z)     <u>University premises</u> - All buildings, land, facilities, and any other property owned, leased, operated, controlled or supervised by the University.

(aa)    <u>University sponsored activity</u> - Any activity on or off campus which is initiated, aided, authorized or supervised by the University.

(bb)    The word "Can" is used in the permissive sense.

(cc)    The word "May" is used in the permissive sense.

(dd)    The word "Shall" is used in the imperative sense.

(ee)    The word "Will" is used in the imperative sense.

(ff)    All definitions not included in this Code are in accordance with definitions found in the Merriam-Webster's dictionary located in the Office of Student Conduct and Conflict Resolution.

## Violations

(8)    **Violations.**

(a)    <u>Academic Dishonesty</u>:

1.    *Cheating*: using, attempting to use or giving unauthorized information or material in any academic endeavor. Cheating includes, but is not limited to, unauthorized possession and/or use of an examination, course related materials, cheat sheets, study aids or other information in an academic exercise; communication to another through written, visual, electronic or oral means; submitting the same academic work for credit more than once without the express written permission of the instructor; use of any materials or resources a faculty member has notified the student or class are prohibited.

2.    *Plagiarism* may be specifically defined for the purposes of any course by the school, institute, or college involved. Unless otherwise defined, plagiarism shall include, but is not limited to, failure of the student to use another's work without any indication of the source and in so doing, conveying or attempting to convey that the work is the student's own; submitting a document or assignment in whole or in part that is identical or substantially identical to a document or assignment not written by the student; allowing another person to compose or rewrite an assignment or document.

3.    A student who assists in any of the academic dishonesty violations mentioned above shall be considered equally as responsible as the student who accepts such assistance.

4.    When the University's schools, colleges or institutes choose to internally address academic dishonesty violations, students should consult with the academic dean, director or program coordinator in the respective school, college, or institute for procedural information.

5.    The penalties for academic dishonesty violations may include: reprimand, reduction of grade; denial of academic credit; invalidation of university credit or of the degree based upon such credit; probation; suspension; or expulsion. In addition to any other penalties that may be imposed, the individual or student may be denied admission or further registration, and the University may invalidate academic credit for work done by a student and may invalidate or revoke the degree based upon such credit if it is determined that the student has made false, fraudulent, or incomplete statements in the application, residence affidavit, or

accompanying documents or statements in connection with, or supplemental to, the application for admission to or graduation from the University.

(b) <u>Alcoholic Beverages</u>: The violation of alcoholic beverages is defined as noted in FAMU Regulation 3.021.

(c) <u>Conspiracy</u>: Assisting or attempting to assist another in any act(s) that violate(s) the Student Code of Conduct.

(d) <u>Criminal Conviction</u>: The student convicted of a criminal offense by an off- campus court of competent jurisdiction may be subject to sanctions by the University.

(e) <u>Demonstrations/Riots</u>: Participating in an on-campus or off-campus demonstration, riot, or activity that disrupts or obstructs the normal operations of the University and/or infringes upon the rights of other members of the University community; leading or inciting others to disrupt scheduled and/or normal activities within any campus building or area.

(f) <u>Destruction of property</u>: Defacement, damage, misuse or destruction of University property or services, or the private property of another. In addition to being subject to conduct action, students or student organizations responsible for such damage may be financially liable.

(g) <u>Disorderly Conduct</u>: Behavior that disturbs the peace or undermines public safety, such as causing a disturbance or being unruly.

(h) <u>Disruptive Behavior</u>: Disruption of a class, curricular or University activity; obstruction of the free flow of pedestrian or vehicular traffic on University premises; interference with the rights of others to carry out their activities or duties at, or on behalf of the University; interference with the freedom of movement of any member or guest of the University; interference with the academic freedom and freedom of speech of any member or guest of the University; or any other act that impairs, interferes with or obstructs the mission, purposes, academic atmosphere, operations, processes, orderly conduct and/or functions of the University or the rights of other members of the University community.

(i) <u>Drugs</u>: Use, possession, manufacture, cultivation, distribution or sale of illegal drugs and/or controlled substances is prohibited. Illegal drugs include, but is not limited to, synthetic drugs or other substances that will alter a student's mental state (e.g. glue, nitrous oxide, paint, etc.); drug paraphernalia; possession, use, sale or distribution of prescription medication not issued to the student.

(j) <u>Extortion</u>: The act or practice of obtaining something or compelling some action by force, coercion, intimidation or threat is prohibited.

(k) <u>Gambling</u>: Participating, or play, in an unlawful game of chance for money or for anything of value on University premises, or at an affair sponsored by a student or student organization; to unlawfully sell, buy, barter or dispose of a ticket, or any interest in a scheme of chance by whatever name on University premises or at any affair

# MEMORANDUM

To:      Rica Calhoun, FAMU Office of Compliance and Ethics
CC:      Denise Wallace, Esq., FAMU General Counsel
         Craig Reed, FAMU Board of Trustees, Audit and Compliance Committee Chair
From:    Jennifer Smith, Professor of Law
Re:      October 2022 Incident, Eighth Memo on the Matter (Investigative Report 2022-11-117)
Date:    June 12, 2023

I am in receipt of the University's investigative report 2022-11-117 emailed to me on June 5, 2023 ("Report") by Rica Calhoun, Chief Compliance and Ethics Officer of FAMU Office of Ethics and Compliance ("Compliance"). The Report found all Michelle Wanamaker's (law student) allegations to be meritless, but found Professor Smith retaliated against the student and recommended the imposition of undescribed punishment against Professor Smith. Professor Smith demands: 1) immediate rescission of the Report, 2) removal of the Report from her file, 3) an immediate investigation of the Code of Conduct violations she initially reported on October 20, 2022 (the date of the incident) against the student (admitted instigator), and 4) an investigation into Compliance for its failure to follow its own guidelines, for the reasons herein.

