MAR 6 2024 PM2:56
FILED - USDC - FLMD - ORL

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**JENNIFER SMITH,**

    **Plaintiff,**

                                         **CASE NO.: 6:24-cv-00457**

**FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY**
**BOARD OF TRUSTEES,**

    **Defendant.**

_____/

## PLAINTIFF'S EMERGENCY MOTION AND MEMORANDUM OF LAW IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND <u>INJUNCTIVE RELIEF</u>

Plaintiff Jennifer Smith ("Professor Smith"), moves this court for a temporary restraining order pursuant to Fed. R. Civ. P. 65 and Local Rule 6.01, with notice to the opposing party, to prevent her threatened and impending termination until the Court has a full opportunity to examine the merits of her case. Professor Smith moves for emergency relief because Defendant has begun eliminating her privileges as a tenured professor and it appears extremely likely that Defendant will attempt to act on an unlawful termination on Friday, March 8, 2024, should Professor Smith

not receive her biweekly pay.[1] Professor Smith is entitled to a temporary restraining order against the Defendant and, in support she alleges:

## PRELIMINARY STATEMENT

At the heart of this case is Professor Smith's continued solo quest for equal pay for women at the Florida A&M University College of Law. However, in this latest battle, Defendant has clearly shown it will silence Professor Smith one way or another by taking a series of actions leading up to the latest and most severe – Professor Smith's purported termination from her tenured professorship. Twice, she has received notice from the Defendant that it intends to terminate her, notwithstanding a neutral 3-member lawyer panel's decision to the contrary. Defendant's anticipated termination of Professor Smith not only violates the principles of academic freedom and her legal rights, but the purported termination also exposes her to immediate and irreparable harm. Losing a tenured position—a role with significant job security and professional esteem—cannot ever be fully remedied with money. Injunctive relief is necessary and the only option to halt Professor Smith's termination, protecting her reputation, career, and the broader principle of academic freedom until this Court can hear the merits of this case.

---

[1] On March 1, 2024, the Defendant locked Professor Smith out of her email and denied her any access to the FAMU database, thereby preventing her from viewing any information related to her employment, health insurance or pay status.

For now, Professor Smith is still being paid but she is not permitted on campus and she only recently lost access to her email and other rights and privileges. At the time that Professor Smith filed her state court TRO on January 29, 2024, she was also still employed. The state trial court denied Professor Smith's emergency motion because it assumed she was already terminated and because she had not filed a bond, which was for that court to set.[2] However, Defendant could, at any moment, act on its desire to terminate Professor Smith's employment based on unlawful and pretextual reasons disguised as "just cause" before an injunction is entered. Shortly after discovering that Professor Smith was seeking legal redress in state court,[3] the

---

[2] The trial court ignored established precedent that a trial court's injunction is not invalidated simply because it issued without a set bond amount. *See Aaoep USA, Inc. v. Pex German OE Parts, LLC,* 202 So. 3d 470, 472 (Fla. 1st DCA 2016); *Fla. Georgia Grove, LLP v. Collier Cnty.*, 95 So. 3d 948, 950 (Fla. 2d DCA 2012) (affirming the trial court's issuance of an injunction but remanding for evidentiary hearing on bond); *Pledger Tr. Series 28, LLC v. Apeiron Holdings Miami, LLC,* 306 So. 3d 1115, 1116 (Fla. 3d DCA 2020) (affirming "the order on appeal with respect to the trial court's issuance of the temporary injunction but revers[ing] the order as to the failure of the trial court to require a bond and remand to the trial court with directions to conduct an evidentiary hearing to set an appropriate bond."); *Offshore Marine Towing, Inc. v. Sea Tow Servs. Int'l, Inc.*, 778 So. 2d 510, 511 (Fla. 4th DCA 2001) ("We . . . affirm without discussion . . . the entry of the temporary injunction [but] direct the trial court on remand to hold an evidentiary hearing on the bond amount."); *Graham v. Battey,* 347 So. 3d 515, 522 (Fla. 5th DCA 2022) ("[T]he lack of a bond does not invalidate the injunction as Appellants claim.").

[3] While Plaintiff concedes the clerk's default entered in the underlying state action was a bit premature, Defendant's argument that it was not properly served is without merit. Defendant was served consistent with its regulations: OGC ADVISORY NO. 13-01, https://www.famu.edu/about-famu/leadership/division-of-legal-affairs/office-of-the-general-counsel/pdf/Advisory%20-%20Subpoenas%20Summons%20Court%20Orders%20and%20Other%20Written%20Request%20for%20Information.pdf. Professor Smith's process server served the Defendant at its place of business and the process server effected process on the person at Defendant's office representing that he was authorized to receive service. Defendant has offered no evidence to demonstrate otherwise. In any event, Defendant was emailed by the state court regarding the TRO (see Exh. 3 of this Motion) and was contacted by the 6th DCA regarding the notice of appeal. Therefore,

Defendant immediately restricted her access to her email account on March 1, 2024, near or on the exact day the Defendant became aware. Furthermore, the Defendant is currently in the process of organizing the class schedules for the upcoming fall and summer terms, as well as reviewing applications for summer research and scholarship grants. Absent a decision from this Court, Professor Smith faces the constructive and continued loss of her constitutional, statutory, and contractual rights as a tenured employee. The issues in this case are of an immediate nature and of great public importance. They directly impact the rights of thousands of tenured professors in this State and across the country.[4]

---

Professor Smith asks that this Court to find that service was proper, or in the alternative, that any issue with service be excused. Fla. Stat. § 1001.72(1) states that: "In all suits against a board of trustees, service of process shall be made on the chair of the board of trustees or, in the absence of the chair, on the corporate secretary or designee." According to FAMU Regulations, its designees for service are listed in OGC ADVISORY NO. 13-01 cited above.

