## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**JENNIFER SMITH,**

     **Plaintiff,**

                                 **CASE NO: 6:24-cv-00457-PGB-RMN**

**FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY
BOARD OF TRUSTEES,**

     **Defendant.**
_____/

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM

     Pursuant to Federal Rule of Civil Procedure 65 and Middle District of Florida Local Rule 6.02, Plaintiff, Jennifer Smith ("Professor Smith") respectfully moves this Court for an Order restoring the status quo ante and preliminarily enjoining the Defendant from carrying out its threatened and impending termination or reinstatement if so. Professor Smith is entitled to a preliminary injunction against the Defendant and, in support, she alleges:[1]

_____

[1] This is not a reconsideration of the TRO. The TRO sought to preserve the status quo. This motion seeks to restore the status quo ante. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974), among other things.

**PRELIMINARY STATEMENT**

While preliminary injunctions are extraordinary equitable relief, they are issued in situations remarkably similar to Professor Smith's case. Professor Smith remains in limbo with regard to her employment (and attendant job benefits – health insurance etc.) at the Florida Agricultural & Mechanical University College of Law, having had no communication with Defendant since February 28, 2024 in which Professor Smith's notice for appeal was acknowledged and before that January 29, 2024 when she was served with a second notice of intent to terminate. Each day that Professor Smith is not in the classroom she suffers unmeasurable reputational loss among students, who will soon join her in the practice of law, her colleagues in the legal academy, and potential employers should she elect to seek employment elsewhere.

Established precedent dictates that university professors pursuing discrimination claims, having pursued all available administrative remedies, need not demonstrate irreparable harm to qualify for a preliminary injunction for reinstatement while their case is pending – it is presumed.[2] Other federal courts have found irreparable harm and issued preliminary injunctions for professors and other public employees where the Defendant's violations of its own rules and regulations concerning notice of non-reappointment to a non-tenured professor gave a

---

[2] *Middleton-Keirn v. Stone*, 655 F.2d 609 (1981).

reasonable expectation of continued employment, and found that in addition to loss of income, the professor would have suffered a loss of repute within the academic community as well as a denial of access to research resources vitally necessary to an academician, both of which are insusceptible of compensatory measurement. Those cases remarkably mirror the circumstances now involving Professor Smith.

## I.    RELEVANT BACKGROUND[3]

1.    Jennifer Smith is a tenured, full professor at the Florida A&M University College of Law with a stellar employment history. (Doc. 6-1 #1).

2.    From 2004 through December 4, 2023, Professor Smith regularly worked onsite at Defendant's law campus in Orlando, Florida.

3.    On October 17, 2023, Professor Smith commenced this action in state court.

4.    On December 5, 2023, Defendant sent Professor Smith a Notice of its intention to terminate her from her tenured professor position. Within that notice, Defendant immediately restricted Professor Smith's access to campus pending a predetermination hearing should she elect for one.

---

[3] Professor Smith incorporates the allegations in the Amended Complaint, (Doc. 1-1) which is verified, and its 11 attachments, as well as Professor Smith's Declaration (Doc. 6-1 #1), as stated herein. All documents upon which she relies are already on the docket.

5.      On December 12, 2023,  Professor Smith elected for a predetermination hearing, so as to ensure she exhausted her administrative remedies, and she notified Defendant.

6.      Defendant held the predetermination hearing on January 11, 2024, before a three-person panel of lawyers chosen by Defendant.

7.      In its report dated January 12, 2024, the panel, unanimously, found no just cause to terminate Professor Smith and recommended that Defendant rescind its notice of termination to Professor Smith. The panel's report stated:

> The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". **After careful and thorough deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.**[4] (Emphasis added.) Amended Complaint (Doc. 1-1, Exh. 7, page 3).

8.      On January 18, 2024, Professor Smith emailed the Defendant to ask about the outcome of the predetermination hearing because that day was the deadline for notification if the Defendant intended to continue with Professor Smith's termination.

