

# Florida Agricultural and Mechanical University

TALLAHASSEE, FLORIDA 32307-3100

OFFICE OF THE PROVOST AND
VICE PRESIDENT OF ACADEMIC AFFAIRS

TELEPHONE: (850) 599-3276
FAX: (850) 561-2551

*Excellence With Caring*

December 5, 2023

**Via Hand Delivery by Process Server,**
**Electronic Mail to jennifer.smith@famu.edu, and**
**CERTIFIED MAIL-7020 ▮▮▮▮▮ 5973**
**Return Receipt Requested**

**Re:** **CONFIDENTIAL**
**Notice of Intent to Dismiss from Employment**

Jennifer M. Smith
▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮


PLAINTIFF'S
EXHIBIT
6

Dear Professor Smith:

Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulations 1.019(21), 10.120, and 10.205, you are hereby notified of the University's intent to dismiss you from employment on January 19, 2024. You are placed on Administrative Leave with Pay, effective immediately, until the resolution of this process, in accordance with University Regulation 10.120. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. Regarding administering and grading your exams, arrangements have been made. Should you need access to your work area, please contact Deidre Keller, Dean of the College of Law, in advance for approval.

The reason for this employment action is the substantiated finding of retaliation documented in the FAMU Division of Audit and Compliance Investigation Report 2022-11-117, dated June 5, 2023, and Supplemental Report 2022-11-117, dated July 6, 2023, which are attached and incorporated in this Notice of Intent to Dismiss from Employment ("Notice"). Subsequent to the referenced reports, you continued to engage in behavior which you were advised was retaliatory, as evidenced by your memo dated October 5, 2023, also attached and incorporated in this Notice.

The University, therefore, proposes your termination from employment for just cause pursuant to University Regulations 10.205(5)(a) and 1.019(21). Evidence at any conference regarding your termination of employment may be used by the University to support its finding and all witnesses and evidence upon which the determination was based.

In accordance with University Regulation 10.120, you have ten (10) days – or until December 15, 2023 – from receipt of this Notice to submit a written request for a conference to provide an oral or written statement in response to this Notice. Your request for a conference may be provided to

DocuSign Envelope ID: A44B2D58-F35D-465B-AFC5-870FF03CD582

Dr. Reginald Perry, Interim Associate Provost for Academic Affairs and Faculty. Late requests will not be considered. The conference will be held on January 11, 2024, at a time and place determined by the University. You are permitted to bring a representative to advise and assist you in the process, but discovery, cross-examination, and similar legal procedures are not permissible. Any documentation you intend to present during the conference should be submitted to Dr. Perry no later than January 8, 2024, at reginald.perry@famu.edu.

Pending a final determination in this matter, you are expected to refrain from any behavior that disrupts the University, violates any University regulations or policies, and/or misuses any University resources, whether in person or via electronic mail. You are also expected to maintain professionalism throughout this process pursuant to University Regulations.

Additionally, please call to arrange the return of all University equipment and property, which you may have in your possession or control, to Reginald Green, Associate Dean for Student Services and Administration at the College of Law, pending the final decision. University equipment or property shall include any and all keys, cellular phone(s), iPads, laptop computers, electronic devices, computer passwords, flash drives, data files, both hardcopy and computer records. Any University equipment or property that you may have offsite of FAMU's campus must be returned to the University immediately.

The University desires to reduce the risk of error in taking this proposed action against you and to avoid damaging your reputation by untrue or erroneous charges. Therefore, the University is interested in receiving and considering your response in this matter.

Sincerely,

*Allyson Watson*

Allyson Watson, Ph.D.
Provost and Vice President for Academic Affairs

cc:     University Regulations 1.019, 10.120, 10.205
        Referenced documents- Reports and Memo

**DocuSign**

## Certificate Of Completion

Envelope Id: A44B2D58F35D465BAFC5870FF03CD582
Subject: Complete with DocuSign: J.Smith 12.5.23 FINAL.docx
Source Envelope:
Document Pages: 2     Signatures: 1
Certificate Pages: 1     Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Status: Completed

Envelope Originator:
Chardelyne Mercure
chardelyne.mercure@famu.edu
IP Address: 168.223.133.220

### Record Tracking

Status: Original
    12/5/2023 4:54:56 PM

Holder: Chardelyne Mercure
    chardelyne.mercure@famu.edu

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Allyson Watson<br>allyson.watson@famu.edu<br>Provost<br>Florida Agricultural and Mechanical University<br>Security Level: Email, Account Authentication (None) | *allyson watson*<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 168.223.133.122 | Sent: 12/5/2023 4:55:30 PM<br>Viewed: 12/5/2023 4:59:03 PM<br>Signed: 12/5/2023 4:59:07 PM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Kentayvia Coates<br>kentayvia.coates@famu.edu<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 12/5/2023 4:59:07 PM |

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/5/2023 4:55:30 PM |
| Certified Delivered | Security Checked | 12/5/2023 4:59:03 PM |
| Signing Complete | Security Checked | 12/5/2023 4:59:07 PM |
| Completed | Security Checked | 12/5/2023 4:59:07 PM |

| Payment Events | Status | Timestamps |
|---|---|---|



FLORIDA A&M UNIVERSITY
# OFFICE OF COMPLIANCE AND ETHICS

# Investigation Report
## *FAMU 2022-11-117*

Prepared by:

La'Tonya Baker

Approved by:

Rica Calhoun



FLORIDA A&M UNIVERSITY
**OFFICE OF COMPLIANCE AND ETHICS**

June 5, 2023

Larry Robinson, Ph.D., President
Florida Agricultural and Mechanical University
400 Lee Hall
Tallahassee, Florida 32307

Dear President Robinson:

Attached is FAMU-2022-11-117 Investigative Report, addressing allegations of employee misconduct regarding Professor Jennifer Smith. The Office of Compliance and Ethics (OCE) concluded that allegation 1 related to disruptive conduct is **UNSUBSTANTIATED** and allegation 2 related to retaliation is **UNSUBSTANTIATED**. However, an additional finding of retaliation related to Professor Smith's subsequent actions is **SUBSTANTIATED**. If you need further information, please contact our office.

Best,

*Rica Calhoun*

Rica Calhoun

Copy to:
FAMU Board of Trustees
Dr. Maurice Edington, Executive Vice President & Chief Operating Officer
Dr. Denise Wallace, Vice President and General Counsel
Deidré Keller, Dean, College of Law
Dr. Allyson Watson, Interim Provost and Vice President of Academic Affairs
Joseph Maleszewski, Vice President of Audit
Ella Kiselyuk, Associate Vice President, Chief Human Resources Officer
Jennifer Smith, Professor
Michelle Wanamaker, Student

## Background

On October 27, 2022, The Office of Compliance and Ethics (OCE) received a referral via email from the Office of Equal Opportunity Programs (EOP) Director, Dr. Latrecha Scott. College of Law student, Michelle Wanamaker, reported her concern regarding a negative interaction she had with Professor Smith and believed that Professor Smith violated the University Code of Conduct by her behavior.

## Authority

**University Regulation 1.019 (3) and (21) (University Code of Conduct)**
**University Regulation 10.111 (Disruptive Conduct)**

## Purpose

To determine whether Professor Smith violated University policy regarding the allegation of employee misconduct.

## Standards

The investigation was conducted in compliance with the principles and standards in the *Standards for Complaint Investigations for the State University System of Florida, published by the Florida Board of Governors*. Those standards require that we plan and perform investigations to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions. We believe that the evidence provides a reasonable basis for our conclusions.

## Scope

To determine whether Professor Smith violated the University policy regarding allegations of misconduct, OCE utilized the following methodology:

- Reviewed the complaint
- Interviewed parties and witnesses
- Reviewed relevant documents

## Complainant Interview

On October 25, Ms. Wanamaker emailed Markita Cooper, Associate Dean of Academic Affairs, a narrative of events that took place on October 20, 2022, stating that she wanted to file a formal complaint again Professor Smith. The complaint included the following:

*"I would like to file a formal complaint against Professor Jennifer Smith. Today, in front of multiple students Jennifer Smith entered and remained in my personal space. While within 2-3 of my face, she reprimanded me, and insulted me multiple times. At approximately 10:25 AM, I entered our usual classroom for Evidence. Jennifer Smith was sitting at the desk in the front of the classroom. There were no students inside. One of my colleagues was in the doorway. Upon entering the room, I said to her, "Professor Smith, we have Evidence in this classroom, and we need to..." She interrupted me and said, "I know, AT 10:30." I then tried to explain that we needed to come inside to be prepared for class on time. She interrupted me again and repeated, "AT 10:30." She then gestured me to get out. The physical gesture was with her hand, akin to how one would "shoo" an animal away. I did not respond. I left the classroom and proceeded to wait in the hallway. The hallway was filled with students waiting to enter Evidence and 1L's waiting for Professor Smith. There were at least 40 students in the hallway. My colleagues were visibly and audibly upset about our inability to enter our class and adequately prepare for lecture. It is normal practice for our professor to expect us to begin our case briefs at the very start of class. Additionally, our professor has previously given us timed pop-quizzes that begin at our class start time. We were anxious to enter our classroom. While in that hallway, I noticed Professor Smith's classroom was completely empty. One of my colleagues reminded me that Professor Henslee completes his Torts course in that room sometime around 10:00 AM. Professor Smith was on notice that we were anxiously awaiting entrance to prepare for our class. Her adjacent classroom was open and available, but she chose to remain in our class until seconds before our class start time. Jennifer Smith was knowingly interfering with our ability to be prepared for Professor Reyes's Evidence class. At approximately 10:30 AM, she swung the door open. I was standing to the left of the door, leaning against the wall. She stepped towards me, blocking the door, and stopped directly in front of my face. She said, "don't ever do that again" in a stern, diminutive tone. I said, "excuse me?" While still inches from my face she repeated, "I had a make-up class. Don't' do that again!" Her tone was raised, and she was in a physically threatening position to my body. She had me backed against the wall with her body directly in front of mine. I was in shock and paralyzed with fear. As she stepped away from my face, I replied, "You are being unprofessional." She was in the motion of opening the door to the classroom adjacent to ours where she typically conducts her 10:30 class. She heard me say she was unprofessional, and she abruptly turned around and belted out, "YOU ARE UNPROFESSIONAL AND WILL NOT GO FAR!" I responded again with, "excuse me?" She then repeated, aloud in the hallway, "YOU WILL NOT GO FAR!" This traumatic event happened in the presence of 40-50 of my colleagues. Professor Smith's 1L Civil Procedure students were in the hallway, as well as my entire 2L Evidence class. After*

