## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**JENNIFER SMITH,**

  **Plaintiff,**

           **CASE NO: 6:24-cv-00457-PGB-RMN**

**FLORIDA AGRICULTURAL &**
**MECHANICAL UNIVERSITY**
**BOARD OF TRUSTEES,**

  **Defendant.**

_____/

### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND
### SUPPORTING MEMORANDUM OF LAW

  Pursuant to Federal Rule of Civil Procedure 65 and Middle District of Florida

Local Rule 6.02, Plaintiff, Jennifer Smith ("Professor Smith") respectfully moves

this Court for a preliminary injunction that restores the status quo ante –restoring

Professor Smith to her tenured position as a Full Professor – until the merits of this

case is decided. A university cannot be freely permitted to destroy a tenured

professor's stellar career based on objectively fabricated and newly altered

allegations.  In support, Professor Smith alleges:[1]

---

[1] This is not a reconsideration of the TRO. The TRO sought to preserve the status quo. This motion seeks to restore the status quo ante. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974), among other things.

## I.     RELEVANT BACKGROUND

1.     Jennifer Smith is a tenured, full professor at Florida A&M University (FAMU) College of Law with a stellar employment history for twenty years, evidenced by student and dean evaluations. (Ex. 1).

2.     On October 17, 2023, Professor Smith commenced this action in state court, after receiving a right to sue letter from the Equal Employment Opportunity Commission ("EEOC"). (Ex. 14) (Ex. 15, Amended Complaint)

3.     On November 13, 2023, another professor notified Defendant of Professor Smith's unserved complaint in a federal court filing entitled "Plaintiff's Response to Defendant's Motion to Dismiss with Prejudice Plaintiff's Second Amended Complaint, Or in the Alternative, Motion to Strike." *See Reyes v. FAMU BOT*, 6:22-cv-1525-WWB-DCI, 2023 WL 9283741, ECF No. 36 at 12 (M.D. Fla. 2022). (Ex. 13) Defendant, through that filing, learned Professor Smith had filed a state court complaint for equal pay and retaliation.

4.     Twenty-two (22) days later, on December 5, 2023, Defendant sent Professor Smith a Notice of its intention to terminate her from her tenured professor position because of alleged retaliation. (Ex. 2) Pursuant to FAMU Regulations, Defendant held a conference hearing on January 11, 2024, before a three-person panel of lawyers chosen by Defendant, and the panel found Professor Smith did not engage in retaliation. (Ex. 3)

5.    After the conference, Defendant missed the deadline to inform Professor Smith that it intended to continue with her termination after winning the appeal. (Ex. 12, 10.120(4)) ("If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified as described in this rule within five workdays prior to the date the action is effective."). Thus, Professor Smith had a reasonable expectation of continued employment.

6.    On January 23, 2024, Provost Watson emailed Professor Smith to indicate that she was moving forward with her termination even though the panel recommended otherwise, and such an action was well beyond the mandatory notification date articulated in FAMU Regulations. Without regard for the original effective date, Defendant created a new effective date. (Exs. 5, 12) Professor Smith was properly/formally apprised of this new effective date of January 30, 2024 on January 29, 2024, which was eleven days after Defendant was required to notify Professor Smith by personal or certified mail. (Ex. 12, 10.120(4))

7.    In the Defendant's second notice to Professor Smith, Defendant offered Professor Smith the opportunity to re-appeal, which Professor Smith has done.