The University waited nearly 100 days to start the investigation; failed to preserve or destroyed the video evidence; prolonged the investigation for over four months with no real evidence of any wrongdoing by Professor Smith; ignored and dismissed the two complaints Professor Smith filed against the student; and decided seven months after the incident to re-characterize Professor Smith's initial complaint as "not a real complaint" to cover itself and accuse Professor Smith of retaliation when all the actions surrounding the complaint were in the manner the University would handle a "real" complaint. This Report is an embarrassment to the University, shows retaliation against Professor Smith for her equal pay lawsuit, and shows the negligence by the University personnel from the day of the incident until the issuance of this report, June 5, 2023.

## Undated Report

At the outset, it is immediately worth noting the University has omitted a specific date in the Report. This omission raises concerns about the transparency and integrity of such a significant document. The assigned Report number, 2022-11-117, suggests that it was issued in November 2022, even though the investigation did not commence until January 26, 2023—98 days after the incident—and the investigation was not completed until June 5, 2023—228 days after the incident. The University's omission of a date from the Report appears to be a deliberate attempt to do two things. First, to downplay or hide the University's own negligence regarding the investigation, and second to obscure the retaliatory timing of the investigation because of Professor Smith's pursuit of equal pay.

The University's failure to date the Report undermines the crucial element of timing, which is vital in establishing a case of retaliation. By intentionally omitting the date, the University has attempted to obfuscate the sequence of its actions in comparison to Professor Smith's equal pay filings, potentially impeding Professor Smith's ability to substantiate claims of retaliation for seeking equal pay. Such actions can be construed as both unethical and illegal, as they seek to undermine Professor Smith's efforts to assert her rights and pursue equal treatment.

PLAINTIFF'S EXHIBIT

11

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

Furthermore, the University's apparent intention to penalize Professor Smith for asserting her civil rights represents a clear act of retaliation, in direct violation of Federal and state laws. Such retaliatory behavior not only undermines the principles of fairness and justice but also disregards the legal protections afforded to individuals fighting for equality and non-discrimination.

The University's failure to date the Report, coupled with the University's punitive actions against Professor Smith, raises serious concerns about transparency, ethical conduct, and compliance with the law. If that is the University's practice, it needs to be changed immediately.

## Issues with the Report
This Report and the associated investigation have presented the following troubling facts:

1. **Retaliation against Professor Smith**: The investigation uncovers clear evidence of retaliation against Professor Smith due to her advocacy for equal pay and assertion of her civil rights. This retaliatory behavior undermines the principles of fairness and equality within the University.
2. **University's negligence and prejudicial conduct**: The Report sheds light on the University's own negligence in fulfilling its duties, particularly in preserving crucial evidence and conducting a timely investigation. This negligence deliberately prejudices Professor Smith, impairing her ability to mount an effective defense. Such actions undermine the integrity of the investigation process.
3. **Inconsistencies, bias, and harassment**: The Report reveals numerous inconsistencies, which indicate biased treatment and harassment of Professor Smith. These inconsistencies not only reflect a lack of impartiality but also expose the University's incompetence in conducting a thorough and unbiased investigation.

These findings raise serious concerns about the University's commitment to fair treatment and due process, and its ability to uphold its responsibilities in an unbiased and competent manner.

## Relief Requested
Professor Smith demands the following:

1. **Immediate rescission of the Report from her file**: Professor Smith seeks the prompt removal of the Report from her file, recognizing the negative impact it may have on her professional reputation. This action is crucial to address any potential harm caused by the Report's presence.
2. **Immediate investigation of the reported Code of Conduct violations against the student, Michelle Wanamaker ("MW")**: Professor Smith requests an immediate investigation into her initial complaint, which she filed on October 20, 2022, the date of the incident, and re-filed in March 2023, which included additional new evidence indicating the student's intent to disrupt Professor Smith's class. This investigation is necessary to ensure a fair assessment of the situation and to address any potential misconduct by the student.

2

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

## I.   RETALIATION AGAINST PROFESSOR SMITH

The evidence contained in this file provides a clear indication that the University is engaging in prohibited retaliation against Professor Smith in response to her advocacy for equal pay. The sequence of events is as follows:

Professor Smith initiated her most recent equal pay activity by filing an Equal Opportunity Program ("EOP") Complaint with the University on June 28, 2022. In November 2022 (2022-FAMU-F-05-005), the University responded by stating that no equal pay discrimination was found.

On October 20, 2022, just two days after filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Professor Smith reported a Code of Conduct violation to Associate Dean of Students Reginald Green via text at exactly 10:30 am. The complaint was against MW, a 2L law student, whom Professor Smith accused of being "so rude" and "aggressively rude" towards her. This incident occurred while Professor Smith was conducting oral mid-terms in a classroom, which Professor Smith had reserved on October 6, 2022 through Dean Green's office. Professor Smith was holding instruction on this date as a makeup class due to the Hurricane to ensure her course complied with ABA Standard 310.[1] Upon receiving Professor Smith's text, Dean Green immediately went to the location of the incident but found that Professor Smith was teaching her next class that started at 10:30am, and MW was under the instruction of Professor Reyes in an adjacent classroom.

Later that evening on October 20, 2022, at 8:46 pm, Dean Green emailed Professor Smith acknowledging her complaint, assuring her that he would identify the student involved, requesting any additional details she could provide, and expressing gratitude for her notification. Unfortunately, Professor Smith did not receive any further communication from Dean Green. Consequently, Professor Smith visited Dean Green's office on November 1, 2022, only to discover that he was on vacation, and his secretary promised that Dean Green would reach out to Professor Smith. However, Dean Green did not reach out to Professor Smith, and classes concluded less than two weeks later, even though in October, he was copied on an email from Provost Edington that appropriate action should be taken on this issue.