[4] According to the Florida Department of Education, there are twelve public universities in the State University System and about 60,000 faculty and staff combined. *See* https://www.fldoe.org/schools/higher-ed/#:~:text=Board%20of%20Governors%2C%20State%20University,of%20more%20than%20%248.5%20billion. Florida State University has 909 tenured faculty and 311 tenure earning faculty, *see* https://ir.fsu.edu/Factbooks/2022-23/Faculty_Age.pdf; University of Florida has 1,971 tenured faculty and 1014 tenure earning faculty, *see* Tenure Status heading https://ir.aa.ufl.edu/facts/workforce/; In 2021, Florida A&M University had 293 tenured faculty and 99 tenure earning faculty, *see* https://www.famu.edu/administration/strategic-planning-analysis-and-institutional-effectiveness/institutional-research/factbook_files/pdf/21-22/Employees.pdf; In 2022, University of South Florida had 945 tenured faculty and 228 tenure earning faculty, *see* https://usfweb.usf.edu/ODS/Diversity/FacultyDemographics.aspx; University of West Florida had 611 total faculty without designation of tenure status, *see* https://uwf.edu/media/university-of-west-florida/academic-affairs/departments/institutional-research/cds/CDS_2022-2023.pdf; University of Central Florida - 46% of its 1,923 person faculty are tenured and 12% are tenure earning faculty, *see* https://www.ucf.edu/about-ucf/facts/#faculty-data; Florida International University - 47.68% of its 1,803 person faculty are tenured or tenured earning, *see* https://opir.fiu.edu/factbook/dash.html; For 2020-2021, New College of Florida had 59 tenured faculty and 35 tenure earning faculty, *see* https://www.ncf.edu/wp-

## I.    FACTUAL BACKGROUND[5]

1.      Jennifer Smith is a tenured, full professor at the Florida A&M University College of Law.

2.      She has been a faculty member since August 2004.

3.      Prior to joining the FAMU College of Law ("COL"), Professor Smith began as an employment and commercial law associate and was later elevated to partner in the D.C. and Miami offices of an international law firm. There, she was recognized as an extraordinary associate, said to be appointed the youngest department chair, and was also awarded a bonus for her distinguished contributions in that role.

4.      The COL Faculty Handbook specifically explains:

> [t]enure in the University: A faculty employee who has been granted tenure by the BOT shall have the status of permanent member of the faculty and be on the continuing employment of the University until he/she: resigns, retires, dies, is dismissed for just cause or is discontinued pursuant to layoff provisions.

(COL Faculty Handbook, p. 61-62, Doc. 1-1, Exh. 9).

---

content/uploads/2023/04/2020-2021-NCF-Fact-Book-Updated-09.01.211.pdf;    University    of North   Florida   has   328   tenured   faculty   and   119   tenure   earning   faculty,   *see* https://www.unf.edu/ir/faculty-dashboard.html; Florida Golf Coast University has a 587 person faculty   without   information   on   tenured   or   tenure   earning   faculty,   *see* https://www.fgcu.edu/about/fastfacts; Florida Polytechnic University has a 73 person faculty without   information   on   tenured   or   tenure   earning   faculty,   *see* https://floridapoly.edu/about/facts.php.

[5] Please see the Amended Complaint (Doc. 1-1), which is verified, and its 11 attachments for the support of the factual background, as well as Professor Smith's Declaration (Attached as Exh. 1 to this Motion) and other attachments to this Motion.

5.      Pursuant to the COL Faculty Handbook, Defendant recognizes tenure as "continuous employment." Defendant's actions over the years have reflected the same.

6.      Professor Smith and Defendant also entered into signed agreements annually concerning the specific compensation package for the corresponding year. The same has occurred for the present academic year 2023-2024. (Smith 2023-24 Contract, Doc. 1-1, Exh. 3)

7.      From 2012 to 2021, Professor Smith, alone, litigated against Defendant for equal pay. Her litigation has resulted in (1) significant individual pay increases for women faculty ranging up to $23,000, (2) elimination of the gender pay gap between male and female associate deans that previously amounted to a $20,000 difference, and (3) otherwise overdue promotions for women faculty.

8.      Because of Professor Smith, Defendant completed a salary analysis study in 2015 that confirmed Defendant underpaid women faculty.

9.      To remedy or normalize the differences in pay, Defendant created a salary structure in 2016 that it intended to follow moving forward.

10. In August 2021, Defendant hired a male faculty member, Ewanrinareto "Areto" Imoukhuede (Comparator), ten years junior to Professor Smith in age and experience, well outside of the 2016 salary structure at a salary nearly $25,000 more than Professor Smith.

6

11.  On May 9, 2022, Professor Smith wrote Defendant's president, Dr. Larry Robinson, about the disparity in pay between her and Comparator. Robinson referred her to the FAMU Equal Opportunity Program (EOP).

12.  On June 28, 2022, Professor Smith filed a gender equity complaint with Defendant's EOP.

13.  On September 22, 2022, Defendant's EOP department sent its investigative report to Professor Smith, denying any pay inequities without any rationale for paying Comparator more than Professor Smith.

14.  On October 18, 2022, Professor Smith filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) under the Equal Pay Act (EPA).

15.  On October 20, 2022, a student, Michelle Wanamaker intentionally disrupted Professor Smith's class and then waited for Professor Smith to exit the classroom to re-confront Professor Smith in violation of the Student Code of Conduct (Student Handbook, p. 122, Doc. 1-1, Exh. 10).

16.  Professor Smith had no idea who the intruder was or whether she was even a student, although Professor Smith assumed so. Professor Smith immediately sent a text to Associate Dean Green with a description of the student for

identification purposes.[6] He ran up to the classroom, but by then, Professor Smith was in her next class teaching.

17. Associate Dean Green responded at 8:46 pm that same evening of the incident: "Jen, I will try and identify the student tomorrow. Please feel free to send me an email detailing the interaction. Thanks for the notification. Sincerely, Reginald Green."