---

[4] There were actually two other retaliation allegations the Defendant invented that were so blatantly inconsistent with the basic elements of retaliation that the three-member lawyer panel did not even address those allegations in the hearing and ignored them in the recommendation.

9.      Defendant ignored Professor Smith until January 19, 2024, at 6:45 pm.

10.     Defendant then apologized for the delay and said that the "letter should be available next week." This "delay" was a critical missed deadline of Defendant's own rules and regulations. The missed deadline – violation of its own rules and regulations – gave Professor Smith a reasonable expectation of continued employment.

11.     In the late afternoon of January 23, 2024, Defendant emailed Professor Smith to indicate that it was moving forward with her termination even though the panel recommended Defendant not do so, and even though this notice was beyond the mandatory notification date to continue with Professor Smith's termination. Because Defendant violated its owns rules and regulations by failing to notify Professor Smith by January 18, 2024, Defendant changed the termination date from January 19, 2024 to January 30, 2024. Professor Smith was properly/formally apprised of this new effective date on January 29, 2024, eleven days after Defendant was required to notify Professor Smith by personal or certified mail.

12.     In the Defendant's notification that it intended to proceed with her termination, Defendant offered Professor Smith the opportunity to re-appeal.

13.     On February 28, 2024, Professor Smith notified Defendant by email of her intent to proceed with the administrative appeal process (re-appeal), and it was

immediately acknowledged by Associate Dean Reginald Perry. Professor Smith has heard nothing further on it.

14.    From December 5, 2023, until on or about March 1, 2024, Professor Smith retained access to all legal research platforms and her email account, and she was on the Defendant's law website. As of the date of this motion, Professor Smith only remains on Defendant's law website. Her email account has been restricted, thereby eliminating her ability to proceed with the February 28, 2024 appeal. Also, her research resources have been eliminated.

15.    Professor Smith remained on Defendant's payroll from December 5, 2023 through February 23, 2024. She has been removed for the March 8, 2024 pay period and presumably beyond.

16.    Defendant has begun preparing the law schedule for Summer and Fall 2024, and Professor Smith has not been notified to teach for either academic session.

17.    Defendant will also soon begin accepting and awarding research grant proposals for which Professor Smith presumably will not be considered.

18.    On March 4, 2024, Defendant removed Professor Smith's state action to this Court.[5]

---

[5] Defendant complains that service was improper but has failed to carry its burden. Defendant has issued and operates under two general counsel advisories. First, OGC 11-01 which dictates the procedure that process servers must follow when appearing on campus to serve the University with legal documents. OGC 11-01 specifically states "Process servers requesting to present University personnel with subpoenas, warrants or court documents involving official University business must be directed to the appropriate person or department pursuant to OGC Advisory 13-01. When

## II.    LEGAL STANDARD

"The grant or denial of a preliminary injunction rests in the discretion of the district court." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).[6] "The district court does not exercise unbridled discretion[;] however[,] it must exercise that discretion in light of what we have termed 'the four prerequisites for the extraordinary relief of preliminary injunction.'" *Id.* To obtain a preliminary injunction, Professor Smith must establish "that (1) [she] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *See Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020). "Employees who, having exhausted EEOC or other administrative remedies, have filed Title VII actions in the district courts seeking final adjudication on the merits … petition the court for a preliminary injunction, the

---

notified, the DPS (Dept. of Public Safety) or the OGC (Office of General Counsel) will assist, as appropriate, by escorting or making appropriate contact with the necessary individuals on campus to ensure a non-disruptive process for the investigating outside agency." Second, OGC 13-01 tracks Florida statute defining who can be served. Here, Defendant claims that its administrative assistant is not a designee under Florida statute and OGC 13-01. Defendant's argument is nothing more than gamesmanship because Professor Smith's process server verified the identity of the administrative assistant and questioned the assistant to ensure he could properly receive service. The administrative assistant confirmed his authority and under the principles of agency, Professor Smith should not be held responsible for Defendant's poor office management. As a final point, Defendant has regularly permitted assistants to receive service in the care of the Board of Trustees, as evidenced by Cynthia Henry having accepted service in 2018.