> *this exchange, multiple students approached me in shock. Many offered to support me and give their eye-witness account of this situation. Word began spreading immediately. I have been approached by multiple students offering support or asking what happened. I have received emails and phone calls regarding this event. This situation has me absolutely traumatized and dreading coming back to school at FAMU Law. I am a student leader on our campus who goes above and beyond to serve my colleagues and community with the upmost professionalism. I am the President of the Women's Law Caucus. I serve on the FAMU COL Student Leadership Committee. I am a Junior Editor on Law Review. I am the current Holland & Knight Scholar. I have organized and participated in countless events in support of our school. I am utterly sickened and discouraged by this violent encounter within the walls of our law school. Jennifer Smith was threatening in her proximity to my body, in her elevated tone, as well as her insults. She was so close to my face that I could feel the warmth of her breath. I felt assaulted. She degraded and embarrassed me in front of my colleagues. She bullied me and created a hostile environment for me at my law school. I have never engaged in a conversation with Jennifer Smith before today. Her verbal and physical aggressions were completely unprovoked. I do not feel safe in her presence. Jennifer Smith's abusive behavior was in direct conflict with 6C3-1.019 University Code of Conduct. I would like to pursue this complaint to the maximum extent possible."*

On November 15, 2022, Ms. Wanamaker provided five eyewitness statements from students that were present in the hallway during the interaction.

## Respondent Interview/Statement

### Jennifer Smith, College of Law Professor, February 1, 2023
Professor Smith denied the allegations, indicating that she "reviewed the relevant provisions that [OCE] cited, but none apply." Professor Smith explained that she was using another classroom for make u classes due to it being cancelled because of a hurricane. The following statement was provided via a February 7, 2023, memo sent the OCE:

---

*Substance of the Incident*

*On October 6, 2022, I reserved the subject classroom (Room 253) for October 20, 2022 for makeup classes, which were cancelled due to a hurricane (Exhs. G, J). The classroom is usually empty, and it is the classroom next to the one I was assigned for my 10:30am classes (Room 255) on M, T, TH.*

On October 20, 2022, I was in the classroom for oral exams, which require students to come in one by one for no more than about 3 minutes. The students wait outside the classroom until the next student comes out until the exams are complete. Sometime in the middle of the oral exams, a student (not WM) entered, and I explained that I was having oral exams. The student left. Soon after, MW aggressively entered and interrupted my student doing her oral exam. I explained to MW that I am having oral exams, and she did not care and responded with indignation that her professor, Prof. Reyes, told students to make sure they are set up for class at 10:30am. She felt entitled to be in the classroom before her class began. I said it is far from 10:30 am, and I have the room reserved. I literally had to verbally demand she leave for her to get out. She was not pleased and expressed that. She had to know that the classroom was being used because students were in the hallway chatting about what was going on in the classroom, including my students who were scheduled for oral exams.

At about 10:29am on that day, I finished the exams and gathered my stuff to exit the classroom, which has two entrances/exits. When I opened the door, MW was standing right there waiting to come in the classroom. I said to her not to do that again (referring to her entering the classroom being used and being rude), and she passed by me as she got loud and rude and was so disrespectful; I was floored. I knew by her aggressiveness that she was likely from the New York/New Jersey area - she's from Philadelphia, I later learned. She walked all the way to I believe the last row being absolutely disrespectful. When she was at her seat in the back, I said from the front door something like: "With your attitude, you will not get far in law/life."

At 10:30am, I texted Associate Dean Green about the incident, indicating that the student was "aggressive rude," then went into my classroom (255) to teach my class. A student of mine who saw it, Jo'Anna Clayton, asked me if I wanted her to get me some water before I started teaching. I declined. Associate Dean Green emailed back that night, and I assumed he would handle it from there (Exh. E).

Students began talking about the incident to others. On October 31, 2022, Prof. Patricia Broussard told me that the student was MW, who is supposed to be interning for the same firm where I was a partner. Prof. Broussard said she was looking for MW as it related to the women's law group and she asked a student/friend of MW's, who relayed to Professor Broussard that MW was not feeling well and was remorseful, ashamed and embarrassed about HER OWN conduct regarding something that occurred. I made a note of it (Exh. H).

Then, again in December, Professor Broussard relayed that she was in the stall of the ladies' room when she overheard a few students discussing how badly MW felt because of her conduct regarding the incident. Again, MW was concerned about HER OWN behavior and was physically ill about her conduct towards me. It appeared to me that MW's concern was largely concerned because I was a former partner with the firm. I did not hear much about this after. I said to Prof. Broussard that perhaps I should send MW an email to let her know that I am not going to report this incident to the law firm or the bar, although I believe it was questionable as to whether I had reporting obligations to The Florida Bar about the incident. Prof. Broussard said that it would be great if I did send MW an email to give MW peace and show her how professionals act or respond in these cases. Prof. Broussard has regular contact with the MW, who never mentioned the incident to Prof. Broussard.

On December 18, 2023, I sent the following email to MW (Exh. I):

Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.

*Best,*

*Prof. Smith*

*MW did not respond. I believed the issue was over until I received the emails from Ms. Baker on January 26, 2023 and January 27, 2023, with a bit more detail (Exhs. A, C). The first time I had any notice that I was ever the subject of an investigation regarding this incident was January 27, 2023, and with more details on February 1, 2023, yet apparently a complaint had been filed on October 27, 2022 - over 90 days before. The Dean's office made the unilateral decision to escalate the complaint without ever speaking to me, and I was never informed about the escalation of the student complaint orchestrated by the Dean's office nor was I informed that the complaint I filed a week before MW's was going to be ignored.*

*There are cameras in the hallway that should give some context of the incident.*

*Conclusion*

*I am not sure what I could have done to avoid this incident. I reserved the classroom, but even if not, students do not have the right to use the classrooms for study places, and they certainly do not have the right to use the classrooms being utilized by professors. Further, if a student walks in on a classroom, what response should he/she have but that he/she is sorry for the intrusion and depart quickly. This should never have been a "back and forth" argument with a student in the middle of another student's examination. I also should not have had to bump into or encounter the student as I was leaving the classroom. The student did not need to be at the door entrance, ready for battle as I exited.*

*I reported the immediately reported the incident of being confronted by an aggressive student, which Associate Dean Green indicated would be immediately handled. In reporting the incident, I assumed that the COL was handling it and would contact me as needed, but I certainly did not know that I was the alleged subject of an investigation at any point until over 90 days later. This is problematic and unprofessional.*

*I did not retaliate against the student; indeed, I sent her an email to give her peace about her behavior in the incident, which clearly she relayed to others. When I continued to hear how ashamed she was about her conduct, especially because I was a former partner at the firm she will be working soon, I gratuitously sent her an email to minimize her fears about relaying the incident to interfere with her career. I have emails and witnesses about the student remorse regarding her OWN conduct, not mine.*

*The chain of documents alone that I have provided already and am resubmitting with this memorandum support my position that I reserved the room, was confronted by a student and reported the incident immediately, documented the student's alleged conversations to others about her own disruptive conduct, and harbored no negativity or retaliatory motives by the email I sent to MW to give her peace about her disruptive conduct. Never in my 30 years as a lawyer have I ever been accused of any employee misconduct.*

Professor Smith provided the name of a student who was also present and could give additional details related to the incident. She also provided the text message that she sent to Associate Dean Reginald Green.