8.    A hearing was held before Antoneia Roe on March 15, 2024, one day after the mandatory deadline pursuant to FAMU Regulations. (Ex. 6, 10.206(7)

Professor Smith has not heard back from Ms. Roe since then, and Ms. Roe has not responded to email correspondence from Professor Smith. (Ex. 10)

9.     On March 25, 2024, Provost Watson stated, under penalty of perjury, that, "My decision to termination (sic) Ms. Smith's employment was based on her unprofessional and inappropriate behavior towards students as articulated in the Investigative Reports." (Ex. 7) This was not the basis given for Professor Smith's termination in any of the notices. (Exs. 2, 5) Nor was this reason indicated in any hearing or ever before disclosed to Professor Smith that this was the basis for Professor Smith's termination. (Ex. 3)

## II.    LEGAL STANDARD

To obtain a preliminary injunction, Professor Smith must establish "that (1) [she] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *See Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020). "Employees who, having exhausted EEOC or other administrative remedies, have filed Title VII actions in the district courts seeking final adjudication on the merits … petition the court for a preliminary injunction, the element of irreparable injury will be presumed." *Middleton-Keirn v. Stone*, 655 F.2d 609, 612 (5th Cir. 1981). "The third and fourth

factors 'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271 (11th Cir. 2020) (citation and internal quotations omitted).

According to *Callaway*,

> The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. **If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties,** *Ross-Whitney Corp. v. Smith Kline & French Laboratories*, 9 Cir. 1953, 207 F.2d 190, by the issuance of a mandatory injunction, see 7 Moore's Federal Practice P65.04(1), or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Id.* at 576. (emphasis added)[2]

## III.   ARGUMENT

Professor Smith is entitled to a preliminary injunction restoring her to the status quo ante as a professor teaching at the law school.

---

[2] *Schrank v. Bliss*, 412 F. Supp. 28, 34 (M.D. Fla. 1976) ("In exceptional situations, however, where an irremediably deteriorating condition threatens to thwart the Court's ability to render a proper final judgment on the merits later, the Court must act to preserve or restore the vanishing **status quo ante**.") (emphasis added); *see, e.g.*, *Porter v. Lee*, 328 U.S. 246, 251 (1946) ("It has long been established that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the **status quo**. The Administrator, therefore, was entitled to seek a restoration of the status quo in this case.").

### A. Professor Smith Has Shown a Substantial Likelihood of Success on Her Claims

Professor Smith is only required to show that her success is merely "*likely* or probable, rather than *certain.*" *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). This factor is the most important, *see Gonzalez*, 978 F.3d at 1271 n.12, thus Professor Smith addresses this element first.

#### 1.   *Equal Pay Act Claim*

Professor Smith is likely to succeed on this claim. The EPA follows a two-step framework. First, to establish a prima facie case a plaintiff must show "that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974) (quoting 29 U.S.C. § 206(d)(1)). Second, if an EPA plaintiff establishes a prima facie case, "the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act:" (1) "a seniority system;" (2) "a merit system;" (3) "a system which measures earnings by quantity or quality of production;" or (4) "a differential based on any factor other than sex." *Brock v. Ga. Sw. Coll*., 765 F.2d 1026, 1036 (11th Cir. 1985), *overruled on other grounds by McLaughlin v. Richland Shoe Co*., 486 U.S. 128 (1988). A defendant carries the burden to prove an affirmative defense, and where the defendant relies on the "factor other than sex" defense, the defendant has

a heavy burden. *See Bowen v. Manheim Remarketing, Inc.,* 882 F.3d 1358 (11th Cir. 2018).

Here, Defendant has already admitted that 1) Professor Smith's salary is "lagging" and "limited" allegedly due to her promotion history and 2) that the male comparator's "salary is in line with the other professors teaching and specializing in that area" – Constitutional Law. (Ex. 8) Promotion history is not a reason for unequal pay. *Glenn v. General Motors Corp.*, 841 F.2d 1567 (11th Cir. 1988) ("prior salary alone cannot justify pay disparity."). The EPA is concerned with pay equality for the same job not a promotion history. *See Rizo v. Yovino*, 950 F.3d 1217 (9th Cir. 2020) (*en banc*) (discussing history of the EPA and its fourth defense). This second reason is a blatant falsity and further highlights the significant salary discrepancies rooted in gender differences. (Ex. 10) The most qualified and longest teaching Constitutional Law is Professor Patricia Broussard (a woman), who earns significantly less than the lesser qualified men in Constitutional Law teaching. (Ex. 10) Defendant has also admitted that the jobs require substantially equal skill, effort, and responsibility, performed under similar working conditions within the same establishment – professors teaching different classes do not merit higher salaries, which shows why Broussard is so underpaid compared to the lesser qualified men in teaching Constitutional Law. (Ex. 9). Therefore, because Professor Smith has established her prima facie case and negated Defendant's proffered business reasons,