It became apparent that students were discussing the incident with others. On October 31, 2022, Professor Patricia Broussard informed me that the student involved in the incident was MW, who happened to be interning at the same law firm where Professor Smith was a partner. Professor Broussard mentioned that she was searching for MW in relation to the Women's Law Group, and in her conversation with a student/friend of MW's, it was conveyed that MW was feeling unwell and experiencing remorse, shame, and embarrassment for her own behavior in the incident on October 20, 2022 and was not aware that Professor Smith had been a partner at the firm where MW was interning.

---

[1] Professor Smith is most likely the only professor who even properly reserved classrooms to make up hurricane classes.

3

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

Then again, in December 2022, Professor Broussard informed Professor Smith of an incident that occurred in the ladies' room. While in a restroom stall, Professor Broussard overheard a discussion among a few students expressing concern for MW and how badly she felt due to her own conduct in relation to the incident. MW appeared to be particularly concerned because of Professor Smith's association with the law firm. After this incident, there was not much further discussion about it. Professor Smith mentioned to Professor Broussard that Professor Smith contemplated sending MW an email to reassure her that Professor Smith had no intention of reporting the incident to the law firm or the bar, although Professor Smith acknowledged she may have reporting obligations to The Florida Bar. Professor Broussard suggested that if Professor Smith sent MW an email it would be a positive gesture, providing MW with peace of mind and demonstrating how professionals handle such situations. Professor Broussard maintains regular contact with MW, who never mentioned the incident to Professor Broussard.

On December 18, 2022, Professor Smith sent the following email to MW:

> Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor.  I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.
>
> Best,
>
> Prof. Smith

MW did not respond. Professor Smith believed the issue was over until she received emails from Ms. Baker on January 26, 2023 and January 27, 2023, requesting an interview concerning the October 20, 2022 incident. The first time Professor Smith had any notice that she was ever the subject of an investigation regarding this incident was January 27, 2023, and with more details on February 1, 2023, yet apparently a complaint had been filed on October 27, 2022 – over 90 days before. It was not until February 1, 2023 that Professor Smith learned from Dean Green that the Dean's office made the unilateral decision to escalate the student complaint without ever speaking to Professor Smith, and she was never informed about the escalation of the student complaint orchestrated by the Dean's office, nor was she informed that the complaint she filed a week before MW's was going to be ignored.

MW's complaint was emailed to Associate Dean Markita Cooper on October 25, 2022. The Complaint was formally referred to the Office of Compliance and Ethics ("OCE") on October 27, 2022. MW waited five days to make her complaint and therein MW intentionally omits "Professor" in several of MW's references to Professor Smith. MW's complaint contains one line of particular importance – "Jennifer Smith was knowingly interfering with our ability to be prepared for Professor Reyes's Evidence class." This is not even possible because students are supposed to prepare before class and are instructed not to use empty classrooms for personal study. No other student in MW's evidence class reported any issue with a makeup class occurring to administration. MW's delay, the content of the Complaint, and lack of other complaints would suggest it was filed at someone else's direction. Interestingly, MW's Complaint also omits: (i) any

4

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

reference to her performance in class on October 20, 2022 or (ii) whether she consulted with any faculty or staff about the incident. Any retaliation here was by MW, who filed her complaint because she learned I am the professor who worked at Holland & Knight for nearly 11 years and was a partner.

On February 1, 2022, Professor Smith emailed Dean Green:

> Hey...you never did anything about this complaint and now I'm being investigated when the student should be, and Reyes is all over this. What came of this? Compliance said you did not follow procedures.

Dean Green responded that day:

> The process was to meet with the student and discuss the misconduct allegation. Before I could meet the student, she had already filed her complaint which raised EOP issues. As a result, since the matter involved a faculty member, she sent her complaint to [Associate Dean] Cooper. To my knowledge afterward a determination was made to send the matter to EOP. We could not conduct two separate investigations without interfering with the other. An EOP investigation supersedes a conduct allegation.

To protect themselves, both the University and Dean Green are now asserting that my October 20, 2022 complaint against MW, which I communicated in writing via text message to Dean Green, was not actually a complaint. This contradictory stance directly conflicts with Dean Green's actions and the previous position taken by both the University and Dean Green. More importantly, it reveals the University key employees' willingness to be dishonest.

On February 15, 2023, Professor Reyes sent an email to Professor Smith and the deans that shed light on the incident from October 20, 2022. The email stated:

> Last semester (fall 2022), you harassed a student in my evidence course after the student **reminded** you that I was about to start class in the classroom where you were conducting one-on-one sessions with students from your civil procedure course. You were not supposed to be in that classroom when the student **reminded** you that I was going to start class in a few minutes. You were assigned to teach civil procedure in the classroom next door, yet you chose to remain in the classroom where I was due to start teaching evidence to disrupt my class, which you did. You engaged in unprofessional, rude, and harassing behavior in full view of the students in your civil procedure course and my evidence course who were waiting in the hallway (emphasis added).

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

The language used by Professor Maritza Reyes is strikingly similar to MW's complaint.[2] On February 16, 2023, Professor Smith sent a memorandum to Ms. Baker, providing details about MW's intention to disrupt my class and expressing my request for an investigation into MW's intentional and hostile conduct towards me. Additionally, Professor Smith highlighted her concerns about Professor Reyes, believing Professor Reyes to be a "danger to me and other faculty at this law school."

Just four days later, on February 20, 2023, Professor Smith received an email from Ms. L. Scott of the Equal Opportunity Program (EOP), notifying Professor Smith that Professor Reyes had filed a complaint against Professor Smith. This incident revealed a breach of confidentiality, as it became apparent that EOP and Compliance were divulging information to Professor Reyes and engaging in what appeared to be "selective investigations." It was clear that they were willing to investigate complaints made against Professor Smith but failed to address the complaints Professor Smith had reported. Additionally, Professor Smith had previously reached out to the FAMU General Counsel's office via email on January 19, 2023, with the subject line "Prof. Reyes," requesting a call, but unfortunately, Professor Smith's communication was ignored. It is worth noting that none of this favorable information supporting Professor Smith's claims was mentioned in the Report.