18. Pursuant to FAMU Code of Conduct 1.019 (18b), Associate Dean Green was "responsible for reporting complaints received to the Office of Compliance and Ethics [("Compliance")], either directly or through the University's Compliance and Ethics Hotline." (Doc. 1-1, Exh.6, Notice to Terminate)

19. Green never reported Professor Smith's complaint to Compliance directly or through the hotline.

20. Pursuant to Defendant's Law Student Handbook and its Faculty Handbook, both of which conflict with the FAMU Code of Conduct,[7] Green was also required to investigate the incident himself as "Conduct Officer." (Student Handbook, pp. 116-122, Doc. 1-1, Exh. 10; Faculty Handbook, p. 34, Doc. 1-1, Exh.9).

21. Green failed to investigate Smith's complaint as well.

---

[6] The visible identification of the student was incorrect because the student identifies as a Black woman.

[7] The June 5, 2023 report from Compliance noted this conflict for repair.

22. Having realized that she was the law clerk at the same law firm where Professor Smith spent ten years, on October 27, 2022, Wanamaker filed a complaint against Professor Smith for the interaction on October 20, 2022, but Defendant did not relay that to Professor Smith.

23. None of Defendant's employees did anything with Professor Smith's complaint or the student (Wanamaker) complaint for nearly 100 days, until two weeks after Professor Smith filed her rebuttal to Defendant's EEOC position statement. Professor Smith pointed out in her rebuttal that Defendant admitted that she was underpaid, which is in violation of the Equal Pay Act.

24. After allowing nearly 100 days to pass, Defendant's Compliance department was suddenly investigating the student (Wanamaker) complaint as high importance and advised Professor Smith that the result of the investigation could be her termination.

25. During this investigation, which began on January 26, 2023, Professor Smith learned that Associate Dean Green did not follow proper procedures with the complaint she filed on October 20, 2022.

26. Professor Smith also learned in January 2023 that the unidentified student, Wanamaker, had also filed a complaint against Professor Smith a week later on October 27, 2022.

27. Professor Smith also learned that Defendant did not preserve video evidence that should have existed and would have vindicated Professor Smith; Defendant did not request such evidence until some three months after the incident, and by then the evidence no longer existed, according to Defendant.

28. On February 1, 2022, Professor Smith emailed Associate Dean Green:

> Hey...you never did anything about this **complaint** and now I'm being investigated when the student should be, and [Professor] Reyes is all over this. What came of this? **Compliance said you did not follow procedures.** [emphasis added]

Associate Dean Green responded:

> The process was to meet with the student and discuss the misconduct allegation. Before I could meet the student, she had already filed her complaint which raised EOP issues. As a result, since the matter involved a faculty member, she sent her complaint to [Associate Dean] Cooper. To my knowledge afterward a determination was made to send the matter to EOP. **We could not conduct two separate investigations without interfering with the other.** An EOP investigation supersedes a conduct allegation. [emphasis added] (Doc. 1-1, Exh.5)

But Defendant had not begun investigating neither Professor Smith's complaint nor the student (Wanamaker) complaint.

29. Because Professor Smith was informed her complaint was improperly filed by Associate Dean Green and reached neither Compliance's hotline nor was personally investigated by him, she re-filed her October 20, 2022, complaint on

March 9, 2023, with Compliance's hotline, which is where Associate Dean Green was supposed to have sent it.

30. Compliance immediately deleted Professor Smith's properly filed complaint of the October 20, 2022 incident from the hotline, and Compliance sent the law deans a memorandum to scold Professor Smith for purported retaliation for her conduct.

31. To cover themselves, Compliance and Associate Dean Green coordinated their responses to indicate they did not consider Professor Smith's October 20, 2022, complaint to be an actual complaint in order to transform the complaint she filed on March 9, 2023, into the first "formal" complaint she filed against the student, Wanamaker, manufacturing a retaliation claim. Because Compliance and Associate Dean Green purported to consider Professor Smith's March 9, 2023, submission to be her first "formal" complaint, Compliance wrongly determined Professor Smith's resubmission of the October 20, 2022, complaint constituted retaliation notwithstanding Associate Dean Green's email. (Doc. 1-1, Exh.5) Had Associate Deen Green forwarded Professor Smith's original complaint to Compliance, it would have been a "formal" complaint.

32. Through Defendant's clearly unwarranted investigation from January 26, 2023, until June 5, 2023, it determined all of Wanamaker's allegations were absolutely meritless.

33. On June 5, 2023, Professor Smith received an email from Compliance:

> Professor Smith, Attached is FAMU-2022-11-117 Investigative Report, addressing allegations of employee misconduct regarding you. The Office of Compliance and Ethics (OCE) concluded that allegation 1 related to disruptive conduct is UNSUBSTANTIATED and allegation 2 related to retaliation is UNSUBSTANTIATED. However, an additional finding of retaliation related to your subsequent actions is SUBSTANTIATED.

34. The June 5, 2023, email indicates that the investigation concluded.

35. On June 12, 2023, Professor Smith responded to Compliance's June 5, 2023, Report. Doc. 1-1, Exh.11) She did not receive a response.

36. Although Professor Smith believed the student (Wanamaker) investigation was concluded with the June 5, 2023, Report, Compliance prepared a Supplemental "Secret" Report on July 6, 2023, and never provided it to Professor Smith. In fact, the Report shows several people were copied but not Professor Smith. This was drafted by the Compliance director, Rica Calhoun, Esq., in retaliation for Professor Smith's June 12, 2023, memorandum, detailing the clear bias, negligence and incompetence of Compliance's June 5, 2023, Report and investigation.

37. Professor Smith saw Defendant's July 6, 2023, Supplemental Report for the first time on December 5, 2023, in the Notice to Terminate. (Doc. 1-1, Exh. 6)

38.     This Supplemental Report included copies of descriptive emails/texts Professor Smith provided to Defendant on February 9, 2023 – near the start of the investigation – but all but one were created on the day of the incident.