[6] Decisions from the Fifth Circuit Court of Appeals issued before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

element of irreparable injury will be presumed." *Middleton-Keirn v. Stone*, 655 F.2d 609, 612 (1981). "The third and fourth factors 'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020) (citation and internal quotations omitted).

> According to *Callaway*,

> > The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. **If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties**, *Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 9 Cir. 1953, 207 F.2d 190, by the issuance of a mandatory injunction, see 7 Moore's Federal Practice P65.04(1), or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Id.* at 576. (emphasis added)

"In exceptional situations, however, where an irremediably deteriorating condition threatens to thwart the Court's ability to render a proper final judgment on the merits later, the Court must act to preserve or restore the vanishing **status quo ante**." *Schrank v. Bliss*, 412 F. Supp. 28, 34 (M.D. Fla. 1976) (emphasis added); *see, e.g.*, *Porter v. Lee*, 328 U.S. 246, 251 (1946) ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction **restore** the **status quo**. The

Administrator, therefore, was entitled to seek a restoration of the status quo in this case.").

## III.   ARGUMENT

Professor Smith is entitled to a preliminary injunction that restates her to the status quo ante as a professor teaching at the law school.

### A. Professor Smith Has Established Irreparable Harm.

"It is often loosely stated that the purpose of a preliminary injunction is to preserve the status quo." *Callaway*, 489 F.2d at 576. Binding precedent has long established that "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by **returning to the last uncontested status quo between the parties**, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *See id.* (internal citations omitted). As will be shown below, Professor Smith has demonstrated the irreparable harm that she is currently experiencing clears the precedential bar and justifies issuance of a preliminary injunction.

This Court previously focused on lack of irreparable harm for injuries presumably remediated by money damages and a quick assessment that the public's interest is unserved by monetary damages in denying Professor Smith's request for a TRO. The Court's finding does not appreciate binding precedent requiring it to

consider irreparable harm that a plaintiff is currently experiencing and not just future harm. When irreparable injury cannot be shown, preliminary injunctions are improper in employment-termination cases. *Sampson v. Murray,* 415 U.S. 61, 92 (1974).

There are two ways to show irreparable harm in these types of cases. One is presumed where employees who, having exhausted EEOC or other administrative remedies, have filed Title VII actions in the district courts seeking final adjudication on the merits.[7] *Stone*, 655 F.2d at 612. The other line of cases involves an employee seeking a preliminary injunction during the pendency of an EEOC or other agency action. These cases have held that an employee with a charge in this posture must show irreparable injury in order to warrant issuance of a preliminary injunction. *Id.* Professor Smith believes her case mirrors the plaintiff in *Stone*, but argues that she can show irreparable injury under *Sampson* and its progeny as well.

*Sampson* anticipated the extraordinary situation that Professor Smith is currently in. In *Sampson*, a probationary – untenured – employee with the Public Buildings Service of the General Services Administration (GSA) was discharged four months after she began working for GSA. 415 U.S. at 62-63. The probationary employee was "granted a temporary restraining order, and after an adversary hearing

---

[7] To be clear, *Stone* involved a Title VII claim and this case an EPA claim, but both are federal claims that aim to remedy workplace discrimination.

extended the interim injunctive relief in favor of respondent until the Acting Commissioner of the Public Buildings Service testified about the reasons for respondent's dismissal." *Id.* at 63. The D.C. Circuit affirmed the trial court's issuance of the TRO and the U.S. Supreme Court granted certiorari to (1) confirm a trial court's authority to grant injunctive relief and (2) clarify when such relief should be granted. *Id.*