 

## Employee Witness Interviews

### Reginald Green, College of Law Associate Dean March 13, 2023
Dean Green provided the following written statement:

"On October 20, 2022, around 10:30 am, Professor Jennifer Smith contacted me by text: "Hey…I had hurricane make up class in 254 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom. I immediately went to room 254 to investigate. Upon arriving at room 254, Professor Maritza Reyes had begun her class (which it appears followed Professor Smith's class) and Professor Smith had ended her class and left. Since Professor Smith's email did not communicate the name of the student, I sent her an email later that day telling her I would "try and identify the student tomorrow". I also encouraged her to send me her details about the "interaction" in writing. By the time I had identified who the student was, I was informed that the student had filed a grievance with Markita Cooper who was the Associate Dean for Academic Affairs. Per the Student Handbook, student petitions or grievances involving faculty should be forwarded to the Associate Dean for Academic Affairs. At the same time, I was notified that the complaint involved EOP issues (hostile environment and fear). Within days of learning of the complaint, I was copied on an email from then Provost Edington to Latrecha Scott who was Director of Equal Opportunity Programs and Labor Relations/Title IX. Provost Edington's instructions were for her to "please review and take appropriate

action." At that time, without a written complaint from Professor Smith and an internal inquiry being conducted by Associate Dean Cooper and EOP, the process had ended for me. Even if Professor Smith had sent a formal accusation of a student code of conduct violation, it would have been impractical to conduct two separate investigations without interfering with the other. It is my belief that an EOP investigation superseded a conduct allegation. While investigating the EOP allegation, it would be impossible not to evaluate the student's conduct."

**Markita Cooper, Associate Dean for Academic Affairs and Law Professor February 6, 2023**
Dean Cooper provided the following written statement:

*"I received Ms. Wanamaker's email with the complaint attached on Tuesday, October 25, 2022. The email cc'd another faculty member, Professor Maritza Reyes. I responded to the email on Tuesday, October 25, acknowledging receipt of the complaint and advised Ms. Wanamaker that I would ask my assistant to contact her to set up an appointment. In this message, I noted that Ms. Wanamaker had copied Professor Reyes and advised her that because the complaint raised sensitive personnel issues, it would not be appropriate for me to include other faculty members on communications regarding the matter. Ms. Wanamaker responded with a thank you in an email on Tuesday, October 25.*

*On the afternoon of Wednesday, October 26, Professor Reyes sent an email to Ms. Wanamaker, apparently in response to Ms. Wanamaker's email submitting the complaint. The email began with Professor Reyes stating, "I have been waiting for Associate Dean Markita Cooper to respond to the complaint you submitted to her about the incident with Professor Jennifer Smith last Thursday...I wanted to give her the first opportunity to respond." I had responded, but did not include Professor Reyes in the response, as explained in the message to Ms. Wanamaker. The message from Professor Reyes also stated, among other points, that "I infer that, because you copied me in your email/complaint to Associate Dean Cooper, that you want me involved in this matter."*

*Concerned about the nature of the allegations in the complaint (including bullying, creating a hostile environment, and "abusive behavior in direct conflict with 6C3-1.019 University Code of Conduct") as well as having another faculty member involved in the discussions of the complaint and any attempts to informally resolve the matter at the College of Law level, I sought guidance from the University EOP Office. I forwarded the complaint and related emails that I had received from Ms. Wanamaker and Professor Reyes to Ms. Kimberly Ceaser, Ms. Latrecha Scott, and Ms. Letitia McClellan on the afternoon of Wednesday, October 26.*

*On the evening of Wednesday, October 26, 2022, Ms. Wanamaker sent an email, stating that she needed clarification before scheduling a meeting with me. She requested clarification as to whether she was to be afforded an advisor during the meeting. Her position was that she was "afforded the right to have an advisor present during hearings and proceedings related to various violations of the Student Handbook." (This complaint, however, did not involve a violation of the Student Handbook.)*

> *After I forwarded the email messages to EOP, I was advised not to meet with Ms. Wanamaker, and that Ms. Ceaser would contact her and assist regarding the next steps in the process. On Wednesday, November 2, I sent an email to Ms. Wanamaker advising her that I had reached out to the University EOP Office. In this message, I also informed her that Ms. Ceaser was reaching out to her to assist with the next steps in the process."*

## Patricia Broussard, College of Law Professor, February 1, 2023

On February 2, 2023, Professor Broussard acknowledged that she advised Professor Smith to reach out to Ms. Wanamaker. Professor Broussard explained that she became aware from students that Ms. Wanamaker was upset about her actions. Professor Broussard said that she told Professor Smith that this was a way to show Ms. Wanamaker that she would not hurt her and how women could uplift one another.

# Student Witness Interviews

### Complainant Witnesses

The OCE spoke with four of the five students who confirmed the statement received from the Complainant was true and accurate. In summary, the students recalled hearing Professor Smith aggressively saying that "you won't go far" to Ms. Wannamaker in a loud tone and commented that it was unprofessional.

### Respondent Witness

On February 8, 2023, OCE spoke with the student that Professor Smith said could provide information. The student confirmed being present and outside of the classroom. The student recalled Ms. Wanamaker being next to her "with an attitude" and Professor Smith whispering to Ms. Wanamaker that her behavior was inappropriate; however, Ms. Wanamaker replied, screaming, that Professor Smith was being inappropriate. They both exchanged words, with Professor Smith telling Ms. Wanamaker that she would not go far. Ms. Wanamaker walked off stating that she was going to go tell Dean Cooper.

# Additional Documents Reviewed/Requested

### Video Footage

On January 31, 2023, the OCE requested video footage from room 253 on October 20, 2023, between 10:25 a.m.-10:30a.m. from Terence Calloway, Chief of Police. Chief Calloway reported that video footage was unavailable.

### Respondent Subsequent Memoranda

Professor Smith also provided subsequent memoranda on the following dates:
Memo #2 was received on February 9, 2023
Memo #3 was received on February 16, 2023.
Memo #4 was received on February 26, 2023.

Memo #5 was received on February 27, 2023
Memo #6 was received on March 23, 2023

### Email from Ms. Smith to Ms. Wanamaker

On January 24, 2023, the Complainant stated that in December 2022, Professor Smith emailed her the following, in pertinent part:

> **From:** Smith,Jennifer<jennifer.smith@famu.edu>
> Sent: Sunday,December18,20227:16PM
> To: Wanamaker,Michelle<michelle1.wanamaker@famu.edu>
> Subject: FAMU COL
>
> *Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*
>
> *Best,*
>
> *Prof. Smith*

On February 1, 2023, Professor Smith stated that the only reason she emailed the Complainant was because Professor Broussard told her that she should, as Ms. Wanamaker felt badly about how she behaved. Professor Smith related that Professor Broussard told her that the Complainant felt bad about how she acted and was nervous because she (Professor Smith) was a former partner at Holland & Knight.

## Discussion

**Allegation 1: Professor Smith engaged in disruptive conduct by her behavior during an interaction with Complainant, in violation of University Regulations 10.111 and 1.019.**

University Regulation 10.111 establishes guidelines for employee relationships to set behavioral expectations for the University. Individuals engaged in disruptive conduct under the policy:

*[Disruptive Conduct is defined as] ...*

*(1) Faculty, Administrative and Professional, and USPS employees who intentionally act to impair, interfere with, or obstruct the orderly conduct, processes, and functions of the University shall be subject to appropriate disciplinary action by the University authorities ...*

*c. Interference with the freedom of movement of any employee or guest of the University;*

*d. Deliberate impediment to or interference with the rights of others to enter, use, or leave any University facility, service, or scheduled activity, or in carrying out their normal functions or duties ...*

The regulation provides a non-exhaustive list of examples of prohibited behavior. This expectation is reinforced by the University Code of Conduct (University Regulation 1.019), which sets standards for adherence to policy and regulation.

According to witness statements, Ms. Wanamaker and Professor Smith had a negative interaction when Ms. Wanamaker entered a classroom early for her regularly scheduled class, interrupting Ms. Smith's administration of an exam. Professor Smith booked that same class for make-up oral exams that ended immediately before Ms. Wanamaker's class began. Ms. Wanamaker argued that her class was starting soon and her professor wanted the class seated and ready for class. Professor Smith told Ms. Wanamaker to leave. The interaction picked up again when Professor Smith exited the classroom and Ms. Wanamaker was standing near the classroom door. During their conversation, Professor Smith stated that Ms. Wanamaker "would not go far." Ms. Wanamaker asked Professor Smith to repeat herself and Professor Smith loudly repeated that Ms. Wanamaker would not go far. Ms. Wanamaker then loudly responded that Professor Smith was inappropriate and unprofessional.

Based on the information available, Professor Smith's behavior did not interfere with Ms. Wanamaker's freedom of movement, her scheduled class, or obstruct university processes. Witness statements indicate that Ms. Wanamaker and Professor Smith were close during the confrontation, but Ms. Wanamaker had a path to walk away from the interaction, either further into the hallway or into the classroom. Witness statements indicate that Ms. Wanamaker actually walked back into her scheduled classroom and turned back around to say, "excuse me?" to Professor Smith, who repeated herself. Ms. Wanamaker's class also continued as scheduled.

While a witness stated that Professor Smith's behavior was startling and made them uncomfortable, the behavior did not rise to the level of restricting Ms. Wanamaker's freedom of movement or disrupting University processes. OCE is concerned about the tone of described interaction between a professor and student; however, the allegation is **UNSUBSTANTIATED**.

## Allegation 2: Professor Smith retaliated against Complainant after discovering that Complainant filed a complaint.

University Regulation 1.019(21) regarding retaliation states,

> "Members of the University community are prohibited from engaging in retaliation against another for reporting compliance or ethics-related concerns or participating in an investigation due to such reports. Findings of retaliation are independent of the underlying claim of violation and will result in disciplinary action, up to and including termination. Retaliation against any

individual for their actual or perceived involvement in an investigation is prohibited by the University."

Retaliation is established when an individual takes adverse action against another because of their participation in an investigation or opposing perceived violations of University policy or law. Such adverse action is actionable when it could reasonably deter an individual from engaging in such activity.