she has shown a likelihood of success on the merits of her first EPA claim. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) (discussing burdens).

### 2.   *Equal Pay Act Retaliation*

Professor Smith is likely to succeed on her EPA retaliation claim. To prevail on an EPA retaliation claim, a plaintiff must prove that "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000). A plaintiff may carry her burden of establishing pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

For purposes of this motion, Professor Smith engaged in protected activity when she filed a lawsuit to vindicate her pay allegations. *See Simpson v. State of Alabama Dep't of Hum. Res.*, 501 F. App'x 951, 954 (11th Cir. 2012). Plaintiff has suffered an adverse employment action through Defendant's notices of termination and the subsequent termination. *See Davis v. Legal Servs. Alabama, Inc.*, 19 F.4th 1261, 1266 (11th Cir. 2021) (finding that termination constitutes an adverse

employment action) (quotation omitted).[3] Plaintiff is not an at-will employee, so Defendant cannot fire her as though she is – there must be just cause to terminate a tenured employee. (Ex. 4) Furthermore, Professor Smith was in a contract with the Defendant that protected against unilateral terminations as discussed below.

Having satisfied her *prima facie* case, Professor Smith has established any reason proffered by Defendant is pretext. Defendant will argue the termination is based on "just cause." Such a position is illogical and unsupported by any evidence especially given Provost Watson's significantly departure from the original rationale for Smith's termination. (Exs. 2, 7) This is because Defendant's understand that the initial reasons for Professor Smith's termination notice cannot and do not meet any reasonable or legal definition of retaliation.

### 3.   *First Amendment Retaliation*

Professor Smith is likely to succeed on her First Amendment retaliation claim. For preliminary relief, a plaintiff must show that "(1) [s]he engaged in protected activity, (2) [s]he suffered an adverse action, and (3) a causal connection exists between the protected activity and the adverse action." *Warren v. DeSantis*, 90 F.4th 1115, 1127 (11th Cir. 2024) (citation omitted). A public employee engages in

---

[3] At least one district court in this Circuit has recognized that a notice of intent to terminate constitutes an adverse employment action. *See Sorenson v. Delta Air Lines, Inc.*, No. 1:17-CV-00541-ELR, 2023 WL 5420953, at *18 (N.D. Ga. Mar. 31, 2023). Similarly, other circuits have similarly held that a notice of termination constitutes an adverse employment action. *See Fowler v. AT&T, Inc.*, 19 F.4th 292, 301 (3d Cir. 2021) (surveying the circuits); *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 305– 06 (2d Cir. 2017).

protected activity only if she can overcome the government-speech doctrine. A plaintiff can overcome the government-speech doctrine provides if:

> that: (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a substantial part in the employer's decision to demote or discharge the employee. If he or she can make a prima facie showing, the burden shifts to the employer to show, by a preponderance of the evidence, that it would have reached the same decision in the absence of protected speech.

*Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015).