Then, on March 9, 2023, I re-reported my concerns about MW. However, this time I chose to use Compliance's online form instead of contacting Dean Green. Unfortunately, immediately after submitting my complaint, Compliance disabled the link that allowed complainants to follow up on investigations, effectively dismissing my complaint without proper consideration. On March 10, 2023, Ms. Baker emailed Professor Smith the following:

> The Office of Complainace (sic) and Ethics (OCE) recieved (sic) your complaint filed on yesterday. Please note that FAMU-2022-11-117 has already been assigned for this incident and you were given the opportunity to interview and provide statements.  As previously stated, your statement and account of the incident will be included in 2022-11-117 report.

Professor Smith believed she had reporting obligations to The Florida Bar and students do as well.[3] Professor Smith responded:

> There is a difference in being the one who brings a charge and is the subject of a charge. So, these are not the same. The student needs to

---

[2] Professor Reyes, who Professor Smith recommended for hire even knowing Reyes' problematic and brief job history at the law firm where they both worked some 20 years ago, has filed over 10 meritless complaints against women faculty and staff at the COL. She is now using students as her weapon to continue her harassment.

[3] Applicants for admission to the Florida bar must truthfully answer question 9a. on the Application, which states: "Have you ever been accused of a violation of an honor code or student conduct code, warned, placed on academic, scholastic or disciplinary probation, suspended, requested or advised to discontinue your studies, dropped, expelled or requested to resign or otherwise subjected to discipline by any college, law school or other post-secondary institution? If yes, provide a complete statement of the circumstances surrounding each such occurrence, including the name and address of the institution and the date thereof."

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

understand she was also the subject of an investigation, and I am not sure she will.

Professor Smith took action in re-reporting her October 20, 2022, complaint because if students fail to report such actions to The Florida Bar, it may result in the Bar considering the students to have provided false information, potentially leading to delays in obtaining their Bar card.

Then, on March 13, 2023, Professor Smith was summoned to the law deans' office, where she was subjected to a "reprimand" or "warning" regarding potential retaliation against MW due to her re-filing of the complaint on March 9, 2023. During this meeting, Dean Keller and Associate Dean Cooper presented Professor Smith with a memorandum accusing her of engaging in potential retaliation. In response to these allegations, Professor Smith promptly prepared a memorandum in which she outlined in detail how her decision to re-file the complaint against MW could not possibly be considered as an act of retaliation.

Equally troubling is the fact that Dean Green asserted that a Compliance complaint could not be investigated concurrently with Professor Smith's complaint. However, the University's decision to investigate a student's report of a potential Compliance violation, filed a week after Professor Smith's earlier report (dated October 20, 2022) regarding a potential Code of Conduct violation, is left unexplained by Compliance. Furthermore, Dean Green **now** contends that he never regarded Professor Smith's text message complaint as a formal "complaint" at all. These contradictions raise concerns about the consistency and fairness of the University's approach to handling complaints. Dean Green appears to not understand the distinctions between EOP and Compliance.

Additionally, it is disconcerting that the University waited 98 days to initiate the investigation into the incident that occurred on October 20, 2022. This delay is compounded by the failure to preserve the video evidence, which could have promptly vindicated Professor Smith and demonstrated MW's violation of University policies. Such actions, or lack thereof, call into question the University's commitment to timely and thorough investigations, as well as its responsibility to preserve crucial evidence.

Considering *Babb v. Sec'y, Dep't of Veterans Affs*, 992 F.3d 1193 (11th Cir. 2021), it is evident that Professor Smith's activities involving the EEOC and EOP played a role in the University's decision to take adverse action against her. This connection cements the University's retaliation against Professor Smith because of Professor Smith's engagement in protected activities related to her pursuit for equal pay. In light of these circumstances, Professor Smith unequivocally demands that the University immediately rescind the Investigative Report.

## II.    UNIVERSITY'S NEGLIGENCE & FAILURE TO PRESERVE EVIDENCE

### A. Failure of the University to Preserve Key Evidence

Professor Smith was interviewed on ZOOM by Ms. Baker about the October 20, 2022 incident. Professor Smith informed Ms. Baker that there should be videos of this incident. On February 7, 2022, Professor Smith sent a memorandum to Ms. Baker, again indicating that there should be videos of this incident. The Report Professor Smith received on June 5, 2023 stated:

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

> On January 31, 2023, the OCE requested video footage from room 253 on October 20, 2023, between 10:25 a.m.-10:30a.m. from Terence Calloway, Chief of Police. Chief Calloway reported that video footage was unavailable.

The absence of the video footage is deeply concerning. According to the Report, MW collected statements from her fellow classmates regarding the incident, obtaining a total of five statements out of the 40-50 students present in the hallway. Surprisingly, while MW's statement was shown to her witnesses, Compliance refused to provide MW's statement to Professor Smith. It wasn't until June 5, 2023, when Professor Smith reviewed the Report, that she became aware of the content of MW's statement. This lack of access to the statement not only placed Professor Smith at a disadvantage but also unfairly benefited MW, whose witnesses who were able to view it. Professor Smith was left unaware of the specific false claims made by MW, making it difficult for her to provide a counterargument. The availability of the video footage would have resolved the uncertainties surrounding the incident, providing a clear picture of what actually transpired.

It is perplexing that the hallway video footage was not requested promptly in October 2022 or even on November 15, 2022, when MW submitted the eyewitness statements from students she claims were present during the interaction. The delay of three months raises questions as to why the videos were not requested earlier, perhaps suggesting that they could potentially support Professor Smith's position. Moreover, Professor Smith has no knowledge regarding whether the student statements were provided by individuals who were actually present in the hallway and who witnessed the incident. This entire situation significantly prejudices Professor Smith's case.