39.     In the Supplemental report, the emails/texts were described as "gossip" but never retaliation; and they could not be retaliation as they were filed *before* any protected conduct or known protected conduct and were not adverse employment actions. (Doc. 1-1, Exh. 6)

40.     Professor Smith did not receive any communications from Defendant regarding the Wanamaker matter after June 7, 2023, when Compliance emailed Professor Smith to confirm receipt of information she sent to Compliance via email on June 5, 2023.

41.     On October 5, 2023, Professor Smith wrote a memorandum to Compliance and the General Counsel about Wanamaker's concerning behavior regarding the settled matter that occurred a year before. (Doc. 1-1, Exh. 6)

42.     Professor Smith indicated continuing concerns about her personal safety with a student who seemed completely and oddly engrossed with Professor Smith for the entire year and that she believed she was obligated to report Wanamaker's conduct to the Florida Bar, but Professor Smith never reported Wanamaker's conduct. (Doc. 1-1, Exh. 6)

43.     Drafting a memorandum and querying the responsibility to report disruptive student conduct to the Florida Bar is not retaliation. Not a single action was taken by Professor Smith against Wanamaker.

44.     The University never responded to Professor Smith's memorandum dated October 5, 2023.

45.     On October 17, 2023, Professor Smith filed her equal pay and retaliation complaint against Defendant in state court to meet the deadline requirements. However, she did not serve the complaint.

46.     On November 13, 2023, another COL professor, Reyes, notified Defendant of Professor Smith's unserved complaint in Reyes's own federal court filing entitled "Plaintiff's Response to Defendant's Motion to Dismiss with Prejudice Plaintiff's Second Amended Complaint, Or in the Alternative, Motion to Strike." *See Reyes v. FAMU BOT*, 6:22-cv-1525-WWB-DCI, 2023 WL 9283741, ECF No. 36 at 12 (M.D. Fla. 2022). Defendant, through that filing, learned Professor Smith had filed a state court complaint for equal pay and retaliation.

47.     Within weeks, the Defendant sent Professor Smith a Notice to Terminate on December 5, 2023, which was soon after she had turned in her class exam. (Doc. 1-1, Exh. 6)

48.     The Defendant's conduct is blatant retaliation because the proposed discipline for Professor Smith's alleged misconduct based on a closed investigation

is extreme, University regulations provide many other lesser options than termination, and none of her conduct the University points to can be considered an adverse action or retaliation against Wanamaker.

49.    Professor Smith received a notice of termination ostensibly for retaliation by 1) re-filing her complaint against Wanamaker in the proper channels, 2) sending descriptive texts/emails to another faculty member and former student about the October 20, 2022, incident and  provided to the University on February 9, 2023 in the investigation and 3) sending an October 5, 2023, memorandum to Defendant indicating her safety concern about Wanamaker who, for a year, seemed overly preoccupied with Professor Smith, who had never seen Wanamaker before the day of the incident on October 20, 2022. (Doc. 1-1, Exh. 6)

50.    The alleged retaliation fails to meet the definition of retaliation in any way and merits a Florida bar complaint and Rule 11 sanctions for any lawyer who advances the baseless retaliation theories because they are so unfounded.

51.    Pursuant to FAMU Regulations, Professor Smith was allowed to submit defense arguments by January 8, 2024. (Attached to this Motion as Exh. 2)[8] She was also entitled to and did have a hearing on her proposed termination on January 11, 2024, before a three-person panel of lawyers chosen by Defendant.  In its report dated January 12, 2024, the panel, unanimously, found no just cause to terminate

---

[8] The most current FAMU regulations are attached to the Amended Complaint (Doc. 1-1).

Professor Smith and recommended that Defendant rescind its notice of termination to Professor Smith. The panel's report stated:

> The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". **After careful and thorough deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.**[9] (Emphasis added.) Doc. 1-1, Exh. 7, page 3.

52.    According to FAMU Regulation 10.120(4): "If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified within five workdays prior to the date the action is effective." Doc. 1-1, Exh. 6.

53.    According to FAMU Regulation 10.120(1), Defendant shall give written notice to the employee of the proposed action. According to Regulation 10.120(2): "The notice shall include the following information: (a) The effective date of the University's proposed final action." Doc. 1-1, Exh. 6.

---

[9] There were actually two other retaliation allegations (three total) the Defendant invented that were so blatantly inconsistent with the basic elements of retaliation that the three-member lawyer panel did not even address those allegations in the hearing and ignored them in the recommendation.

54.     The date of the proposed final action in Defendant's written notice was listed as January 19, 2024. Doc. 1-1, Exh. 6.

55.     Notwithstanding Professor Smith emailing the Defendant on January 18, 2024, to ask about Defendant's decision, Defendant ignored Professor Smith until January 19, 2024, at 6:45 pm.

56.     Defendant then apologized for the delay and said that the "letter should be available next week."

57.     Defendant failed to notify Professor Smith by January 18, 2024, and thus, Defendant waived its ability to terminate Professor Smith, who believed the notice was withdrawn due to the University's inaction as indicated by the FAMU Regulation 10.120(4).

58.     In the late afternoon of January 23, 2024, Defendant emailed Professor Smith to indicate that it was moving forward with her termination even though the panel recommended Defendant not do so.  By FAMU Regulations, notice has to be given by certified mail or personal delivery. Doc. 1-1, Exh. 7.

59.     Contrary to the FAMU Regulations and because Defendant missed its notification deadline of January 18, 2024, Defendant changed the effective date of Professor Smith's termination from January 19, 2024, to January 30, 2024, even though FAMU Regulations indicate the effective termination date must have been indicated in the December 5, 2023, notice. Doc. 1-1, Exhs, 6, 7.