The Supreme Court vacated the trial court's TRO finding an absence of irreparable harm from the probationary employee's unverified complaint having alleged that "she might be deprived of her income for an indefinite period of time, that spurious and unrebutted charges against her might remain on the record, and that she would suffer the embarrassment of being wrongfully discharged in the presence of her co-workers." *Id.* at 89.  That Court held "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Id.* at 90. However, the Court also recognized that "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Id.* at 92 n.68. In recognizing this narrow exception, that Court made clear "insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support

a finding of irreparable injury, however severely they may affect a particular individual." *Id.*

Notwithstanding the high bar that *Sampson* has placed on irreparable harm in employment cases, several employees have presented unique and distinctive facts sufficient to clear that high standard. These cases are so analogous to Professor Smith's case that preliminary relief must be granted to Professor Smith. The following cases are instructive.

First, and most on point is *Assaf v. v. University of Texas System*, in which a Dr. Said A. Assaf was a nontenured faculty member in his second year at the University of Texas Health Science Center who received notice on March 22, 1975, that his appointment would be terminated no later than September 1, 1975. 399 F. Supp. 1245, 1245-47 (S.D. Tex. 1975), *appeal dismissed and vacated on other grounds,* 435 U.S. 992 (1978). Dr. Assaf moved for and received a preliminary injunction to prevent the University of Texas from terminating him based on the University's alleged failure to follow its own Rules and Regulations on dismissal notifications. The court made the following finding concerning irreparable harm:

> Here, there is much more than a temporary loss of income which the *Sampson* court admonishes to be insufficient to alone constitute irreparable injury. ***Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician, especially one in the sciences.*** Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. ***Further, even a temporary deprivation of the cloak of professorial status which***

> ***allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money.*** Also, here plaintiff faces termination less than a week from the date of this court's hearing. It is clear that this situation has come about purely from the inability of plaintiff to clearly ascertain his status until a short time ago. ***If any fault is to be found, it is in the bureaucratic monolith which operates in most state institutions.*** Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable. Therefore, at least until there has been a fair determination, in a proper hearing, of the validity of plaintiff's termination, this court is persuaded that fundamental fairness requires that plaintiff's employment not be terminated.

*Id.* at 1251 (internal citations omitted)(emphasis added).

Second, another judge from this Court examined a deputy sheriff's plea for a preliminary injunction to restore the status quo ante and distinguished *Sampson* in *Schrank v. Bliss,* 412 F. Supp. 28 (M.D. Fla. 1976). In *Schrank*, the deputy sheriff was a non-probationary, permanent employee with good behavior and above satisfactory performance who was at no point "afforded [] procedural due process over the nearly five past months [since his termination], nor has he any realistic hope of such in the foreseeable future." 412 F. Supp. at 37. The court described the irreparable harm as being *inter alia* two-fold. One, "[the deputy sheriff] is handicapped by a system of police officer certification, established by State statutes, that guarantees that every potential law enforcement employer will be alerted to the fact of, and the alleged reason for, plaintiff's termination. That is both actual and official stigmatization." *Id.* Two, "the official records . . . charging [the deputy] with insubordination, especially when coupled with the highly dubious validity of that

13

charge, constitute a scandalizing stigma to plaintiff's professional stature as a law enforcement officer." *Id.* The court granted the preliminary injunction; the defendant was enjoined pendente lite from preventing, interfering with, or otherwise altering the employment of plaintiff as a Lake County Sheriff's deputy; and upon receipt of plaintiff paying a $250 bond,[8] plaintiff was reinstated to his permanent position as a deputy sheriff.