Ms. Wanamaker reported that Professor Smith's December 18th email was sent to intimidate her. According to witness and Respondent statements, Professor Smith's email to Ms. Wanamaker was sent at the behest of a colleague, who thought it would be helpful to make Ms. Wanamaker feel better. The motivation for Professor Smith's email indicates that the email was not sent with adverse intent.

The allegation is **UNSUBSTANTIATED.**

# Additional Finding

OCE became concerned with how Professor Smith responded after she was made aware that Ms. Wanamaker filed a complaint against her.

In response to the complaint, Professor Smith indicated that she filed a complaint with Reginald Green, Associate Dean for Student Services and Administration, on October 20, 2022:





The College of Law Faculty Handbook states the following regarding faculty complaints against students:

> C. STUDENT MISCONDUCT
>
> The Student Code of Academic Conduct is outlined in the Student Handbook. Faculty allegations of student misconduct not covered by the Student Code of Conduct should be referred to the Associate Dean for Student Services and Administration.

In a subsequent statement, Associate Dean Green maintained that he did not consider Professor Smith's text message as a complaint, reporting that:

> On October 20, 2022, around 10:30 am, Professor Jennifer Smith contacted me by text:
>
> "Hey...I had hurricane make up class in 254 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom.
>
> I immediately went to room 254 to investigate. Upon arriving at room 254, Professor Maritza Reyes had begun her class (which it appears followed Professor Smith's class) and Professor Smith had ended her class and left. Since Professor Smith's email did not communicate the name of the student, I sent her an email later that day telling her I would "try and identify the student tomorrow". I also encouraged her to send me her details about the "interaction" in writing which is consistent with the Student Handbook.
>
> Had I received an email with details regarding any alleged misconduct, I would have forward[sic] that information to the Director of Student Affairs to complete a report.
>
> It is my belief that the text message above was not intended to be a formal complaint nor did it constitute a formal complaint as required by the Student Handbook. I think Professor Smith will agree with that contention, as she has served as the chair of the Student Disciplinary Committee in past academic years.

It is unreasonable that Professor Smith considered her text message to Associate Dean Green as a formal complaint of a student conduct violation. Professor Smith did not respond to Associate Dean Green's request for further information. Further, Professor Smith indicated in the same statement that she felt the issue was resolved after her December 18, 2022 email, noting that:

> "MW did not respond [to my email]. I believed the issue was over until I received the emails from Ms. Baker on January 26, 2023 and January 27, 2023, with a bit more detail."

As Professor Smith notes in Memorandum 1, during her interview with the OCE investigator on February 1, she emailed Associate Dean Green to ask "what happened to my complaint," referencing the email that she sent to him. Professor Smith included her email to Associate Dean Green, in which she asked:

*"Hey...you never did anything about this complaint and now I'm being investigated when the student should be, and Reyes is all over this. What came of this?"*

Professor Smith continued to send OCE supplemental memoranda restating her position and other concerns regarding the investigation and colleagues. Professor Smith submitted five supplemental memoranda to support her initial testimony.

On March 9, 2023, Professor Smith filed a complaint through the University's Compliance and Ethics Hotline, reporting that a student knowingly and intentionally disrupted her class on October 20, 2022. OCE advised Professor Smith on several occasions that the investigation would include her testimony regarding her account of the incident.

On March 10, 2023, OCE sent an email to Professor Smith reiterating that the issue would be addressed in the ongoing case FAMU 2022-11-117.

Professor Smith responded that

*"...there is a difference in being the one who brings a charge and is the subject of a charge. So, these are not the same. The student needs to understand she was also the subject of an investigation, and I am not sure she will."*

On March 13, 2023, OCE sent a Notice regarding Non-Retaliation to Deidré Keller, Dean of the College of Law, to reinforce the University prohibition on retaliation with Professor Smith. In the notice, OCE stated that "...Filing a complaint for the purpose of making a student "understand she is also the subject of an investigation" is inappropriate."

The notice also reiterated the requirement that reports be made in good faith. The law deans met with Professor Smith. In response, Professor Smith submitted Memorandum #6 dated March 23, 2023. In this memorandum, Professor Smith goes on to clarify why it was important that Ms. Wanamaker know that she was a subject in a complaint:

*"...It is necessary for the student to properly file her Bar application; otherwise, she will be accused of not being truthful about her law school experiences. I knew an investigation was being reviewed, but Ms. Baker informed me that I (not MW) was the subject of the investigation."*

Professor Smith's subsequent complaint on March 9, 2023, although she knew that an investigation was being reviewed, memorandum responses, and the timeline of events are concerning. Professor Smith did not follow up on her text message to Associate Dean Green about Ms. Wanamaker being "aggressive rude" or his request for additional information in October 2022, which contradicts her subsequent assertions that she filed a complaint and was under the impression that it was being handled. Professor Smith also stated that she felt the issue was resolved in December 2022.

Despite this, Professor Smith filed an additional complaint against Ms. Wanamaker with the Office of Compliance and Ethics after discovering that Ms. Wanamaker filed a complaint against her. Based on Professor Smith's statements, she filed this complaint for the purpose

of ensuring that Ms. Wanamaker would report that she was the subject of an investigation on her bar application. Professor Smith's clarifying statement that she filed the complaint would prevent Ms. Wanamaker from being "accused of not being truthful about her law school experiences."

Based on the information available, the allegation is **SUBSTANTIATED**.

## Summary Conclusion

The allegation that Professor Smith violated University Regulation 10.111 and 1.019 related to disruptive conduct is **UNSUBSTANTIATED.**

The Complainant's allegation that Professor Smith violated the University Code of Conduct related to retaliation by sending the December 18, 2022 email is **UNSUBSTANTIATED.**

The additional finding of retaliation due to Professor Smith's subsequent action in filing an additional complaint against Ms. Wanamaker for the purpose of having Ms. Wanamaker report the complaint on her bar application, is **SUBSTANTIATED**.

## Additional Information and Recommendations

During the course of the investigation, OCE became aware of additional concerns which OCE will address directly with management. Additionally, the OCE recommends that Interim Provost and Vice President of Academic Affairs, Allyson Watson and College of Law Dean Deidré Keller:

- ♦ Review this report and take any corrective actions deemed appropriate.
- ♦ Consider if additional training is appropriate regarding civil discourse, conflict resolution, and professionalism in the practice of law for faculty and students.
- ♦ Consider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices.



FLORIDA A&M UNIVERSITY
# OFFICE OF COMPLIANCE AND ETHICS

## Supplemental Report
### FAMU 2022-11-117

Prepared by:

La'Tonya Baker

Approved by:

Rica Calhoun



July 6, 2023

Larry Robinson, Ph.D., President
Florida Agricultural and Mechanical University
400 Lee Hall
Tallahassee, Florida 32307

Dear President Robinson:

Attached is FAMU-2022-11-117 Supplemental Report, addressing additional concerns as a result of the investigation of employee misconduct regarding Ms. Jennifer Smith. If you need further information, please contact our office.

Best,

*Rica Calhoun*

Rica Calhoun

Copy to:

Dr. Maurice Edington, Executive Vice President & Chief Operating Officer
Dr. Denise Wallace, Vice President and General Counsel
Deidré Keller, Dean, College of Law
Dr. Allyson Watson, Provost and Vice President of Academic Affairs
Joseph Maleszewski, Vice President of Audit
Dr. Latrecha Scott, Director, Office of Equal Opportunity Programs
Ella Kiselyuk, Associate Vice President, Human Resources

# SUPPLEMENTAL REPORT

## Background

On June 5, 2023, The Office of Compliance and Ethics (OCE) released FAMU-2022-11-117 Investigative Report, addressing allegations of employee misconduct regarding Professor Jennifer Smith. The (OCE) concluded that allegation 1 related to disruptive conduct is UNSUBSTANTIATED and allegation 2 related to retaliation is UNSUBSTANTIATED. An additional finding of retaliation related to Professor Smith's subsequent actions is SUBSTANTIATED. However, the OCE had additional concerns related to documentation reviewed during the course of the investigation.

## Document Review

On February 9, 2023, Professor Smith emailed "MEMO 2" with the following message:

> *Hi again.*
> *I think these are the last of emails/texts on matter.*
> *Thx,*
> *JS*

CONFIDENTIAL; WORK PRODUCT

# MEMORANDUM

To:     Latonya Baker, FAMU Office of Compliance and Ethics
From: Jennifer Smith, Professor of Law
Re:     October 2022 Incident, Second Memo on the Matter
Date:  February 9, 2023

Enclosed are some emails/texts that I had regarding the incident between Prof. Broussard and me (mine are in green) and Elliot Preston Jackson (████████████) and me. They are dated October 20, 21 and Nov. 1 (went to see Associate Dean Green on the matter, but he was on vacation).

I remain concerned about the lack of information I have about what other alleged witnesses are saying, especially because some may not even have been there, but are claiming to be a witness. In addition, eyewitness testimony is already unreliable and now it is over 100 days later to try and remember the incident – that is completely unfair to me. I am glad that I have some documentation on the matter.

Thank you.