Here, Professor Smith filed her complaint on October 17, 2023, to a public forum – Florida State Court. Her petition and the speech therein concerned matters of public concern because it involved alleged equal pay violations. *See generally Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.,* 57 F.4th 791, 820 (11th Cir. 2022) (Lagoa, J., concurring) (explaining that women's rights are issues of general public concern – Title IX context). When Defendant became aware of the complaint 22 days later, Defendant then unlawfully interfered with Professor Smith's freedom of speech and petition because Defendant retaliated against her by terminating her for engaging in this speech/petition. Additionally, Professor Smith's First Amendment interests outweigh the University's interest because Professor Smith has not taken any action to publicize or otherwise bring unnecessary attention to her filing, nor can it be stated that Smith's petition is interfering with College of

Law or University operations. Silencing Professor Smith's concern would render a chilling blow to women across the country on pay equity. *See Oakes Farms Food & Distribution Servs., LLC v. Sch. Dist. of Lee Cnty., Fla.*, 541 F. Supp. 3d 1334, 1343 (M.D. Fla. 2021) (finding that termination would cause a chilling effect on speech). Lastly, "[t]he balance of equities tips in favor of [a] plaintiff's interest in preventing infringement of their First Amendment rights." *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009). Further, Defendant could not reach its decision in the absence of Professor Smith's protected conduct as is evident that months had passed, and Defendant had taken no action until Professor Smith filed suit. Finally, Defendant has changed its original rationale for sending Professor Smith notices of termination because the alleged retaliation excuse fails to hold up under the law, and thus, clearly Defendant would not have reached the same decision in the absence of the protected speech.

### 4. *Breach of Contract*

Professor Smith is likely to succeed on her breach of contract claim. "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citation omitted). Here, Professor Smith has an employment contract she signed on April 14, 2023, to end May 10, 2024, and that contract is similar to all

others she signed in previous years that carry an expectation and obligation of renewal because of her tenure.

Defendant has breached Professor Smith's employment contract by violating its own regulations, (Exs. 4, 12, 13), when Defendant carried out a malicious investigation against Professor Smith and manufactured subterfuge to terminate Professor Smith. (Ex. 2) This breach is most analogous to doctors and physicians with medical privileges, who have been faced with nonrenewal of their staffing privileges at hospitals, Florida courts have routinely found that such an action amounted to a termination, or breach of contract, so injunctive relief issued. *Compare Spunberg v. Columbia/JFK Medical Center*, 1997 WL 868607, at *1-3 (Fla. Cir. Ct. Dec. 23, 1997) *with Shands at Lake Shore, Inc. v. Ferrero*, 898 So. 2d 1037, 1039 (Fla. 1st DCA 2005) and *Genchi v. Lower Fla. Keys Hosp. Dist.*, 45 So. 3d 915, 917 (Fla. 3d DCA 2010).

Florida courts have also regularly concluded that a hospital's alleged contractual breach of their Bylaws is sufficient to grant compensatory and injunctive relief. *See Lawler v. Eugene Wuesthoff Mem'l Hosp. Ass'n*, 497 So. 2d 1261, 1264 (Fla. 5th DCA 1986) (collecting cases). Moreover, courts in other States have found that tenured professors face similarly immeasurable and catastrophic injury from an unlawful termination – New Jersey and South Carolina courts have, and their decisions offer instructive value. *See Amer. Ass'n of Coll. Professors v. Bloomfield*

*Coll.*, 322 A.2d 846 (C.H. Div. 1974), *affirmed* 346 A.2d 615 (App. Div. 1975) [hereinafter, "*AACP*" or "*AACP v. Bloomfield*"]; *Zisk v. The Charleston School of Law,* Case No. 2015-CP-1003661 (Charleston Cir. Ct. 2015) (Ex. 11). Professor Smith relies on *Zisk* and *AACP* to demonstrate that tenured professors – unlike probationary or non-civic public employees – may suffer incalculable loss and injury if they are terminated for improper or unjust reasons.

Similarly, here, Professor Smith has damages that are unquantifiable because her reputational loss, inability to teach law, inability to return to practice as partner, and overall professional losses are consistent with the harm suffered by the physicians in the cases mentioned above. Thus, Professor Smith has established a likelihood of success on this claim.