By withholding crucial video evidence and providing limited access to MW's statement, the investigation has created an imbalanced and unfair environment, placing Professor Smith at a distinct disadvantage. The unavailability of the video footage and the lack of transparency regarding the credibility of the student statements contribute to the overall prejudicial treatment against Professor Smith.[4]

## B. Failure of the University to Investigate Immediately and Wait Over 90 Days

As mentioned above, the University's failure to promptly investigate this matter for a period of over 90 days showcases a clear case of negligence. Furthermore, the University's inability to preserve crucial video evidence only adds to its negligent handling of the situation. The passage of time may have resulted in the fading of witnesses' memories, which potentially explains Compliance's decision to show MW's statement to MW's witnesses. If the incident that took place in October 2022 genuinely involved fear or threats, it is inconceivable that the University would have waited for such an extended period before launching an investigation. This prolonged delay raises concerns and suggests a lack of seriousness in addressing the issue and clear retaliation.

---

[4] The Court will likely allow Professor Smith an adverse inference instruction on the failure to preserve this key evidence.

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

The fact that this investigation appears to be a contrived effort, fueled by my equal pay complaints, is not only unjust but also illegal. The University's attempt to initiate a witch hunt against me based on stale matters after my equal pay action is a clear violation of the law.

### C.  The University Failed to Follow Its Own Procedures (Code of Conduct)

University Code of Conduct 1.109 (17) states: *"Investigation. Preliminary Review and Investigation. University offices tasked with investigation take every reported concern seriously. All concerns will be assessed through intake to determine the appropriate course of action. If an investigation is warranted, such initial investigation will be completed within a reasonable timeframe. If an investigation takes more than 30 business days from the date of intake, the principal investigator will notify both parties to the complaint of such need."*

As indicated below, the University has not and is not following its own Code of Conduct.

1. The University's lack of seriousness in addressing Professor Smith's concerns reported on October 20, 2022, as well as the alleged student complaint reported a week after, is deeply concerning. It took nearly 100 days for the University to notify Professor Smith and initiate an investigation into the October 2022 incident. Professor Smith had assumed that Associate Dean Green (COL) was looking into the matter as he had indicated in his email on October 20, 2022, or that the University had determined that the "appropriate course of action" was to not investigate the incident based on its inaction. This prolonged period of inaction and delay raises doubts about the University's commitment to addressing issues promptly and effectively.

2. Intake of the incident occurred by both parties when they submitted information about an incident in October 2022 – Professor Smith's on October 20, 2022 and MW's a week later. Professor Smith was not notified 30 days later that there was a need to extend an investigation or that an investigation was ongoing. The University's procedures mandate a 30-update on the progress, which did not happen.

3. Professor Smith was notified on January 26, 2023, via email from the investigator, that an investigation into the October 2022 incident was deemed necessary. It was astonishing to learn that the given reason for the significant 100-day delay in initiating the investigation was attributed to the University's apparent lack of available personnel to handle the matter. This explanation is truly difficult to believe, as it raises concerns about the University's capacity to handle such incidents promptly and effectively. Timely investigations are crucial in ensuring a fair and timely resolution for all parties involved. Moreover, this excuse is concerning because if there was a lack of available personnel to handle the Compliance complaint then under Dean Green's post-hoc theory that EOP and Student Conduct could not be investigated concurrently, this does not explain why Professor Smith's complaint was not acted upon since there was available personnel to handle that matter.

4. The initial investigation into the October 2022 incident seemingly commenced on January 26, 2023, when Professor Smith was informed about an interview regarding the matter. However, there was no subsequent notification provided after 30 days to indicate any need for extending the investigation. It is important to note that this investigation has continued well beyond the duration of the spring semester, which is both unreasonable and has caused

9

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

Professor Smith significant distress and anxiety. The prolonged nature of the investigation has created an undue burden on her well-being and has hindered her ability to focus on her professional responsibilities. This is so mainly because Professor Smith was never allowed to see the allegations against her. Professor Smith thought Ms. Baker provided them in their interview on ZOOM, but when Professor Smith read them in the Report, she was floored as to the student's dishonesty. Professor Smith requested the actual student complaint several times, and her request was denied; yet student witnesses were allowed to review the student complaint – that is so prejudicial against Professor Smith.

5.   During the course of the investigation, Professor Smith discovered that the investigator (Ms. Baker) claimed Professor Smith had not properly filed her initial complaint on October 20, 2022.[5] As a result, Professor Smith diligently re-filed the complaint through the appropriate channels in March. However, to her surprise, the investigator subsequently wrote a memo to the law deans, suggesting that they discuss potential retaliation with Professor Smith. It is perplexing how Professor Smith's actions, which involved promptly re-reporting the student's misconduct, could be construed as retaliation. Every step Professor Smith has taken to report this incident has allegedly been deemed improper and met with resistance, despite her adherence to the University's procedures. It is evident that the University, through its investigation, is not adhering to its own Code of Conduct or Charter. Neither did Dean Green adhere to proper procedure.

6.   In January 2023, Professor Smith reached out to Shira Thomas, the University Associate General Counsel, regarding employee issues dealing with Professor Reyes and requesting a phone call. Regrettably, Ms. Thomas did not respond to Professor Smith's request, even though she promptly replied to her colleagues' requests. Such selective behavior on the part of the General Counsel's office is indicative of retaliation. As an employee of the University, Professor Smith expects and is entitled to fair treatment, and the General Counsel's office should not cherry-pick whom they engage with based on the employee's pursuit of their legitimate rights or litigation history with the University.