60.     Defendant provided additional appeal procedures to Professor Smith. Doc. 1-1, Exh. 6.

61.     Professor Smith prevailed in the initial appeal hearing with three lawyer-judges chosen by the Defendant with no relief received, and thus believed any appeal to Defendant would be futile because Defendant failed to accept the recommendation of the hearing panel comprised of three disinterested lawyers chosen by Defendant.

62.     FAMU Regulations provide that Defendant can appoint each and every decisionmaker in every step of the FAMU appeal process. Doc. 1-1, Exh. 7.

63.     Thus, there is no reason to believe Defendant will accept the recommendation of any decisionmaker who again recommends rescission of the notice to terminate moving forward.

64.     Nevertheless, Professor Smith notified Defendant by email of her intent to proceed with the appeal process on February 28, 2024. Defendant acknowledged receipt of Professor Smith's notice on that same day, then locked her out of her email on March 1, 2024. She has heard nothing further on the matter from Defendant.

65.     On January 29, 2024, the day Professor Smith was formally served with the second notice of intent to terminate her employment on January 30, 2024, she filed a TRO in state court because Appellee's employment decision would violate Professor Smith's federal and state constitutional, statutory, and contractual rights.

66. The trial court summarily denied Professor Smith's motion based on (1) an assumed fact that was not then or now in existence because Professor Smith was not and has not been terminated; and (2) a misunderstanding of the law concerning bond.

67. The trial court found that when the motion was received, Professor Smith's termination was effective. That is inaccurate.

68. Professor Smith emailed her emergency motion to the trial court at 11:45 A.M. on January 29, 2024, and perfected all issues with the emergency nature of the filing by 4:17 P.M. The trial court confirmed receipt of the motion on January 30, 2024, at 8:33 A.M., which is before the effective date of Professor Smith's purported termination and within ample time for an emergency hearing to be scheduled. Attached to this Motion as Exh. 3

69. Because the trial court assumed Professor Smith was already terminated, the trial court erroneously found no immediate and irreparable injury existed. The court specifically stated: "Unfortunately, by the time the Motion was received by the court, the terminative was arguable (sic) effective." Attached to this Motion as Exh. 4

70. Contemporaneous with the filing of her TRO motion, Professor Smith filed an Amended Complaint (Doc. 1-1) (verified) for injunctive relief and damages resulting from discrimination and retaliation under the Equal Pay Act, breach of

contract, First Amendment violations, and violation of her procedural due process. The amended complaint was served on February 2, 2024.

## II.    LEGAL STANDARD

To obtain a temporary restraining order, Professor Smith must show "(1) [she] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1209 (11th Cir. 2022). "The third and fourth factors 'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020) (citation and internal quotations omitted).

## III.    ARGUMENT

Professor Smith is entitled to a temporary restraining order for four reasons. First, she has established in her First Amended Complaint that her constitutional, statutory and contractual rights were violated. *See Bd. of Regents of State v. Snyder*, 826 So. 2d 382, 388 (Fla. 2d DCA 2002); *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989) ("[T]he law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the first amendment."); *See* Fla. Const. art I. §4 ("Every person may speak, write and

publish sentiments on all subjects but shall be responsible for the abuse of that right."); *Crocker v. Pleasant*, 778 So. 2d 978, 982 n.5 (Fla. 2001) (recognizing that the due process clause prohibits a state from depriving any person of life, liberty, or property without due process of law). Professor Smith's verified facts also establish a violation of her right to procedural due process. *See McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). Second, she has suffered and will continue to suffer immediate and irreparable harm absent a TRO. Third, she has established that public interest favors issuance of a TRO and any harm to the Defendant is severely outweighed by the threatened injury to Professor Smith's health, professional reputation, and overall livelihood. Fourth, she has established exceptional cause to waive the imposition of a bond in this matter.

### A. Professor Smith Has Shown a Substantial Likelihood of Success on Her Claims

Professor Smith is only required to show that her success is merely "*likely* or probable, rather than *certain.*" *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). This factor is the most important, *see Gonzalez*, 978 F.3d at 1271 n.12, thus Professor Smith addresses this element first.

#### 1.   *Equal Pay Act Retaliation*

Professor Smith is likely to succeed on her EPA retaliation claim. Defendant's Regulations do not define "retaliation." "The anti-retaliation provision of the Equal Pay Act, as incorporated into the FLSA, makes it unlawful for an employer to

discharge or otherwise retaliate against an employee for filing a complaint or instituting proceedings related to the FLSA." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1314 (11th Cir. 2018) (citing 29 U.S.C. § 215(a)(3)) *see also Seldon v. Total Sys. Servs., Inc.*, 653 F. Supp. 2d 1349, 1377 (M.D. Ga. 2009) (holding that Title VII and EPA retaliation claims are evaluated the same way); *Calicchio v. Oasis Outsourcing Grp. Holdings, L.P.*, 584 F. Supp. 3d 1215, 1253 (S.D. Fla. 2021) (same). Thus, to prevail on an EPA retaliation claim, a plaintiff must prove that "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000). A plaintiff may carry her burden of establishing pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

For purposes of this motion, Professor Smith engaged in protected activity when she filed a lawsuit to vindicate her EOP allegations. *See Simpson v. State of Alabama Dep't of Hum. Res.*, 501 F. App'x 951, 954 (11th Cir. 2012). Plaintiff has suffered an adverse employment action through Defendant's notice of termination and failed, ineffective termination on January 30, 2024. *See Davis v. Legal Servs.*

*Alabama, Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) (finding that termination constitutes an adverse employment action) (quotation omitted); *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 920 (11th Cir. 1993) (finding that a thirty day suspension was an adverse employment action).[10] There is a strong causal connection between Professor Smith's protected activity and Defendant's decision to terminate her in many ways. First, temporal proximity reflects a connection because only 22 days had passed between Defendant learning of Professor Smith's state complaint and Defendant's decision to terminate her. *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003). Second, there is no intervening event or action taken by Professor Smith to break the causal connection demonstrated by the 22-day window. Third, Defendant's refusal to follow its well-established guidelines demonstrates its retaliatory motive. *See Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 951 (11th Cir. 1991) ("Oftentimes, departures from well-