Third, another judge from this District recognized a modern example of irreparable harm in the employment context post-Sampson in *Blaine v. N. Brevard Cnty. Hosp. Div.*, 312 F. Supp. 3d 1295, 1307 (M.D. Fla. 2018). In *Blaine*, seven well-regarded oncologists with impeccable track records of providing excellent patient care were denied reappointment, continued staff privileges, and the right to a hearing; but they were offered an interview or appeal with members of the Board who voted to reject them. 312 F. Supp. 3d at 1298-1302. The oncologists moved for and received a preliminary injunction, and the Court made the following finding concerning irreparable harm:

> On review, the Court finds that Plaintiffs have met their burden of showing irreparable injury that cannot be monetized. First, denying Plaintiffs' Reappointment Applications caused and continues to cause irreparable injury to Plaintiffs' critically ill cancer patients who have not and cannot receive the same type of care as before. Maintaining the relationship between a patient and treating physician is of paramount concern and cannot be taken lightly. PMC's apparent

---

[8] $250 in 1974 is $1,659.88 in 2024, Amortization.org,
https://www.amortization.org/inflation/amount.php?year=1974&amount=250&to=2024.

indifference to patient well-being as weighed against protection of their own business interest leaves the Court nonplussed. No further degradation of care for these patients will be tolerated, and this alone constitutes "irreparable injury." ***Yet the Court is also troubled by PMC's dogged refusal to confirm whether Plaintiffs' denial constitutes a reportable event to the National Practitioner Data Bank. Hedging is unacceptable, since such reporting implicates Plaintiffs' right to practice and cannot be monetized.*** Therefore, coupling the injury to Plaintiffs' patients ***with the Data Bank reporting,*** the Court finds that irreparable harm exists to support injunctive relief.

*Id.* at 1307 (internal citations omitted) (emphasis added).

Fourth, in *Keyer v. Civil Service Commission of the City of New York*, two permanent civil service employees working in different employs were terminated without notice of charges or a hearing because "the License Division of the Police Department ('License Division') disapproved him for designation as a 'Special Patrolman.'" 397 F. Supp. 1362, 1364-65 (E.D.N.Y.1975). Both plaintiffs earned permanent status by satisfactorily performing during a six-month probationary period, "scoring high enough in written examinations to attain eligibility ratings, passing medical and physical tests, surviving interviews by appointing agencies and the so-called 'one-in-three rule'; *i.e.*, being chosen in preference to two other prospective appointees." *Id.* at 1365. The plaintiffs moved for and received a preliminary injunction and the court made the following finding concerning irreparable harm:

Both plaintiffs have not only lost job security, health insurance coverage and pension benefits but also reasonable expectations of advancement in their civil service careers. The longer they remain

> away from their chosen work, the greater are the chances that advancement will go to others. Eventual reinstatement, should they prevail in this action, will not adequately recompense them for the opportunities of promotion which in the interim pass them by. They need such relief now.

*Id.* at 1370. The court lastly distinguished *Sampson* by framing the facts before it as "a total denial of due process which has had the effect of terminating permanent civil service employment and stigmatizing the plaintiffs in an occupation peculiarly susceptible to such a stigma." *Id.* at 1372.

Here, Professor Smith's purported termination is far from the traditional case explained in *Sampson*. The typical employee is not a caretaker of her elderly father who depends on them for housing, round the clock care, and more. But Professor Smith is. The typical employee is not terminated in violation of the employer's stated obligations under the contract and its own rules/regulations, and then lured to follow a sham appeals procedure, but Professor Smith was. The typical employee is not given notice that she is or will be terminated then paid for a number of weeks after, retained in the public directory, and allowed access to company resources for a number of months. Again, Professor Smith was. The typical termination is not based on clearly dubious charges alleging a violation of a legal concept (retaliation) and fails to meet the elements of the legal concept and unrelated to work performance, but Professor Smith was. Lastly, a typical termination does not have reporting implications to state licensing authorities. Once again, the termination of a barred