## Discussion

The University outlines its values of accountability, inclusion, innovation, and integrity. This sentiment is echoed in regulation as well as collective bargaining agreements. For example, the UFF Collective Bargaining Agreement indicates that,

> "in addition to their assigned duties, faculty members have responsibilities arising from the nature of the educational process. Such responsibilities include, but are not limited to... respecting the confidential nature of the relationship between professor and student; adhering to one's proper role as teacher, researcher, intellectual mentor, and counselor; and conducting oneself in a collegial manner in all interactions."

In Professor Smith's message to Assistant Dean Reginald Green, she identified Michelle Wanamaker as "one of Reyes' students (Hispanic blonde)." The text messages between Professors Smith and Broussard and former student Professor Smith identified as Elliot Preston Jackson (c/o 2021) were concerning based on the nature of their discussion regarding current students. "Preston," as identified by Professor Smith, sent her a picture of Michelle Wanamaker and told her that "Michelle Wanamaker is the student who walked up on you." Preston then stated that Daniel Jefferson, a current 3L student, reported to him that

> "another student in [Professor Smith's] class saw everything and is supporting a complaint against you to Admin. That report is being fueled unofficially by Reyes."

The text message exchange continued with a discussion about information that Preston said came from current and former students. Professor is noted asking Preston if the student is "brown." Professor Smith then shared the picture of Michelle Wanamaker with Professor Broussard, discussing the situation with the student. Professor Smith also provided a "note to self," that stated:

> "...also heard Michelle being really nice to my blk women students and asking irrelevant questions...that's a big book you have...to try to start convo. I said did she speak before...they said sometimes here n there..."

While the text messages did not rise to the level of a policy violation, the OCE is concerned with the appropriateness and professionalism displayed by Professor Smith and others in the messages that she provided. The apparent undercurrent of race and the perceived rivalry between Professors' Reyes and Smith, internalized by students, is a distraction and out of step with the values reiterated in University commitments and regulations.

The expectation of privacy refers to an individual's reasonable belief that their personal information, activities, communications, and spaces will remain private and free from unwarranted intrusion or surveillance. While this incident did not violate Family

Educational Rights and Privacy Act (FERPA), sharing a student's photograph for the non-educational purpose of gossip is wholly inappropriate. Additional general observations follow:

**Confidentiality and Privacy:**

➤ Professors should respect the privacy and confidentiality of their current and former students. Personal information, academic records, or any other sensitive details should not be disclosed without the explicit consent of the individuals involved.

**Professional Boundaries:**

➤ University faculty are bound by academic standards of professionalism and decorum, which encompasses a strong commitment to ethical conduct and integrity. College of Law faculty, as attorneys, are additionally bound by professional codes of conduct and ethical rules, which guide their behavior and ensure they act in the best interests of their clients while respecting legal and moral principles. Upholding ethical standards, fosters fairness and justice, and maintains the integrity of the profession.

➤ Faculty should be mindful of maintaining professional boundaries when discussing students with former students. They should avoid sharing personal opinions, making derogatory remarks, or engaging in gossip. The focus should be on constructive and objective discussions related to educational experiences or academic achievements.

➤ Faculty should ensure that discussions about students with former students serve a legitimate educational purpose. This may include seeking insights, feedback, or recommendations related to educational development or career opportunities. Discussions should be conducted in a professional and respectful manner.

# Recommendation

Deidré Keller, Dean of the College of Law, should review this supplemental report and take any action deemed appropriate, taking into consideration the recommendations outlined in FAMU 2022-11-117 Investigative Report.

# Appendix A: Documentation

CONFIDENTIAL; WORK PRODUCT

# MEMORANDUM

To:     Latonya Baker, FAMU Office of Compliance and Ethics
From:   Jennifer Smith, Professor of Law
Re:     October 2022 Incident, Second Memo on the Matter
Date:   February 9, 2023

Enclosed are some emails/texts that I had regarding the incident between Prof. Broussard and me (mine are in green) and Elliot Preston Jackson (704.891.4223) and me. They are dated October 20, 21 and Nov. 1 (went to see Associate Dean Green on the matter, but he was on vacation).

I remain concerned about the lack of information I have about what other alleged witnesses are saying, especially because some may not even have been there, but are claiming to be a witness. In addition, eyewitness testimony is already unreliable and now it is over 100 days later to try and remember the incident – that is completely unfair to me. I am glad that I have some documentation on the matter.

Thank you.

Thursday, October 20, 2022

Hey...I had a hurricane make up class in 253 until 10:30 and one of reyes' students (Hispanic blonde) was so rude because we were in the classroom. Aggressive rude...like fight rude...i reported it.JS

10:41 AM

Oct 21, 2022    10:19 PM

Call immediately if can

10:19 PM



10:20 PM





Michelle Wanamaker is the student

Who walked up on you

10:26 PM

Repeated by: Daniel Jefferson

Daniel reports that another student in your class saw everything and is supporting a
complaint against

4:31

 **Preston** ⌄

⋮

Oct 21, 2022

Daniel reports that another student in your class saw everything and is supporting a complaint against you to Admin. That report is being fueled unofficially by Reyes .

10:27 PM

Oct 21, 2022   10:32 PM

Who is Daniel Jefferson

10:33 PM

Daniel is a student in 3L class

He is a friend of Tyran who does not like you. She never had you as a professor but they are on vendetta against you





Oct 21, 2022

K

Tyran...???

Because colorism panel ???

11:24 PM

Yes

From last year

11:24 PM

Pat had her...she brown?

11:28 PM

Yes







4:40

🔒 🕐 📶 26% 🔋

< P Patricia Broussard ∨ ⋮

Oct 21, 2022        4:44 PM

The girl who acted crazy so reyes trying to get me fired

10:25 PM



10:27 PM



4:40

26%

**Patricia Broussard** ⌄

10:49 PM

Oct 21, 2022

Apparently she trying to get folk to say I hunted her down...facts don't support that

10:49 PM

Hunted her down?!!!

10:50 PM

Case 6:24-cv-00457-JR-EN Document 17-1 Filed 03/04/25 Page 36 of 58 PageID 580



**Patricia Broussard**

Oct 24, 2022

Green should have said she had no right to be inthere.in there.. heard her folk said i have supporters for my side...other students say she's loud and rude often

3:03 PM

**RE: AD Green**

**Pissini, Theresa** <theresa.pissini@famu.edu>
Tue 11/1/2022 10:27 AM
To: Smith, Jennifer <jennifer.smith@famu.edu>

Good morning Professor Smith,

Not a problem. I did recognize you when you got close to me.

Theresa Pissini
Senior Administrative Assistant to the Associate Dean for Student Services and Administration
Florida Agricultural and Mechanical University
College of Law
201 Beggs Avenue
Orlando, Florida 32801
407.254.3205 Office
407.254.3214 Fax
theresa.pissini@famu.edu

**From:** Smith, Jennifer <jennifer.smith@famu.edu>
**Sent:** Tuesday, November 1, 2022 10:23 AM
**To:** Pissini, Theresa <theresa.pissini@famu.edu>
**Subject:** AD Green

GM. I forgot I had sunglasses and a mask on when I came to see AD Green. Sorry about that - I was
probably unrecognizable.

**Jen Smith**
**Professor of Law**
**Florida A&M University College of Law**
**201 FAMU Law Lane**
**Orlando, Florida 32801**
**407.254.3256 Office**
**407.254.2456 Fax**
jennifer.smith@famu.edu
**https://profjensmith.com/about-me/**

Just went to see green but he's off for the week. His secretary, teresa,, jumped up like she was blocking me. I took off my sunglasses...oh but I still had a mask on...she probably ain't know who I was...also heard Michelle being really nice to my blk women students and asking irrelevant questions...that's a big book you have...to try to start convo. I said did she speak before...they said sometimes here n there...

# MEMORANDUM

To:       Rica Calhoun, FAMU Office of Compliance and Ethics
CC:       Denise Wallace, Esq., FAMU GC
From:     Jennifer Smith, Professor of Law
Re:       October 2022 Incident, Ninth Memo on the Matter
Date:     October 5, 2023

---

A year ago, I experienced an unexpected confrontation with a law student, Michelle Wanamaker, whom I had not previously met. She entered through the side door of a classroom I had reserved weeks earlier, interrupting my ongoing oral exams to insist on preparing for her upcoming class. After asking her to leave, she then positioned herself outside the main entrance where she knew I would exit, awaiting another opportunity to confront me. Shocked about this stranger's hostility towards me, I immediately contacted Associate Dean Green, who promptly arrived, but by then my subsequent class was in session.

Although Dean Green had indicated there would be an investigation, it was not until 100 days later that I was approached for an interview by L. Baker from Compliance. Surprisingly, the investigation focused on a complaint filed by the student, one week after my own, and of which I was not informed. The subsequent 130-day investigation, spanning January to June, resulted in an incomplete report riddled with discrepancies, bias and oversight. While I was ultimately exonerated, this could have been expedited or non-existent had the University sought to retain the video evidence when the incident happened, but the University did not think the incident worthy of investigation in October.

In January, the University launched an investigation, which had my employment on the line. For reasons unbeknownst to me, my initial complaint I filed on the day of the incident was overlooked and subsequently deemed invalid. Thus, I re-submitted my complaint in March. Instead of addressing the issue, I was accused of potential retaliation in March for "re-filing the complaint" and spoken to by Deans Keller and Cooper about this potential retaliation, but they seemed unaware of what to say or do. Then, after the investigation was concluded in June, the report determined I had engaged in retaliation and re-assigned unspecified punishment to follow by the dean or provost.