### 5. *Violation of Procedural Due Process*

Professor Smith is likely to succeed on her procedural due process claim. The Florida and U.S. Constitutions both require "fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property." *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994). "When bringing a section 1983 claim alleging a denial of procedural due process, three elements must be shown: (1) a deprivation of a constitutionally-protected [] property interest; (2) state action; and (3) constitutionally-inadequate process." *Bradsheer v. Fla. Dep't of Highway Safety & Motor Vehicles*, 20 So. 3d 915, 918 (Fla. 1st DCA 2009). A

"tenured employee is entitled to oral or written notice of the charges against [her], an explanation of the employer's evidence, and an opportunity to present [her] side of the story" before a state or state agency may terminate an employee. *See McKinney*, 20 F.3d at 1561.

Here, Professor Smith has a property interest in her employment as a tenured law professor. Additionally, Defendant is an extension of the state, so state action is also satisfied. One case is truly instructive regarding the final element of inadequate process, and that case is *Spiegel v. University of South Florida*, 555 So.2d 428 (Fla 2d DCA 1989). In *Spiegel*, the court held that "[a] written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown." 555 So.2d at 429 (citing *Perry v. Sindermann*, 408 U.S. 593, 601 (1972)). The court further found that "USF's attempt to terminate [Spiegel] as department chairman is so fatally defective that it is of no force or effect." *Spiegel*, 555 So.2d at 429.

Such is a similar case for Professor Smith. Pursuant to FAMU Regulations, Professor Smith was granted an opportunity to be heard and by an impartial panel, exclusively chosen by the Defendant; however, Defendant's ultimate decisionmaker Provost Watson was and remains biased resulting in no procedural due process. The panel found Professor Smith completely without blame and recommended that the

Defendant rescind the Notice of Termination. The Defendant, without lawful reason, has refused to follow the panel's decision and has suggested that Professor Smith re-appeal. That means the alleged procedural due process was not fair at all and Defendant predetermined that it would uphold its decision to terminate Professor Smith even if the panel found otherwise – which the panel did. Furthermore, the Defendant missed the deadline to notify Professor Smith that she was going to be terminated nonetheless, so Defendant in violation of the FAMU Regulations reset the termination date to avoid not complying with its own notice requirements. Like *Spiegel*, the Defendant's procedural process is so fatally defective it should also have no force or effect and Professor Smith, like *Spiegel*, should be immediately reinstated.

The Defendant will likely argue Professor Smith has had the ability to appeal the decision through a separate complaint process likely to drag out six months. The law does not support that. In *State Dept. of Health and Rehabilitative Services v. Artis*, 345 So.2d 1109, 1112 (Fla. 4th DCA1977), the court stated: "where pursuit of an administrative remedy would be of no avail, there is no adequate remedy provided, and one is not required to follow that avenue for relief." *See also Southern Bell Telephone and Telegraph Co. v. Mobile America Corp., Inc.*, 291 So.2d 199 (Fla.1974). Accordingly, Professor Smith is likely to prevail on this claim as well.

15

### B. Professor Smith Has Established Irreparable Harm.

This Circuit has long recognized, as a general rule that "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by **returning to the last uncontested status quo between the parties**, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *See Callaway*, 489 F.2d at 576. (internal citations omitted). As will be shown below, Professor Smith has demonstrated the irreparable harm that she is currently experiencing clears the precedential bar and justifies issuance of a preliminary injunction.