7.   On April 28, 2023, approximately 90 days after the initiation of the investigation in January 2023 and nearly 180 days after the incident took place, Professor Smith reached out to the investigator via email to inquire about the progress of the investigation. In response, the investigator stated, "The investigation is still ongoing. You will be notified once the report has been completed." This delayed investigation of allegations the University ignored for nearly 100 days further compounds the frustration and uncertainty Professor Smith experienced throughout this process. The prolonged duration of the investigation, coupled with the lack of timely updates and adequate information of the student allegations, has caused significant distress because these types of investigations may result in termination.

8.   On April 28, 2023, Professor Smith asked the investigator: "Who does compliance report to?" Professor Smith never received a response.

9.   Professor Smith has expressed her concerns to the investigator, Ms. Calhoun, the General Counsel (Ms. Wallace), and Professor Cavazos (Faculty Senate President and University trustee who did ensure Ms. Calhoun called Professor Smith on this matter) multiple times regarding Professor Smith's lack of clarity regarding the specific allegations of the investigation. Despite this, Professor Smith has not been provided with the written complaint or any formal documentation outlining the nature of the allegations. Given that

---

[5] Compliance also said Dean Green did not follow procedures.

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

     this was not an anonymous complaint, it is perplexing why Professor Smith has been denied access to this information.

10. The absence of prompt and decisive action from the University following the incident in October 2022 is odd. According to a University representative during the February 2023 faculty senate meeting, all serious complaints result in immediate action even before an investigation. Thus, this incident raises doubts about the severity of the alleged misconduct and the University's belief in the student's facts.

11. It appears increasingly likely that the current investigation is a retaliatory response to Professor Smith's civil rights complaint concerning pay equity. The timing of these events is highly suspicious, suggesting a concerted effort to discredit and undermine her position, as well as threaten her employment. Professor Smith firmly believes that this entire process is a witch hunt fueled by fabricated charges stemming from her pay lawsuit. The University's dilatory actions, including its failure to adhere to its own Code of Conduct, further demonstrate its disregard for proper procedures and fairness.

12. As per the University's Code of Conduct, Professor Smith is duty-bound to report these illegal activities perpetrated by the University. By memorandum to the GC on May 2, 2023, Professor Smith formally reported the University's illegal conduct as described above (and does so again by this memorandum), and Professor Smith urges immediate action to rectify this situation and ensure justice is served.

## III.  REPORT'S INCONSISTENCIES

1. On October 20, 2022, Professor Smith promptly filed a complaint against MW by texting Dean Reginald Green, who immediately ran to the site of the incident. In his email response later that day, Dean Green assured her that he would determine who the student was, offered to receive further details and thanked me for the notification by text. Then, he started the process to investigate Professor Smith's complaint when he went to see Dean Cooper but stopped because by the MW had filed a complaint, but Dean Green did not stop investigating Professor Smith's complaint because he did not think it was a real complaint. On November 1, 2022, just eight business days after the incident, Professor Smith personally visited Dean Green's office to discuss the matter. Unfortunately, Dean Green was away on vacation at the time. Nonetheless, Professor Smith informed his secretary about the purpose of Professor Smith's visit and Dean Green's secretary assured Professor Smith that the secretary would inform Dean Green about Professor Smith's visit. Regrettably, despite Professor Smith's proactive approach, Dean Green did not reach out to her with any information regarding the identity of the student or any updates on the situation. Now, the University claims Professor Smith's text to Dean Green was never considered a complaint. Contrary to what is stated in the Report, Professor Smith did follow up on her complaint, and Dean Green never got back with her, even though he was instructed to take appropriate action by Provost Edington. Professor Smith has submitted supporting documentation to Compliance that clearly demonstrates efforts to address the issue.

2. Upon reading the allegations made by MW for the first time, Professor Smith is appalled by the outrageous and blatantly false allegations. It is important to note that any responsible University, bound by legal obligations, is required to promptly address such allegations against a professor or a student. Failure to do so is a clear violation of University policies

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

and protocols. Given the circumstances, Professor Smith strongly believes that the University had received these baseless allegations and was fully aware of their lack of merit. However, it is deeply concerning that the University chose not to initiate an investigation until Professor Smith filed her pay lawsuit rebuttal, nearly 100 days later. This sudden change in the University's stance raises serious concerns about the retaliatory nature of the actions towards her. It appears that the University deliberately delayed taking action on these allegations, despite knowing their lack of validity, until it became strategically advantageous for the University to do so. This blatant retaliation against Professor Smith undermines the principles of fairness, integrity, and justice that should guide any institution of higher learning.

3. This whole paragraph is poorly written and false as written:

> Patricia Broussard, College of Law Professor, February 1, 2023: On February 2, 2023, Professor Broussard acknowledged that she advised Professor Smith to reach out to Ms. Wanamaker. Professor Broussard explained that she became aware from students that Ms. Wanamaker was upset about her actions. Professor Broussard said that she told Professor Smith that this was a way to show Ms. Wanamaker that would not hurt her and how women could uplift one another.

It should read as follows:

> Patricia Broussard, College of Law Professor, February 1, 2023: On February 2, 2023, Professor Broussard acknowledged that she supported Professor Smith's idea to send an email to Ms. Wanamaker because Professor Broussard explained that she became aware from students that Ms. Wanamaker was upset, ashamed and embarrassed about her [Ms. Wanamaker's own] actions. Professor Broussard said that she told Professor Smith that sending an email was a way to show Ms. Wanamaker that Professor Smith would not seek to destroy Ms. Wanamaker's reputation at the firm where Professor Smith was a partner and would show how women could uplift one another.

Thus, Professor Smith emailed MW the following email in December 2022:[6]

> *Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*

4. In October 2022, both MW and Professor Smith filed separate complaints regarding the incident. However, it is deeply troubling that the University neglected to preserve the crucial video evidence related to the incident. The Report includes a section titled "Video Footage" and states "OCE requested video footage from room 253 on October 20, 2023,

---

[6] Professor Smith is reviewing Bar guidelines and will report to the Bar as she is obligated, and, after reading MW's blatant falsities in this matter, is re-assessing her obligations to disclose details to a place in which she was a partner and department chair.