---

[10] At least one district court in this Circuit has recognized that a notice of intent to terminate constitutes an adverse employment action. *See Sorenson v. Delta Air Lines, Inc.*, No. 1:17-CV-00541-ELR, 2023 WL 5420953, at *18 (N.D. Ga. Mar. 31, 2023). Similarly, other circuits have similarly held that a notice of termination constitutes an adverse employment action. *See Fowler v. AT&T, Inc.*, 19 F.4th 292, 301 (3d Cir. 2021) (surveying the circuits); *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 305– 06 (2d Cir. 2017). Here, Defendants placed Professor Smith on immediate, paid leave until the pretermination hearing. To date, she remains on leave. Defendants have gone even further than that. Defendants did not stop at the leave, rather they have gone further and (1) stripped Professor Smith of access to her campus office, absent prior permission that may well be withheld and (2) required that Professor Smith immediately return all University equipment and property, e.g., her office keys, computer, computer passwords, and data files. These conditions effectively terminate Professor Smith before she even had her hearing. Now, they have stripped her of her email and legal research abilities as used for scholarship. Accordingly, Professor Smith has suffered an adverse employment action.

established guidelines are indicative of attempts to conceal a discriminatory motive through the use of ad hoc criteria which allow the defendant to cloak a discriminatory intent in ostensibly neutral rationales.").

Moreover, the Court should alternatively find that Defendant engaged in a chain of adverse actions against Professor Smith starting after her initial EOP complaint to President Robinson. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (finding a plaintiff satisfied her prima facie case by presenting evidence that Wal–Mart knew of her EEOC charge—she testified that she informed her Wal–Mart managers on February 10, 1995 that she had filed an EEOC charge of discrimination the day before—and that the series of adverse employment actions commenced almost immediately after management learned she had filed the charge.).

Having satisfied her *prima facie* case, Professor Smith has established any reason proffered by Defendant is pretext. Defendant will argue the termination is based on "just cause." Such a position is illogical, unlawful, fraudulent, and unsupported any evidence because the preponderance of the evidence shows Professor Smith never took an action against the student (Wanamaker). Defendant's manufactured cause for her termination is pretext because none of the three things that Defendant has accused Professor Smith of qualifies as retaliation: 1) the October 5, 2023, memorandum, 2) the descriptive texts/emails, or 3) the proper re-filing of

her original complaint. The October 5, 2023, letter involved NO action taken – it was a call for help from the University about the safety of Professor Smith from a student who seemed unhinged and unbalanced and unusually preoccupied with Professor Smith. The "descriptive" texts/emails were made to another faculty and former student gathering an understanding of the student incident made from October 21-24, 2022, on the day of the student incident, and before any complaint or other protected activity was taken by the student. Only one was made on November 1, 2022, but Professor Smith was not even aware a complaint had been filed against her by the student until late January 2023.  The proper re-filing of Professor Smith's original complaint on the Compliance Hotline because the University administration failed to file it properly in violation of FAMU Regulations and Codes of Conduct cannot be considered retaliation either.

More importantly, on January 11, 2024, there was a hearing/conference that took place before a three (3) person panel on ZOOM. The panel consisted of lawyers from various departments on Defendant's main campus. The panel's report dated January 12, 2024, recommended that Defendant rescind its Notice to Terminate and stated that Professor Smith had not retaliated against MW, and thus, Professor Smith did not violate any University policies. The report only addressed the re-filing of the original complaint because a determination that Professor Smith did not engage in the alleged retaliation in the first instance nullifies any subsequent acts or theory of

25

continued retaliation, as well as the others clearly fail to satisfy the elements of retaliation. Notwithstanding the panel's recommendation to rescind the notice to terminate, Defendant indicated to Professor Smith that it intends to move forward with her termination – and this intention was made after the FAMU Regulations indicate it **must** have been done. This is all egregious because Defendant's manufactured reason for termination fails to meet the definition of retaliation by any standard. Professor Smith is therefore likely to prevail on her retaliation claim because she has satisfied her prima facie case, overcome any reason to be proffered by Defendant, and she has demonstrated the inconsistencies and contradictions sufficient to satisfy her burden at the pretext stage as contemplated in *Combs*, 106 F.3d at 1538.

### 2. *First Amendment Retaliation*

Professor Smith is likely to succeed on her First Amendment retaliation claim. For preliminary relief, a plaintiff must show that it is only likely or probable that "(1) [s]he engaged in protected activity, (2) [s]he suffered an adverse action, and (3) a causal connection exists between the protected activity and the adverse action." *Warren v. DeSantis*, 90 F.4th 1115, 1127 (11th Cir. 2024) (citation omitted). A public employee engages in protected activity only if she can overcome the government-speech doctrine. A plaintiff can overcome the government-speech doctrine provides if:

> that: (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a substantial part in the employer's decision to demote or discharge the employee. If he or she can make a prima facie showing, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision in the absence of protected speech.

*Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015).

An employee's petition relates to a matter of public concern if the content, form, and context of the petition, as revealed by the whole record, reveals as much. *See Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 398 (2011). "The forum in which a petition is lodged will be relevant to the determination whether the petition relates to a matter of public concern." *Id.* Moreover, when a plaintiff's petition interferes with government operations and a balancing against of the government and plaintiff's interest favors the employer, the employee's First Amendment claim will fail even though the petition is on a matter of public concern. *Id.*

Here, Professor Smith filed her complaint on October 17, 2023, to a public forum – Florida State Court. Her petition and the speech therein concerned matters of public concern because it involved alleged equal pay violations. *See generally Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 820 (11th Cir. 2022) (Lagoa, J., concurring) (explaining that women's rights are issues of

27

general public concern – Title IX context); *Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1555 (4th Cir. 1994) (recognizing women's rights as an issue of public concern). Professor Smith's state action also sought a declaration that Defendants violated the EPA, which as a matter of public policy would open the door to other women at the College of Law to investigate their own salaries (again). When Defendant became aware of the complaint 22 days later, Defendant then unlawfully interfered with Professor Smith's freedom of speech and petition because Defendant has retaliated against her by noticing her for termination for engaging in this speech/petition.