attorney for misconduct has reporting obligations unlike the termination of a typical 9-5 employee. Nothing about Professor Smith's case is usual as contemplated in *Sampson*. Accordingly, Professor Smith has shown irreparable harm that cannot be remedied with monetary damages and that harm is her (1) "loss of repute within the academic community as well as a denial of access to research resources vitally necessary to a [legal] academician," *see Assaf*;[9] (2) loss of her health insurance and all the other benefits attendant with her job, *see Keyer*; (3) loss of career advancement opportunities for deanships in the face of dubious allegations, *see Keyer & Schrank*; (4) loss of her ability to secure a similar job in this market; (5) loss of her constitutional right to due process from Defendant's failure to follow the rules and regulations it was required to as articulated in Professor Smith's annual contract and its own rules/regulations,[10] *see Assaf*; (6) the potential for eviction, *see Schrank*; (7) damage to her reputation given her inability to complete scheduled scholarship,[11] *see Assaf*; (8) loss of an unblemished disciplinary record and resulting

---

[9] Even now, Professor Smith promised a law review publication, *The Journal of Race, Gender, and Ethnicity* at Touro Law Center, an article that she no longer has the ability to complete without access to her emails and the research database, and had to forfeit her ability to present at the symposium, "The Promise of Educational Equity" on March 21, 2024.

[10] While Defendant provided Professor Smith with a hearing, it was a sham because Defendant ignored that Professor Smith won the hearing and instructed her to re-appeal. This is a violation of Professor Smith's procedural due process under the Fourteenth Amendment. *Stewart v. Pearce*, 484 F.2d 1031, 1034 (1973)( finding that a hearing is required when any charge is made that "might seriously damage [a person's] standing and associations in his community . . . . For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'").

[11] See ftnt 9.

reputational damage as a for-cause termination under obviously dubious allegations is reportable to the Florida Bar, *see Blaine*; (9) lastly but concomitantly her loss of pay as she is the sole caretaker for her father who, with a memory disorder, is not supposed to be removed to another living space, *see Schrank.*

## B. Public Interest Factors[12]

Terminating Professor Smith, who has a consistently stellar employment record of high evaluations by students and deans and a remarkable scholarship history, would be a disservice to the public interest as was seen in *Assaf*. There the court found determined that the issuance of a preliminary injunction would indeed serve the public interest:

> [T]there is a highly important public interest in education and the educational process. The public has a right to except (sic) that faculty members who will directly or indirectly affect the education of their children shall be of impeccable character and have the highest credentials. An accompanying interest of at least equal importance is an interest that there be a fair determination that the educational system is not being deprived of the expertise of people of superior caliber for merely frivolous reasons not relevant to academic excellence. Until such a determination of the validity of termination has been made, then a presumption of competence and integrity which is an integral part of public confidence in public education mandates that a professor be retained. In a broader sense, this court is saying that the public interest in the present context is best served by not terminating an individual until the due process prescribed has been complied with.

*Id. at 1251-52; see also Blaine, Shrank, Callaway.*

---

[12] As stated above, The third and fourth factors 'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020).

### C. Remaining preliminary injunction factors

Professor Smith reincorporates and renews her arguments concerning the remaining preliminary injunction elements from her motion for temporary restraining order, as if stated herein. (Doc. 6-1). Professor Smith also renews her argument in support of waiving the imposition of bond.

### IV.   CONCLUSION

Professor Smith has established the elements necessary for a preliminary injunction, specifically that she suffered and continues to suffer immediate and irreparable injury, and loss and damage of a substantial nature if preliminary injunctive relief is not granted as more fully set forth in the First Amended Complaint. Defendant will not suffer any prejudice by immediately reinstating Professor Smith to her tenured position during the pendency of the litigation.


Dated: March <u>11</u>, 2024

Respectfully submitted,

<u>*/s/ Jennifer Smith*</u>
Jennifer Smith
Florida Bar No. 964514 (*pro se*)
Law Office of Jennifer Smith
13506 Summerport Village Pkwy.
Suite 108
Windermere, FL 34786
407-455-0712
407-442-3023 (facsimile)
jensmithesq@aol.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this <u>11th</u> day of March, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all registered users.

<u>*/s/ Jennifer Smith*</u>
Jennifer Smith (*pro se*)
Law Office of Jennifer Smith