In June 2023, I detailed these inconsistencies and duplicative punishment for the same "retaliation" in a memorandum addressed to Rica Calhoun (Compliance) and Denise Wallace (GC), but copied Craig Reed (BOT) on the email. To date, I have not received a response to my June 2023 memo. This confirms to me that the initial investigation was retaliatory.

On Monday (Oct. 2, 2023), during the provost's visit to the law school, associates of Wanamaker raised the October 2022 incident. They asserted I should have been dismissed, lamented the lack of any follow up, and expressed that students are uncertain about the procedure to lodge grievances against faculty. Yesterday (Oct. 4, 2023), while attending an event hosted by my previous firm (and where Wanamaker received a job offer because I never mentioned the incident), it became evident that Wanamaker has been disseminating a distorted and false narrative of the event, tarnishing my reputation to my former co-workers and within the legal community. Though I've refrained from defending myself outside the formal investigation, I am obligated to report this student's defamatory conduct and slander campaign to The Florida Bar for several reasons, including my personal safety:

- When law students in Florida apply for bar admission, they undergo a character and fitness review. This process evaluates an applicant's honesty, trustworthiness, and fitness to practice law. These factors comprise and applicant's moral character. Wanamaker has demonstrated (1) dishonesty based on her intentional mischaracterization of the events underlying the investigation; (2)

untrustworthiness based on those mischaracterizations and contradictory evidence; (3) manipulation of the complaint process by leveling a meritless complaint; (4) bullying by knowingly interfering in my class by creating a threatening and hostile environment for me; and (5) lack of respect for process because she has initiated this campaign to target and attack my reputation. Misconduct during law school is relevant during this review. I do not believe that Wanamaker is fit for the practice of law. She is dishonest, unethical and a bully.

- We have our own policies or codes of conduct which dictate the actions that faculty members must take in response to student misbehavior. Some infractions require internal reporting, academic consequences, or even reporting to outside entities.

- Faculty members, like other professionals, have general ethical or professional obligations to report certain types of misconduct, especially if they believe that the misconduct suggests the student might be unfit to practice law or if there's a risk to others. The response may vary depending on the severity of the misconduct. While minor indiscretions might be handled internally, more serious violations, especially those involving dishonesty, integrity, or harm to others, might warrant notification to the Florida Bar or other authorities.

- On the bar application, students might be required to disclose certain types of misconduct or disciplinary actions taken against them during their academic career. Failing to disclose such information can be problematic if discovered later.

I am increasingly uneasy about a student who remains severely fixated on an incident that transpired nearly a year ago. Wanamaker, a stranger to me, continues to try to have me professionally harmed, and perhaps personally as well. I have reservations both about the student's mental well-being and my own personal safety. Notably, the student has also begun to exhibit unusual behavior towards Professor Broussard (one of my witnesses regarding the incident), who knew the student before the incident. Prior to this incident, I had no knowledge of the student, but she knew me and hated me (though never knowing me personally), apparently due to misleading information from Professor Reyes (who I recommended for hire at the law school even though her tenure at the firm where we both worked was short and problematic). It's troubling that a student would viciously confront and then attempt to jeopardize the career of a faculty member based on dubious information. Wanamaker's actions suggest emotional and psychological instability.

Through this memo, I wish to formally express my concern regarding Wanamaker's persistent and unsettling behavior towards me. I find myself perpetually on guard, unable to comprehend why a student, with whom I've had NO prior interactions, seems intent on targeting and harming me. The University's biased, unfounded, and retaliatory investigation continues to cause me harm.

2

**Florida Agricultural and Mechanical University**
**Regulation**



## 1.019 University Code of Conduct.

As members of the Florida A&M University (University) community, all faculty, staff, students, members of the Board of Trustees, University officers and affiliates are responsible for sustaining the highest ethical standards of professional conduct and integrity for this institution, and for the broader community in which we function. We share responsibility for this institution and for its enterprises. The University's Strategic Plan outlines the core values we hold as essential to responsible professional behavior, which include: integrity, accountability, innovation, and inclusion. The ethical principles espoused by the Florida Code of Ethics for Public Officers and Employees in Chapter 112, Part III of the Florida Statutes (Code of Ethics), reinforce our commitment to the University's values. Adherence by trustees, officers, faculty, staff, student employees, contractors and others acting on behalf of the University, to the standards set forth in this Code of Conduct is an integral part of the University's goal of attracting quality students, faculty, and staff, while ensuring a safe and healthy environment for all members of the campus community. Further, the University supports and encourages a full and open discourse and the robust exchange of ideas and perspectives. While the University upholds these freedoms, the University will not permit speech, expression, or assembly that advocates lawlessness and/or violence, or restrains, disrupts, or interferes with activities of members of the University community, whether by physical force or intimidation. The Code of Conduct outlines behavioral standards for members of the University community and for those acting on behalf of the University.

*(1) Applicability.* This Code of Conduct applies to the following members of the University community: a) faculty, staff, and students who are paid for working for the University; b) Board of Trustees; c) consultants, vendors and contractors and other individuals using University resources or facilities, or receiving funds administered by the University; and d) individuals who perform services for the University as volunteers and who assert an association with the University. Any reference to members of the University community as provided in this regulation shall refer to the above referenced persons.

*(2) Compliance with Laws and University Rules and Policies.* Per Section 1012.80, Florida Statutes, members of the University community shall comply with the applicable standards, policies, rules, regulations and state and federal laws that govern and guide their work. The University promotes ongoing and open communication at all levels of the institution. As such, administrators, supervisors and managers are responsible for supporting and monitoring compliance. Members of the University community have an obligation to report any behavior that they believe is unethical or in violation of state or federal law, regulations, or university policies. See Section 17 of this Regulation for reporting options.

*(3) Disruptive Conduct.* The University strives to maintain an environment in which members of the University community treat each other with dignity and respect. University Regulation 10.111 prohibits individuals from acting intentionally to impair, interfere with, or obstruct the orderly conduct, processes and functions of the University. This includes substantially disrupting a student's, employee's, or the University's performance, opportunities or benefits.

*(4) Conflicts of Interest and Commitment.* Faculty and staff of the University owe their primary professional allegiance to the University and its mission. The University has an obligation to internal and external stakeholders to use their

resources responsibly and, where required, for designated purposes. Thus, all officers, faculty, principal investigators, staff, student employees and others acting on behalf of the University hold positions of trust, and the University expects them to carry out their responsibilities with the highest level of integrity and ethical behavior. Outside activities are defined as any employment or activities entered into in addition to an individual's employment at the University, that utilize the knowledge, skills, abilities or expertise the individual uses to carry out their University duties. Outside activities, including any interest, obligation, or relationship that could potentially be, or appear to be, in conflict with the interests of the University, including those of immediate family members, must be disclosed to the University immediately so it can be managed appropriately. Conflicts of interest can often be managed to eliminate the risk of damage to the University, but only if they are promptly disclosed.

Failure to disclose outside activities related to an actual, apparent, or possible conflict of interest or commitment is a violation of this Regulation, as well as other applicable conflict of interest policies (including University Regulations 6.002 and 10.122) and the Florida Code of Ethics.

(5) *Political Activities.* Employees with intentions to seek election to and hold public office must notify the President or President's designee of such intentions. The President or President's designee will determine whether the employee's candidacy for holding public office will interfere with the full and faithful discharge of the employee's duties, as outlined in the University Regulation 10.123 and Section 104.31, Florida Statutes.

(6) *External Communication on Behalf of the University.* Pursuant to the University Communications Policy, the Office of Communications is the official University representative to the media and is tasked with establishing and cultivating relationships with journalists, publications and broadcast networks/channels, as well as responding to media inquiries, issuing official statements and announcements and providing guidance and leadership to the University

community about relevant media guidelines and best practices.

All University leaders, faculty, staff, partners, vendors and contractors must coordinate with the Office of Communications to develop and distribute news and information about the University and to participate in solicited and unsolicited media interviews or media events. Use of University logos and identity must be used in accordance with the University Style Guide and other applicable policies.

(7) *Contract Authority.* The acceptance of an agreement, including sponsored project funding, may create a legal obligation on the part of the University to comply with the terms and conditions of the agreement and applicable laws and regulations. Therefore, only individuals who have authority delegated by an appropriate University official are authorized to enter into agreements on behalf of the University. All agreements, understandings, and contracts must be reviewed by the Office of General Counsel before execution.

(8) *Confidentiality and Privacy.* The University community shall use confidential information acquired in the course of University business only for official or legal purposes, and not for personal or illegal advantage, during or after such affiliation. It is imperative that each community member complies with all state and federal laws, agreements with third parties, and University policies, regulations and procedures pertaining to the use, protection and disclosure of such information. Such policies apply even after the business relationship with the University ends.

(9) *Gifts and Entertainment.* Employees must abide by expectations outlined in University regulation, policy, and the Florida Code of Ethics regarding the solicitation or acceptance of anything of value from third parties. Members of the University community are prohibited from soliciting or accepting anything of value based on the understanding that their official position will be

influenced by such a gift. Employees identified as a financial disclosure reporting individual or procurement employee have additional restrictions from donors who are lobbyists, principals, political action committees or vendors doing business with the university.

(10) *Record Keeping.* Employees are expected to demonstrate a commitment to transparency in the retention and management of records that have sufficient administrative, legal, fiscal, or historical value pursuant to University policy, the Public Records Law (Chapter 119, Florida Statutes), and the general records schedule published by the Florida Department of State's Division of Library and Information Services (notably, schedules GS1-SL and GS5).