This Court previously focused on lack of irreparable harm for injuries presumably remediated by money damages and a quick assessment that the public's interest is unserved by monetary damages in denying Professor Smith's request for a TRO. Because Professor Smith is seeking a restoration of the *status quo ant*e, the Court's previous finding is inapplicable here. There are two ways to show irreparable harm in employment cases. Usually, irreparable harm is presumed in Title VII cases.[4] *Stone*, 655 F.2d at 612. However, a separate line of cases have

---

[4] While *Stone* involved a Title VII claim and this case centers on an EPA claim, the distinction is essentially moot. Both claims are federal efforts to address workplace discrimination, indicating a similar legal foundation aimed at remedying inequality in employment. "In situations where the jurisdictional prerequisites of both the EPA and title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 200e *et seq.*, are satisfied, any violation of the Equal Pay Act is also a violation of title VII." 29 C.F.R. 1620.27(a). *See also Seldon v. Total Sys. Servs., Inc.*, 653 F. Supp. 2d 1349,

required that an employee seeking a preliminary injunction make a showing of irreparable harm. Professor Smith believes her case mirrors the plaintiff in *Stone* but argues that she can show irreparable injury under *Sampson v. Murray,* 415 U.S. 61, 92 (1974) and its progeny as well.

*Sampson* anticipated the extraordinary situation that Professor Smith is currently in. In *Sampson*, a probationary employee at the GSA was discharged four months into her job. She received a temporary restraining order (TRO) which was extended after a hearing until the Acting Commissioner testified about her dismissal. The D.C. Circuit upheld the TRO, prompting the Supreme Court to review the case, focusing on the trial court's authority to issue injunctive relief and its appropriate use. The Supreme Court vacated the TRO, citing a lack of irreparable harm but acknowledged exceptions in unusual discharge circumstances and clarifying that unusual cases justify a finding of irreparable injury sufficient for injunctive relief.

Notwithstanding the high bar that *Sampson* has placed on irreparable harm in employment cases, several employees have presented unique and distinctive facts sufficient to clear that high standard. These cases are so analogous to Professor Smith's case that preliminary relief must be granted to Professor Smith. The following cases are instructive.

---

1377 (M.D. Ga. 2009) (holding that Title VII and EPA retaliation claims are evaluated the same way). Further, Professor Smith exhausted administrative remedies under her EPA claim just as she would be required to do under Title VII.

First, and most on point is *Assaf v. v. University of Texas System*, in which a Dr. Said A. Assaf was a nontenured faculty member in his second year at the University of Texas Health Science Center who received notice on March 22, 1975, that his appointment would be terminated no later than September 1, 1975. 399 F. Supp. 1245, 1245-47 (S.D. Tex. 1975), *appeal dismissed and vacated on other grounds,* 435 U.S. 992 (1978). Dr. Assaf moved for and received a preliminary injunction to prevent the University of Texas from terminating him based on the University's alleged failure to follow its own Rules and Regulations on dismissal notifications. The court made the following finding concerning irreparable harm:

> Here, there is much more than a temporary loss of income which the *Sampson* court admonishes to be insufficient to alone constitute irreparable injury. ***Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician, especially one in the sciences.*** Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. ***Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money.*** Also, here plaintiff faces termination less than a week from the date of this court's hearing. It is clear that this situation has come about purely from the inability of plaintiff to clearly ascertain his status until a short time ago. ***If any fault is to be found, it is in the bureaucratic monolith which operates in most state institutions.*** Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable. Therefore, at least until there has been a fair determination, in a proper hearing, of the validity of plaintiff's termination, this court is persuaded that fundamental fairness requires that plaintiff's employment not be terminated.

*Id.* at 1251 (internal citations omitted)(emphasis added).

Second, a Jacksonville-based federal judge, the Honorable Charles Scott, distinguished *Sampson* in *Schrank v. Bliss,* 412 F. Supp. 28 (M.D. Fla. 1976). In *Schrank*, a well-performing, permanent deputy sheriff was denied due process after termination, causing irreparable harm. The court noted two main types of irreparable harm: first, a state-regulated system that ensures all future employers are informed of the plaintiff's termination, leading to actual and official stigmatization; second, official records accusing the deputy of insubordination, which unfairly tarnish his professional reputation as a law enforcement officer. The court intervened, issuing a preliminary injunction to prevent interference with his employment, reinstating him upon a $250 bond payment.