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

between 10:25 a.m.-10:30a.m. from Terence Calloway, Chief of Police." The Report omits any explanation for its own delay in requesting the video. Additionally, the Report appears to be clairvoyant because October 20, 2023 has not happened yet and this would explain why no footage is available. The University's failure to promptly request the footage until over three months later demonstrates a clear lack of competence and disregard for preserving vital evidence. The University scrivener's error or failure to request footage from the correct date demonstrates negligence and incompetence by OCE. At bottom, the absence of this video evidence raises serious questions about the University's handling of the situation. One cannot help but wonder whether the University intentionally failed to preserve the evidence, or worse, deliberately destroyed it because it could have potentially supported my position. This casts a shadow of doubt on the University's motives and lends further weight to the argument that their subsequent accusations against me, made 98 days later, are rooted in retaliation. It is imperative that the University upholds its responsibility to preserve evidence in a timely and impartial manner. Failing to do so not only undermines the integrity of the investigation but also raises concerns about fairness and due process. The University must be held accountable for its actions and the potential consequences of its failure to preserve evidence in a case of this nature.

5. The statement provided in the report regarding the circumstances surrounding Professor Smith's December email to MW is inaccurate and presents a biased perspective. The Report claims that on February 1, 2023, I stated that I **only** emailed the Complainant because Professor Broussard advised me to do so, as MW felt remorseful about her behavior. This portrayal is misleading and does not accurately reflect the sequence of events. In reality, it was Professor Smith who suggested the idea of sending an email to MW in order to provide her with some peace regarding her disruptive conduct. Professor Broussard agreed with my suggestion, acknowledging that MW expressed remorse and nervousness due to my previous association as a former partner at Holland & Knight. The decision to send the email was a voluntary act on Professor Smith's part, driven by a desire to mitigate any negative impact the incident may have had on MW's career aspirations – again before Professor Smith read MW's false allegations. It is important to clarify these details to prevent any misinterpretation or misrepresentation of the events that transpired. The Report's portrayal of the situation inaccurately suggests a different motive for Professor Smith's actions, which undermines the fairness and objectivity of the investigation.

6. The Student Handbook clearly outlines the Student Code of Academic Conduct, which serves as a reference for addressing student misconduct. However, faculty allegations of student misconduct that fall outside the scope of the Student Code of Conduct should be directed to the Associate Dean for Student Services and Administration. The manner of reporting such incidents to our deans is not explicitly specified or restricted within the University's guidelines. In Professor Smith's case, she reported the incident through a text message, which served as an instant and written form of communication. This method of communication has been Professor Smith's usual means of contacting Dean Green, even during her tenure as the chair of the student disciplinary committee. She opted for text communication because it allows for prompt responses from Dean Green. Moreover, Professor Smith has never been informed that text messages were an inappropriate or improper form of filing a complaint – all deans have a University cell phone for school business. It is crucial to clarify that Dean Green did not explicitly state that he would not

13

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

investigate the incident or that Professor Smith's chosen method of filing was incorrect. He expressed his intention to investigate the matter, but unfortunately, Professor Smith did not receive any follow-up from him, even after visiting him for an in-person meeting on November 1, 2022.

7.  It came to Professor Smith's attention, **after** she re-filed my complaint against MW, that Ms. Baker informed Professor Smith that MW was also the subject of a complaint. However, upon reviewing this Report, it is evident that MW was not investigated as the instigator of the entire incident. This raises concerns about the fairness and integrity of the investigation process. Furthermore, the reason Professor Smith re-filed her complaint in March was because she became aware in February that MW intentionally disrupted her class. Professor Smith obtained this new information through an email sent by Professor Reyes.

8.  It is important to note that based on this Report, MW may not be aware that she was the subject of a complaint during her time in law school. It is crucial for MW to understand that as an applicant for the Florida Bar, she has reporting obligations regarding this incident, as outlined in Bar Application Rule 9. Similarly, as an instructor at the law school and a practicing lawyer, Professor Smith also has a responsibility to maintain the integrity of the legal profession by addressing student misconduct. MW must be made aware that failure to disclose this incident on her Bar application could lead to significant consequences, including potential delays in the Bar admission process. It is essential for MW to provide truthful and accurate information on her application to avoid any accusations of dishonesty or misrepresentation. It is recommended that appropriate measures be taken to ensure that MW is informed of her reporting obligations to the Florida Bar, emphasizing the potential implications of failing to disclose this incident.

9.  It is crucial to highlight a significant omission in this Report, which fails to mention the intentional disruption of my class by MW. This omission undermines the trustworthiness and completeness of the Report. The fact that MW instigated both interactions with Professor Smith – a professor who she had never spoken with – on October 20, 2022 cannot be overlooked. This intentional disruption not only impacted the flow and integrity of Professor Smith's class but also raises concerns about the overall environment and professionalism within the academic setting. To ensure the accuracy and comprehensiveness of the Report, it is imperative that the intentional interruption of Professor Smith's class by MW be acknowledged and thoroughly investigated so that similar conduct is not repeated by other students. Failing to address this significant fact undermines the validity of the findings and calls into question the integrity of the entire investigative process. Professor Smith requests that this oversight be rectified and that a comprehensive examination of the circumstances surrounding MW's deliberate disruption of Professor Smith's class be conducted to ensure a fair and unbiased evaluation of the incident. MW's interruption of Professor Smith's class in such a hostile and unhinged manner made the learning environment for Professor Smith and her students unsafe.