Additionally, Professor Smith's First Amendment interests outweigh the University's interest because Professor Smith has not taken any action to publicize or otherwise bring unnecessary attention to her filing, nor can it be stated that Smith's petition is interfering with College of Law or University operations. Professor Smith has been removed from campus and has not engaged in or otherwise been able to perform her duties as a professor, so she could not interfere with operations at the College of Law or University. Rather, silencing Professor Smith's concern would render a chilling blow to women across the country with regard to salary equity. *See Oakes Farms Food & Distribution Servs., LLC v. Sch. Dist. of Lee Cnty., Fla.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. 2021) (finding that termination would cause a chilling effect on speech). Lastly, "[t]he balance of equities tips in

favor of [a] plaintiff's interest in preventing infringement of their First Amendment rights." *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009). Finally, Defendant could not reach its decision in the absence of Professor Smith's protected conduct as is evident that months had passed, and Defendant had taken no action until Professor Smith filed suit.

### 3.    *Breach of Contract*

Professor Smith is likely to succeed on her breach of claim. "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citation omitted). Here, Professor Smith has an employment contract she signed on 4.14.2023 to end May 10, 2024 and that contract is similar to all others she signed in previous years.

Defendant has breached Professor Smith's employment contract by violating its own regulations (10.205, 10.204, 10.120 and others) when Defendant carried out a malicious investigation against Professor Smith and manufactured subterfuge for the intended termination of Professor Smith. (Doc. 1-1, Exh. 8) This breach is most analogous to doctors and physicians with medical privileges. Several Florida courts have considered breach of contract claims involving physicians who faced nonrenewal of their staffing privileges at hospitals and determination that such an

action amounted to a termination, or breach of contract, so injunctive relief issued. *Compare Spunberg v. Columbia/JFK Medical Center*, No. 97-8937 AH, 1997 WL 868607, at *1-3 (Fla. 15th Jud. Cir. Ct. Dec. 23, 1997) *with Shands at Lake Shore, Inc. v. Ferrero*, 898 So. 2d 1037, 1039 (Fla. 1st DCA 2005) and *Genchi v. Lower Fla. Keys Hosp. Dist.*, 45 So. 3d 915, 917 (Fla. 3d DCA 2010).

Florida state courts have also regularly concluded that a hospital's alleged contractual breach of their Bylaws is sufficient to grant compensatory and injunctive relief. *See Lawler v. Eugene Wuesthoff Mem'l Hosp. Ass'n*, 497 So. 2d 1261, 1264 (Fla. 5th DCA 1986) (collecting cases). Moreover, courts in other States have found that tenured professors face similarly immeasurable and catastrophic injury from an unlawful termination – New Jersey and South Carolina courts have, and their decisions offer instructive value. *See Amer. Ass'n of Coll. Professors v. Bloomfield Coll.*, 322 A.2d 846 (C.H. Div. 1974), *affirmed* 346 A.2d 615 (App. Div. 1975) [hereinafter, "*AACP*" or "*AACP v. Bloomfield*"]; *Zisk v. The Charleston School of Law*, Case No. 2015-CP-1003661 (Charleston Cir. Ct. 2015) (attached to this Motion as Exh. 5). The *Zisk* and *AACP* cases demonstrate that tenured professors – unlike traditional public employees – may suffer incalculable loss and injury if they are terminated for improper or unjust reasons.

Similarly, here, Professor Smith has damages that are unquantifiable because her reputational loss, inability to teach law, inability to return to practice as partner,

30

and overall professional losses are consistent with the harm suffered by the physicians in the cases mentioned above. Thus, Professor Smith has established a likelihood of success on this claim.

### 4.   *Violation of Procedural Due Process*

Professor Smith is likely to succeed on her procedural due process claim. The Florida and U.S. Constitutions both require "fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). "When bringing a section 1983 claim alleging a denial of procedural due process, three elements must be shown: (1) a deprivation of a constitutionally-protected [] property interest; (2) state action; and (3) constitutionally-inadequate process." *Bradsheer v. Fla. Dep't of Highway Safety & Motor Vehicles*, 20 So. 3d 915, 918 (Fla. 1st DCA 2009). A "tenured employee is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story" before a state or state agency may terminate an employee. *See McKinney*, 20 F.3d at 1561. Specifically, "[p]rofessors dismissed from an office held under tenure provisions have been held to have a 'property' interest in the continued receipt of benefits." *See Johnson v. Sch. Bd. of Palm Beach Cnty.*, 403 So. 2d 520, 526 (Fla. 1st DCA 1981).

Here, Professor Smith has a property interest in her employment as a tenured law professor. Additionally, Defendant is an extension of the state, so state action is also satisfied. One case is truly instructive regarding the final element of inadequate process, and that case is *Spiegel v. University of South Florida*, 555 So.2d 428 (Fla 2d DCA 1989). In Spiegel, the court held that "[a] written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown." 555 So.2d at 429 (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)). The court further found that "USF's attempt to terminate [Spiegel] as department chairman is so fatally defective that it is of no force or effect." *Spiegel*, 555 So.2d at 429.