Records are defined as "all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings, data processing software, or other material, regardless of physical form or characteristics, or means of transmission, made or received pursuant to law or ordinance or in connection with the transaction of official business by an agency." Employees are prohibited from destroying documents in violation of law or policy, in response to, or in anticipation of, an investigation, audit, or litigation.

(11) *Proper Use and Protection of University Assets.* The University community will strive to preserve, protect and enhance the University's assets by making prudent and effective use of University resources and property and by accurately reporting its financial condition. All funds provided for research must be spent in ways consistent with funding requirements and incompliance with guidelines on allowable costs (i.e. 2 CFR Part 200 Subpart E).

(12) *Misuse of Public Position.* Employees may not use or attempt to use their official position or any property or resource within their trust to obtain special privilege, benefit, or exemption for themselves or others.

(13) *Fraud.* As outlined in BOT Policy 2020-01, fraud occurs when an individual obtains something of value through willful misrepresentation, including, but not limited to, intentional misstatements or intentional omissions of amounts or disclosures in financial statements to deceive users of financial statements, theft of an entity's assets, bribery, or the use of one's position for personal enrichment through the deliberate misuse or misapplication of an

organization's resources. Fraud generally means an act of deception, bribery, forgery, extortion, theft, misappropriation, false representation, conspiracy, corruption, collusion, embezzlement, or intentional concealment or the omission of material facts. Members of the University community must mitigate the risk of fraud by fulfilling their duties honestly, while immediately reporting any observed or suspected irregularities to their immediate supervisor.

University employees, consultants, vendors, or persons doing business with FAMU who have knowledge of a fraud, misappropriation, or other impropriety shall immediately notify his/her supervisor and/or the Division of Audit.

(14) *Complaints may be made anonymously.* Acts of fraud, as well as the failure to report incidents in good-faith or suspected incidents of fraud, is a violation of this Regulation. Examples of fraud include, but are not limited to:

a. Any dishonest or fraudulent act;

b. Falsification of documents;

c. Misappropriation of funds, supplies, or other assets;

d. Impropriety in the handling or reporting of money or financial transactions;

e. Destruction, removal, or inappropriate use of records, furniture, fixtures, and equipment; or,

f. Any similar or related irregularity.

The Division of Audit has the primary responsibility for the investigation of all suspected fraudulent acts as defined above. The Division of Audit will issue reports to appropriate designated personnel detailing the findings.

(15) *Health and Safety.* Members of the University community are expected to perform their duties in accordance with applicable health and safety laws, regulations, policies, and procedures. Members are also responsible for compliance with the health, safety, and risk management program and are required to immediately report workplace/campus injuries, illnesses, and unsafe conditions to the University Department of Environmental Health and Safety and the Office of Risk Manager.

(16) *Sustainability.* We are all responsible for the continued viability of Florida A&M University and our local and regional communities. The University is committed to operating in an environmentally responsible manner, from the procurement of services to the operation of offices and facilities, and other business activities. Members of the University community must comply with all applicable environmental laws and regulations as well as commitments to sustainable practices and environmental protection outlined by the University's Sustainability Institute.

(17) *Information Technology.* Pursuant to University Regulation 5.003 (Electronic Connectivity), members of the University community play a role in safeguarding information systems by adhering to established University controls and applicable law and policy. Members do not have an expectation of privacy in the use of University computers and systems. Cyber security and systems training are required of all employees before they are permitted access to these systems. Members are prohibited from using University computers or systems in furtherance of personal or political business.

Information Technology Services tracks software vulnerabilities and applies patches as soon as they become available. To that end, users of the University network shall not:

- Undermine the security or the integrity of computing systems or

networks or attempt to gain unauthorized access;

- Use any computer program or device to intercept or decode passwords or similar access control information;

- Knowingly or intentionally transmit, download, or upload any material that contains viruses, trojan horses, worms, time bombs, cancelbots, phishing, or any other harmful programs;

- Transmit, download, or upload any material that contains software or other material protected by federal or state intellectual property laws unless the user owns or controls the rights thereto or has received all necessary consents; or

- Use FAMU electronic connectivity for the exchange of pirated software.

(18)  *Reporting Suspected Violations.*

a. Members of the University community are required to report violations of applicable University policy, government contracts, and grant requirements, as well as state and federal laws and regulations. Prompt reporting of possible violations is required as it gives the University the opportunity to investigate the matter and take corrective action where needed. Complainants may initially report their concerns through their normal management chain of command, beginning with one's immediate supervisor. If it is inappropriate to report to the immediate supervisor, (e.g., the suspected violation is by the manager or the complainant is generally uncomfortable), individuals may go to a higher level of management within the college, department, or report directly to the Office of Compliance and Ethics, Office of General Counsel, Division of Audit, the Office of Human Resources or the Office of Equal Opportunity Programs. Managerial and supervisory personnel must maintain an open-door policy and take proactive measures to assure their staff that the institution supports a culture that values ethical behavior and compliance.

b. Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the

University's Compliance and Ethics Hotline. As appropriate, the Office of Compliance and Ethics coordinates with the Division of Audit, the Office of Human Resources, the Office of Equal Opportunity Programs and other relevant areas, both internal and external. Employees are not exempt from the consequences of wrongdoing by self-reporting, although self-reporting may be considered in the determination of an appropriate course of action.

c. Compliance and Ethics Hotline. Members of the University community may use the University Compliance and Ethics Hotline to report complaints of misconduct outlined in this Regulation. The Hotline allows reporting by phone or online, with an option for anonymous reporting.

d. Other Reporting Avenues. While the Office of Compliance and Ethics coordinates the Compliance and Ethics Hotline, violations may also be reported internally to the offices listed above. Externally, suspected violations of state and federal laws may be reported to the Florida Board of Governors' Office of Inspector General and Director of Compliance or the State of Florida Whistleblower's Hotline.

(19) *False Reports.* Submitting a report that is known to be false (made in bad faith) is a violation of this Regulation and will result in discipline up to and including potential termination from employment, in accordance with applicable University regulations, policies, and collective bargaining agreements.

(20) *Investigation.* Preliminary Review and Investigation. University offices tasked with investigation take every reported concern seriously. All concerns will be assessed through intake to determine the appropriate course of action. If an investigation is warranted, such initial investigation will be completed within a reasonable timeframe. The primary investigator will provide appropriate updates to the parties.

a. Independence. Investigators are responsible for establishing and maintaining independence so that conclusions and recommendations are impartial in both fact and appearance. The investigator must consider

organizational, personal, and external impairments that impact the investigators' ability to perform work impartially.

b. Confidentiality. Such reports may be made confidentially, and even anonymously. Confidentiality will be maintained to the extent legal and practicable, informing only those personnel who have a need to know such information.

c. Cooperation. All members of the University community are required to cooperate fully in any external or internal investigation. A copy of this Regulation will be provided to all employees.

d. Interference. The integrity of an audit, investigation, or administrative action is vital in ensuring a fair and equitable outcome for all parties involved. Members of the University community are prohibited from impeding any audit or investigation. Examples of interference includes, but is not limited to: disclosing information inappropriately, making false statements, failing to respond timely to requests for information or tampering with evidence.

e. Referral. Decisions to prosecute or refer the investigation results to the appropriate law enforcement and/or regulatory agencies for independent investigation will be made in conjunction with legal counsel and executive level leadership.

f. Investigative Reports. Despite the disposition, investigative activity will result in a written report. Reports shall be fair, objective, and present the results of investigation in a clear manner.

(21) *Retaliation.* Members of the University community are prohibited from engaging in retaliation against another for reporting compliance or ethics related concerns or participating in an investigation due to such reports. Findings of retaliation are independent of the underlying claim of violation and will result in disciplinary action, up to and including termination, in accordance with applicable University regulations, policies, and collective bargaining agreements.

(22)    *Enforcement.* Members of the University community are responsible for annually completing mandatory compliance and ethics trainings, as well as maintaining compliance with law, regulation, policy, and making ethical decisions. Failure to follow the standards outlined serves as a violation of this Regulation, as well as the originating regulation/policy, if applicable. Members of the University community who violate this Regulation will be subject to personnel action, up to and including termination, in accordance with applicable University regulations, policies, and collective bargaining agreements.

(23)    *Equal Opportunity.* It is the policy of Florida A&M University that each member of the University community is permitted to work or attend class in an environment free from any form of discrimination including race, religion, color, age, disability, sex, sexual harassment, sexual orientation, gender identity, gender expression, marital status, national origin, and veteran status as prohibited by State and Federal Statues. This commitment, identified in several regulations, including 10.103, applies to all areas affecting students, employees, applicants for admission and applicants for employment. It is also relevant to the University's selection of contractors, suppliers of goods and services and any employment conditions and practices.

*Specific Authority: Chapter 112, Part III, Florida Statutes; Section 7(c), Art. IX, Fla. Const., BOG Regulation 1.001. History–New 10-05; Amended 2-9-2020, 11-30-2022, 08-11-23.*

Regulations of
Florida A&M University



**10.120**     **Predetermination Procedures for Tenured and Permanent Status
Faculty and University Support Personnel System Employees.**

(1) Written Notice – Prior to the dismissal, suspension, or disciplinary reduction in pay of a tenured or permanent status employee, the University shall give the employee written notice as follows:

(a) The employee shall be given written notice of the proposed action and the reasons therefore. Such notice shall be sent by certified mail, return receipt requested, or delivered in person with written documentation of receipt obtained.