Third, Judge Dalton distinguished *Sampson* in *Blaine v. N. Brevard Cnty. Hosp. Div.*, 312 F. Supp. 3d 1295, 1307 (M.D. Fla. 2018). In *Blaine*, seven well-regarded oncologists with impeccable track records of providing excellent patient care were denied reappointment, continued staff privileges, and the right to a hearing; but they were offered an interview or appeal with members of the Board who voted to reject them. 312 F. Supp. 3d at 1298-1302. The oncologists moved for and received a preliminary injunction.

Fourth, in *Keyer v. Civil Service Commission of the City of New York*, 397 F. Supp. 1362 (E.D.N.Y. 1975) two permanent civil service employees were fired without being notified of the reasons or given a hearing, following the License

Division's rejection of their 'Special Patrolman' designation. They had earned permanent status through rigorous evaluations and a probationary period, and they successfully obtained a preliminary injunction against their termination as the court found the plaintiffs have lost not only job security, health benefits, and pension contributions but also their expected career progression. The longer their absence, the higher the risk of missing out on promotions. Even if reinstated, the Court found, would not compensate for lost advancement opportunities and thus, immediate relief was necessary. *Id.* at 1370. The court lastly distinguished *Sampson* by framing the facts before it as "a total denial of due process which has had the effect of terminating permanent civil service employment and stigmatizing the plaintiffs in an occupation peculiarly susceptible to such a stigma." *Id.* at 1372.

Here, Professor Smith's purported termination is far from the traditional case explained in *Sampson*. Unlike the typical employee, she is a caretaker of her elderly, ill father; was terminated in violation of her employer's stated obligations under the contract and its own rules/regulations; lured to follow a sham appeals procedure; was given notice that she is or will be terminated then paid for a number of weeks after, retained in the public directory, and allowed access to company resources for a number of months until the Defendant learned of her active complaint and retaliated again; has a termination based on clearly dubious charges alleging a violation of a legal concept (retaliation) and fails to meet the elements of the legal

concept and unrelated to work performance; and has reporting implications to state licensing authorities under FL Bar Rule 4-8.3, 4-84. Nothing about Professor Smith's case is usual as contemplated in *Sampson*. Accordingly, Professor Smith has shown irreparable harm that cannot be remedied with monetary damages and that harm is her (1) "loss of repute within the academic community as well as a denial of access to research resources vitally necessary to a [legal] academician," *see Assaf*; (2) loss of her health insurance and all the other benefits attendant with her job, *see Keyer*; (3) loss of career advancement opportunities for deanships in the face of dubious allegations, *see Keyer & Schrank*; (4) loss of her ability to secure a similar job in this market; (5) loss of her constitutional right to due process from Defendant's failure to follow the rules and regulations it was required to as articulated in Professor Smith's annual contract and its own rules/regulations, *see Assaf*; (6) the potential for eviction, *see Schrank*; (7) damage to her reputation given her inability to complete scheduled scholarship, *see Assaf*; (8) loss of an unblemished disciplinary record and resulting reputational damage as a for-cause termination under obviously dubious allegations potentially reportable to the Florida Bar, *see Blaine*; (9) lastly her loss of pay as she is the sole caretaker for her father who, with a memory disorder, is not supposed to be removed to another living space, *see Schrank.*

### C. Public Interest Factors

As stated above, "[t]he third and fourth factors 'merge' when, as here, the [g]overnment is the opposing party." *Gonzalez,* 978 F.3d at 1271. Terminating Professor Smith, who has a twenty-year stellar employment record of high evaluations by students and deans and a remarkable scholarship history, would be a disservice to the public interest as was seen in *Assaf.* (Ex. 1) There, the *Assaf* court found that the issuance of a preliminary injunction would indeed serve the public interest because:

> [T]there is a highly important public interest in education and the educational process. The public has a right to except (sic) that faculty members who will directly or indirectly affect the education of their children shall be of impeccable character and have the highest credentials. An accompanying interest of at least equal importance is an interest that there be a fair determination that the educational system is not being deprived of the expertise of people of superior caliber for merely frivolous reasons not relevant to academic excellence. Until such a determination of the validity of termination has been made, then a presumption of competence and integrity which is an integral part of public confidence in public education mandates that a professor be retained. In a broader sense, this court is saying that the public interest in the present context is best served by not terminating an individual until the due process prescribed has been complied with.