10. It is important to address the inconsistency regarding the characterization of the complaint filed by Professor Smith. The report indicates that Professor Smith filed an "additional" complaint, which implies the existence of an initial complaint filed in October. This confirms that there was indeed an initial complaint made by me in October 2022, and it is essential for the University to acknowledge and address this fact. If the University recognizes the second complaint as an "additional" one, it signifies that it can in no way be

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

retaliatory in nature. Moreover, it is crucial to note that the second complaint was prompted by new information that came to light after the initial filing in October 2022. This demonstrates that Professor Smith's intention was to ensure that all relevant information regarding MW's conduct was properly investigated and addressed. However, regardless of the characterization of the complaints, the University has yet to provide any resolution or investigation into Professor Smith's initial complaint against MW from October 2022. This failure to address MW as a subject of a legitimate complaint goes against the University's own compliance standards and raises concerns about the thoroughness and fairness of the investigative process. It is imperative that the University rectify this oversight and conduct a proper investigation into MW's improper conduct, which was the primary purpose of Professor Smith's initial filing in October 2022 and subsequent re-filing in March 2023. The failure to investigate MW's intentionally hostile behavior undermines the credibility of the University's commitment to maintaining a safe and respectful academic environment.

11. This Report is retaliatory and punitive, as it fails to include crucial facts that support Professor Smith's position and attempts to re-penalize her for "potential" retaliation after she was "warned" in March and with no additional conduct the "potential" retaliation has now turned into a determination that Professor Smith retaliated against MW. One glaring omission is the fact that MW was the instigator in both incidents that occurred on October 20, 2022. This critical information, which clearly establishes MW's role in creating a hostile environment, has been disregarded in favor of a biased perspective for MW. The Report also fails to acknowledge that MW stated she "never engaged in a conversation with Jennifer Smith before today," but somehow and for some reason MW chose to take it upon herself to interrupt a professor with whom she had no history. The Report's failure to address the actions of MW as instigator raises concerns about the integrity and fairness of the investigation. The University has not taken any measures to investigate MW for creating this hostile environment. This one-sided approach further undermines the credibility of the Report and fails to meet the University's obligations to provide a safe and supportive academic environment for its faculty. Moreover, the University's accusation of retaliation against Professor Smith for filing another complaint to address MW's instigating behavior is deeply troubling. Instead of conducting a thorough investigation into MW's actions, the University has chosen to reprimand Professor Smith for seeking resolution and justice. These actions not only violate the University's own policies but also infringe upon the rights afforded to Professor Smith by both Florida and Federal laws. It is imperative that the University rectify these shortcomings, conduct a fair and unbiased investigation into the incidents involving MW as the instigator, and uphold its commitment to providing a safe and equitable environment for all members of its academic community. Anything short of this would be a failure on the part of the University to uphold its own standards and legal obligations.

## IV.   CONCLUSION

Professor Smith finds herself at a loss as to how she could have prevented this incident from occurring. She did everything "by the book." As a professor, she reserved the classroom on October 6, 2022, which is optional, but reserving is the most responsible action. Even if that were not the case, students are instructed not to enter classrooms without a professor for their personal

MW Incident Oct 20, 2022 (Compliance 2022-11-117, issued June 5, 2023)
June 12, 2023

study purposes, and certainly when the classrooms are already occupied by professors. Moreover, if a student accidentally walks into a classroom, the appropriate response should be to apologize for the intrusion and swiftly exit the premises. There should never have been a prolonged argument with a student in the midst of another student's examination. Additionally, Professor Smith should not have had to encounter the student as Professor Smith was leaving the classroom. The student had no reason to position herself at the doorway, prepared for a second confrontation as Professor Smith exited. The classroom has two exits, so MW could have waited to enter at the "back" door, which is the door she used for her first intrusion.

When Professor Smith reported the incident of being confronted by an aggressive student, Associate Dean Green assured Professor Smith that it would be promptly addressed. Professor Smith assumed that the University was handling the matter and would contact me if necessary. However, Professor Smith had no knowledge that she was the subject of an investigation until over 90 days later. This lack of communication is highly problematic and unprofessional. If the student was so afraid and in fear, wouldn't the University take immediate actions to prevent Professor Smith and the student from interacting?

Professor Smith did not retaliate against the student. On the contrary, Professor Smith sent MW an email in an attempt to alleviate her concerns regarding her behavior during the incident. It is evident that MW relayed this information to others, as Professor Smith continued to hear about MW's remorse and shame over her own conduct, mainly because of Professor Smith's past association with the firm where MW may soon be working (seems MW filed the complaint to retaliate against Professor Smith). In an act of goodwill, Professor Smith sent MW an email to reassure her that her disruptive conduct would not hinder her future career. Professor Smith possesses emails and witnesses attesting to the student's remorse regarding her OWN actions, not Professor Smith's. Professor Smith will revisit her course of conduct after reviewing the blatant falsities in MW's complaint that she was so comfortable in making even when she was the instigator.

The collection of documents Professor Smith has provided to Compliance attached to the several memoranda solidify Professor Smith's position that she reserved the room, encountered a confrontational student twice by the student's choice, promptly reported the incident, documented the student's alleged conversations about her disruptive conduct, and harbored no negative or retaliatory intentions in the email Professor Smith sent to MW. Throughout Professor Smith's 30-year career as a lawyer, she has never been accused of any employee misconduct. The evidence at hand overwhelmingly supports Professor Smith's stance.

The University's delay in taking action until evidence is destroyed and witness memories become distorted is entirely unacceptable. This unfortunate course of events by the University only strengthens Professor Smith's assertion of retaliation by the University. It is evident that such a delay was intentional, further contributing to the prejudicial treatment Professor Smith has experienced. The University's failure to address the situation promptly and appropriately raises serious concerns about its commitment to fairness and justice. It is clear retaliation by the University for Professor Smith's pursuit of equal pay, and Professor Smith has emails and texts that she provided to Compliance for the facts she advances.