Such is a similar case for Professor Smith. While Professor Smith was granted an opportunity to be heard and by an impartial panel, chosen by the Defendant, Defendant's ultimate decisionmaker was biased. The panel found Professor Smith completely without blame and recommended that the Defendant rescind the Notice of Termination. The Defendant, without reason, has refused to follow the panel's decision and has suggested that Professor Smith re-appeal. That means the alleged procedural due process was not fair at all and Defendant predetermined that it would uphold its decision to terminate Professor Smith even if the panel found otherwise – which the panel did. Furthermore, the Defendant missed the deadline to notify

Professor Smith that she was going to be terminated nonetheless, so Defendant in violation of the FAMU Regulations reset the termination date to avoid not complying with its own notice requirements. Like *Spiegel*, the Defendant's procedural process is so fatally defective it should also have no force or effect and Professor Smith, like *Spiegel*, should be immediately reinstated.[11]

The Defendant will likely argue Professor Smith has had the ability to appeal the decision through a separate complaint process likely to drag out six months. The law does not support that. In *State Dept. of Health and Rehabilitative Services v. Artis*, 345 So.2d 1109, 1112 (Fla. 4th DCA1977), the court stated: "where pursuit of an administrative remedy would be of no avail, there is no adequate remedy provided, and one is not required to follow that avenue for relief." *See also Southern Bell Telephone and Telegraph Co. v. Mobile America Corp., Inc.*, 291 So.2d 199 (Fla.1974). Accordingly, Professor Smith is likely to prevail on this claim as well.

### B. Professor Smith has suffered and will continue to suffer irreparable harm.

---

[11] Professor Smith has filed a complaint pursuant to FAMU regulation to preserve her rights and Defendant has until March 14, 2024, to hold a Step One hearing. However, this matter is ripe for consideration because Defendant's Regulation 10.206 contains a "Resort to Other Procedures" provision, which Professor Smith argues is facially unconstitutional as it violates the First Amendment. This provision states in part that "If prior to seeking resolution of a dispute by filing a complaint under this rule, a complainant seeks resolution of the matter in any other forum, administrative or judicial, the University shall have no obligation to entertain or proceed further with the matter pursuant to this rule." The University should not be able to legitimize retaliating against an employee's first amendment rights to petition. Moreover, by revoking Professor Smith's email access shortly after she expressed her intention to utilize the Defendant's appeal process, and considering the Defendant's capacity to disregard its own appeal procedures once an employee resorts to legal action, it strongly indicates that the Defendant has no intention of honoring its appeal process.

Professor Smith has suffered irreparable harm in a number of ways. First, she has alleged an abridgement of her First Amendment rights and "it is well established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (alterations and citations omitted). Second, irreparable harm is usually presumed in breach of contract actions arising under Florida law. *See, e.g., Capraro v. Lanier Bus. Prod., Inc.*, 466 So. 2d 212, 213 (Fla. 1985); *Lawler*, 497 So. 2d at 1264; *Spunberg v. Columbia/JFK Medical Center*, No. 97-8937 AH, 1997 WL 868607, at *1-3 (Fla. 15th Jud. Cir. Ct. Dec. 23, 1997). Third, Professor Smith's loss of her constitutional rights to due process also signify irreparable harm because such a loss cannot be restored. *See, e.g., Messina v. City of Fort Lauderdale, Fla.*, 546 F. Supp. 3d 1227, 1253 (S.D. Fla. 2021) ("Money damages, after all, won't compensate them for the past deprivation of their constitutional rights."). Lastly, money damages cannot compensate her for loss of continuous employment. Nor can money damages compensate her for aspirational or reputational damages and losses that she will otherwise suffer if she is terminated for manufactured cause.

### C. Professor Smith's interest prevails on balance.

Here, the threatened harm to Professor Smith outweighs the harm that a temporary restraining order would inflict on Defendant. Professor Smith has a right

to her constitutionally protected due process protections and property interests in her continued tenure. *See Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("when the state is a party asserting harm, [it] has no interest in enforcing an unconstitutional law."); *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020) ("neither the government nor the public has any legitimate interest in enforcing an unconstitutional ordinance."). Defendant's violations of Professor Smith's constitutionally protected rights are causing, and will continue to cause, imminent and irreparable injury to Professor Smith's constitutional entitlements of due process, to her academic career, to her professional reputation, and to her standing in the academic community.

### D. Professor Smith Has Established Good Cause to Waive Imposition of a Bond

The "bond requirement may be waived if bond is not requested, or if no evidence is presented that a party will suffer damages from the issuance of an injunction." *Tancogne v. Tomjai Enterprises Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005). "[W]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *See Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009). Here, Professor Smith alleges she faces insurmountable losses professionally and personally and that her First Amendment rights have been abridged. Her loss of first amendment rights, even for a second, constitutes catastrophic injury-in-fact.

Therefore, Professor Smith respectfully asks this Court to use its discretion to waive imposition of a bond in this instance. The Defendant will not suffer any damages by the Court's grant of injunctive relief.

## IV.   CONCLUSION

Given the severity of the constitutional, statutory, and contractual rights and public impact of the matter presently on appeal as explained above, coupled with the immediate and irreparable harm, justice requires that this Honorable Court set a hearing for the parties to be heard. As a result of the unlawful conduct on the part of Defendant, Professor Smith will suffer immediate and irreparable injury, and loss and damage of a substantial nature if preliminary injunctive relief is not granted as more fully set forth in the First Amended Complaint. Defendant will not suffer any prejudice by being required to maintain the *status quo* through the issuance of a preliminary injunctive order.

Accordingly, Professor Smith hereby requests the Court schedule a hearing on her Motion for a Temporary Restraining Order so all the parties can be heard on this matter.

Dated: March 6, 2024

Respectfully submitted,

*/s/ Jennifer Smith*
Jennifer Smith
Florida Bar No. 964514 (*pro se*)
Law Office of Jennifer Smith
13506 Summerport Village Pkwy.
Suite 108
Windermere, FL 34786
407-455-0712
407-442-3023 (facsimile)
jensmithesq@aol.com

37

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6<u>th</u> day of March, 2024, I electronically

mailed the foregoing with the Clerk of the Court by using the CM/ECF system,

which will send a notice of electronic filing to all registered users.

<u>*/s/ Jennifer Smith*</u>
Jennifer Smith (*pro se*)
Law Office of Jennifer Smith