(b) The mailed notice shall be considered received by the employee even if refused or ignored.

(2) Contents of Notice – The notice shall be signed by the President or President's designee who makes the final decision regarding the proposed action. The notice shall include the following information:

(a) The effective date of the University's proposed final action;

(b) The specific charges or reasons for the action;

(c) A list of documents or written explanation on which the charges are based; and a statement that documents shall be available to the employee upon request;

(d) A statement that the employee may, within 10 days of receipt of the notice, submit a request in writing for a conference at which the employee may make an oral or written statement, or both, to the University to refute or explain the charges or reasons for the action; and the name and address of the person to whom the request for a conference shall be directed;

(e) A statement that the requested conference must be held prior to the proposed effective date of the action, at a time and place determined by the University, normally during regular business hours, and that the employee may bring a

**10.120**     Predetermination Procedures for Tenured and Permanent Status
Faculty and University Support Personnel System Employees

Page 1 of 3

representative to advise and assist;

(f) A statement that the University desires to reduce the risk of error in taking the action against the employee and to avoid damaging the employee's reputation by untrue or erroneous charges, and therefore, the University is interested in receiving and considering the employee's response; and

(g) A copy of this rule shall be enclosed with the notice.

(3) Conference – The conference must be conducted by the designated representative(s) of the President as follows:

(a) The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted.

(b) The conference shall be informal and shall not be in the nature of an evidentiary hearing. The employee may bring a representative to advise and assist, but discovery, cross-examination and similar legal procedures are not permissible.

(c) The employee shall be permitted to submit relevant information, orally or in writing, or both, with the privilege being reserved to the University to give such information the weight it deems proper. If the employee chooses to make no response, the University will proceed on the basis of the best information it can obtain without such response.

(d) After the conference is conducted, the employee shall be notified, by the President or President's designee of the University's decision.

(4) Decision – If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified as described in this rule within five workdays prior to the date the action is effective. USPS employees shall be informed of their right to appeal to an arbitrator under the provisions of Board of Regents subsection 6C-5.950(4), F.A.C. If the employee occupies a position included in a certified bargaining unit, the employee shall be further notified that the grievance

**10.120**    **Predetermination Procedures for Tenured and Permanent Status Faculty and University Support Personnel System Employees**

procedures as provided in the applicable collective bargaining agreement may be used. Further, the University shall follow the provisions of Part VI of Chapter 112, F.S., Law Enforcement Officers' Bill of Rights, when Sworn Law Enforcement Personnel are involved.

(a) During the period between the first notice and the effective date of the action, one of the following options may be used by the University: retain the employee in the employee's usual duties; temporarily assign the employee to other duties; or place the employee on administrative leave with pay.

(5) Extraordinary Situations.

(a) In extraordinary situations, when the retention of a tenured or permanent status employee is likely to result in damage to property, or is likely to result in injury to the employee, a fellow employee, or some other person, the employee may be suspended or dismissed immediately upon written or oral notice to the employee of the charges giving rise to the suspension or dismissal.

(b) If an oral notice of suspension or dismissal is given to an employee, the University shall within 24 hours issue a written notice confirming the proposed action and the reason(s) therefore.

(c) In lieu of the action to suspend or dismiss the employee, the University may place the employee on administrative leave as described in subsection 6C-5.920(14), F.A.C.

(d) USPS employees shall be informed of their right to appeal to an arbitrator under the provisions of subsection 6C-5.955(4), F.A.C.

(e) If the employee occupies a position included in a certified bargaining unit, the employee shall be further notified that the grievance procedures as provided in the applicable collective bargaining agreement may be used.

(f) Further, the University will follow provisions of Part VI of Chapter 112, F.S., Law Enforcement Officer's Bill of Rights, when sworn law enforcement personnel are involved.

*Specific Authority 1001.74, 1001.75 FS., History–New 6-27-96.*

10.120     **Predetermination Procedures for Tenured and Permanent Status Faculty and University Support Personnel System Employees**

**Regulations of**
**Florida A&M University**



**10.205**      **Disciplinary and Separation from Employment Actions for Faculty**
~~**and Administrative and Professional**~~ **Employees.**

(1)      The provisions of this regulation~~rule~~ are supplemented by the respective collective bargaining agreement for the employees who are represented by a collective bargaining agent.

(2)      Faculty ~~or Administrative and Professional (A & P)~~ employees shall give one month notice of resignation from employment, if possible. An employee who resigns from employment shall not have any rights of appeal.

(3)      Nontenured or Nonpermanent Faculty ~~and A & P employees~~ whose appointments expire after receiving notice of nonrenewal or nonreappointment or whose appointment expires without the requirement of a written notice of nonreappointment may be separated without further notice.

(4)      An employee who is absent without approved leave for three or more consecutive workdays shall be considered to have abandoned the position. For employees governed by the Board of ~~Regents~~ Trustees and United Faculty of Florida ~~(BOR/UFF)~~ (BOT/UFF) Collective Bargaining Agreement, the relevant provisions of ~~Article 16~~ the Collective Bargaining Agreement shall apply for job abandonment.

(5)      The President or President's designee may discipline a Faculty ~~or A & P employee~~ for just cause in accordance with the provisions set forth herein. Counseling of any nature or degree shall not be considered disciplinary action.

(a) Just cause shall be defined as:

1. Incompetence; or

2. Misconduct.

(b) The President or President's designee may impose progressive discipline as applied to employees. The term "progressive discipline" as used in this regulation~~rule~~ means that the form of disciplinary action imposed against the

employee increases in extent or severity with each action taken. The discipline to be imposed against the employee under this paragraph may include a written reprimand, suspension or dismissal from employment with the University. The discipline that is imposed will depend upon the seriousness of the offense and any aggravating or mitigating circumstances.

(c) Written Reprimand – A written reprimand issued by the employee's supervisor is to warn the employee in writing of the specific conduct or performance standard that was violated and to place the employee on notice of the next level of discipline if the offense is repeated. The written reprimand shall be in a letter format from the supervisor to the employee. A copy of the written reprimand shall be placed in the employee's personnel file. The employee must be informed of the possible consequences if the offense is repeated or the performance fails to improve.

(d) Suspension – The President or President's designee may suspend the appointment of the employee during the term of the employment contract for just cause. The President or President's designee shall also determine whether the suspension shall be with or without pay, which will depend upon the seriousness of the offense and any aggravating or mitigating circumstances. The employee shall be given written notice of the suspension action by the President or President's designee specifying the reason(s) therefor. Following appropriate written notice, the employee may be reassigned by the President or President's designee depending upon the nature of the offense and any aggravating or mitigating circumstances.

(e) Suspension Pending Hearing – When the President or President's designee has reason to believe that the employee's presence on the job would adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students, the President or President's designee may immediately suspend the employee from the performance of duties, pending a hearing under the complaint procedure outlined in Regulation~~Rule 6C3-~~ 10.2~~06.32, F.A.C.~~ The President or President's designee shall also determine whether the suspension shall be with or without pay in the manner outlined in

paragraph (4)(d) of this ~~regulation~~rule. If the employee has been suspended without pay and subsequently is reinstated as a result of the complaint procedure under Regulation~~Rule 6C3~~-10.20~~6~~32~~, F.A.C.~~, the employee shall be reinstated with back pay.

(f) Dismissal – The employee may be dismissed during the term of the employment contract for just cause, regardless of tenure status where it appears to the President or President's designee that an employee's actions adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students. The employee shall be given written notice of the dismissal by the President or President's designee specifying the reason(s) therefore. The dismissal shall take effect at the time determined by the President or President's designee and as written in the notice of dismissal.

(g) The President or President's designee may impose other disciplinary action for just cause. The term "other disciplinary action" is defined as discipline incidental or in addition to a written reprimand or suspension. Examples of other disciplinary action may include a demotion, reduction in pay, removal of administrative duties or restitution. Any other disciplinary action imposed will occur simultaneously with a written reprimand or suspension. The other disciplinary action imposed will depend upon the nature of the offense and any aggravating or mitigating circumstances. Written notice of such disciplinary action, specifying the reason(s) therefor, shall be given to the employee by the President or President's designee.

(h) The effective date and hour of the disciplinary action shall be recorded in the written notice. Such notice shall be delivered or forwarded to the employee by certified mail with a return receipt requested, or when practicable the notice may be hand-delivered to the employee provided the delivery is certified in writing by the deliverer. The attempts prescribed above to notify the employee satisfy the requirement of notification, and failure of the employee to receive notification does not invalidate the disciplinary action nor its effective date. It is incumbent upon the University, however, to see that a continuing effort is made to effect notification.

(i) Within 30 days following the receipt of notice of disciplinary action, the employee may file a complaint in accordance with Regulation~~Rule 6C3-~~ 10.2~~0~~6.5~~32, F.A.C.~~

(6) Other Personal Services (OPS) employees without permanent status in any class may be separated from employment at any time without requirements of notice or reason and without rights of appeal.

*Specific Authority: 1001.74, 1001.75 FS. Law Implemented 110.205(2)(d), 1001.74, 1001.75 FS. History–New 6-3-01.*