*Id. at 1251-52; see also Blaine, Schrank, Callaway.*

Provost Watson's objectively untruthful declaration is baseless because it suggests that Professor Smith does not have a stellar employment record based on a single student encounter found by Defendant's panel not to be retaliation and new allegations Provost Watson only recently manufactured to fit Defendant's narrative.

(Ex. 7) First, Paragraphs 4 and 5 of Provost Watson's declaration purport to indicate that Professor Smith had "inappropriate and unprofessional conduct towards students." (Ex. 7, pp. 1-2) Provost Watson's sudden shift in her declaration to attribute the termination of Professor Smith solely to alleged unprofessional behavior, excluding earlier claims of retaliation, is misleading because it presents a completely new rationale to the Court. Such a change misrepresents the facts or the basis of the decision-making process, undermining the integrity of the legal proceedings and depriving the Court of the full context needed for a fair judgment. This new reason for the termination also violates FAMU Regulations, which require that the Notice to Terminate provide the specific reason(s) for the termination. (Ex. 12, 10.120(2)(b)) Further, there never was a finding that Professor Smith behaved inappropriately with students and no students are even identified in either Notice. The Supplemental report dated July 6, 2023, which was never issued to Professor Smith but was attached to the December 5, 2023, Notice to Terminate, specifically indicates that none of Professor Smith's conduct rose to any University policy violations. (Ex. 2, p. 40) But yet, Defendant continues to mischaracterize the charge against Professor Smith. Also, the allegation of rivalry with another law professor, Martitza Reyes, is similarly meritless. Not only did Professor Smith recommend Reyes for employment to FAMU Law years ago, notwithstanding Reyes' lackluster performance as an employee at a law firm where she and Professor Smith both

worked, but also Reyes has filed a 303-count complaint against almost all of the faculty at the College of Law and numerous others. (Ex. 10) This new allegation of rivalry with Reyes cannot be a basis to sully Professor Smith's employment history.

### D. Bond

The "bond requirement may be waived if bond is not requested, or if no evidence is presented that a party will suffer damages from the issuance of an injunction." *Tancogne v. Tomjai Enterprises Corp.*, 408 F. Supp. 2d 1237, 1252 (S.D. Fla. 2005). "Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *See Complete Angler, LLC*, 607 F. Supp. 2d at 1335 (M.D. Fla. 2009). Here, Professor Smith alleges she faces insurmountable losses professionally and personally and that her First Amendment rights have been abridged. Therefore, Professor Smith respectfully asks this Court to use its discretion to waive imposition of a bond in this instance. The Defendant will not suffer any damages by the Court's grant of injunctive relief.

## IV.   CONCLUSION

Professor Smith has clearly established the elements necessary for a preliminary injunction. The Defendant's appeal process, adherence to its own regulations, and transparency throughout this matter are objectively and significantly deficient. Professor Smith requests that this Court grant the preliminary injunction by immediately reinstating Professor Smith to her tenured position during the pendency of the litigation, and notes that Defendant will not suffer any prejudice by this grant.

Dated: April 1, 2024

Respectfully submitted,

*/s/ Jennifer Smith*
Jennifer Smith (FBN 964514) (*pro se*)
Law Office of Jennifer Smith
13506 Summerport Village Pkwy., Ste 108
Windermere, FL 34786
407-455-0712
jensmithesq@aol.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of April, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all registered users.

*/s/ Jennifer Smith*
Jennifer Smith (*pro se*)
Law Office of Jennifer Smith