Case 6:24-cv-00457-CEM-RMN   Document 37-1   Filed 03/04/24   Page 1 of 26 PageID 1155

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA
CIRCUIT CIVIL**

JENNIFER SMITH,

     Plaintiff,

                                         CASE NO.: 2023-CA-016035-O

FLORIDA AGRICULTURAL &
MECHANICAL UNIVERSITY BOARD OF
TRUSTEES,

     Defendant.

_____/

## FIRST AMENDED COMPLAINT

Plaintiff, Professor Jennifer Smith, sues Defendant, Florida Agricultural & Mechanical University Board of Trustees, and states:

## JURISDICTION AND VENUE

1.     This is an action for damages in excess of $50,000.00.

2.     Venue lies in Orange County because the cause of action accrued in Orange County, and Defendant conducts business by operating its law school and managing its employees within Orange County.

## ADMINISTRATIVE PREREQUISITES

3.     All conditions precedent to bringing this action have occurred.

## PARTIES

4.     Plaintiff, Jennifer Smith (hereinafter "Professor Smith") is a woman, citizen of the

1

United States, and a resident of Orange County, Florida, and has so resided at the times material hereto.

5.      Defendant, Florida Agricultural & Mechanical University Board of Trustees. (hereinafter "FAMU," "FAMUBOT," or "Defendant"), is a state university in the Florida university system.

6.      Defendant operates a main campus headquartered in Tallahassee, Florida that is commonly referred to as FAMU.

7.      Defendant also operates a law school located in Orlando, Florida that is known as the FAMU College of Law (where Professor Smith works).

## GENERAL ALLEGATIONS

8.      Professor Smith began working for the Defendant in May 2004 and her official start date was August 8, 2004.

9.      Professor Smith performed the duties of a law professor and was subject to the direction and control of Defendant.

10.     Professor Smith holds the professional title of "tenured Full professor", or "Professor of Law" and has held this title since 2016.

11.     On August 16, 2013, Professor Smith's immediate supervisor, then Dean Pernell, evaluated her as excellent in teaching, scholarship and service for the 2012-13 academic year.

12.     In May 2014, then Dean Pernell evaluated Professor Smith as excellent in teaching, scholarship and service for the 2013-14 academic year.

13.     College of Law faculty were not re-evaluated again for nearly a decade until Professor Smith reported this lapse in evaluations to BOT members at a meeting with the faculty at the College of Law.

14. In October 2014, Professor Smith sued Defendant for violations of the Equal Pay Act, Title VII of the Civil Rights Act, Title IX of the Education Amendments Act, and the Florida Civil Rights Act ("Smith I").

15. On July 22, 2015, Smith I ended in favor of the Defendant and against Professor Smith.

16. After the trial, a disgruntled witness told Professor Smith that the University had conducted a salary study showing women at the law school were grossly underpaid by tens of thousands. Through a public records request, Professor Smith obtained the study dated August 2015 and continued in court, ultimately forcing salary changes and promotions across the board for women faculty.[1]

17. The "*An Analysis of Instructional Faculty Salary Equity in the Florida Agricultural and Mechanical University College of Law*," (hereinafter "FAMU Salary Equity Analysis", Ex. 1) prepared by Defendant's Office of Institutional Research found the following:

> Average and median salaries for instructional faculty in the college were computed by gender and rank. As Table 2 shows, for the 2014-15 academic year the average and median salaries for male College of Law instructional faculty exceeded those of female instructional faculty at both the Professor and Associate Professor ranks. The average salary for males holding the rank of Professor exceeded the average for females at the same rank by $17,691. (P. 3)

> The model estimated that on average, when controlling for other factors male faculty in the College of Law at the rank of Professor earned $20,199 more than their female colleagues. (P. 10)

> Focusing exclusively on College of Law faculty at the Professor rank, the results from Model 2 suggest that in general female faculty at the Professor rank in the FAMU of College earned less than their male counterparts. (P. 13)

---

[1] Electronic discovery indicated that this date had been manipulated before producing the study to Professor Smith.

18.   In 2016, Defendant made five categories of salary adjustments ("2016 Schedule of Adjustments") consisting of (1) one-time salary adjustments to certain tenured full professors and associate professors based exclusively on rank, tenure status, and length of tenure ("Salary Structure"); (2) a university-wide 1% cost-of-living raise to all professors; (3) one percent lump-sum bonuses to law faculty who had not receive a promotion or other pay increase between January 1 and June 16, 2016; (4) nine percent salary increase to associate professors who were promoted to full professor before 2017; and (5) routine changes to professor salaries based on the addition or removal of administrative duties or shifts between a 9-month and 12-month schedule. (Ex. 2)

19.   Defendant acknowledged that one-time adjustments of up to $24,000 were needed for salary adjustments, and the baseline for tenured associate professors would be $120,000.00 and tenured full professors would be $140,000.00. (ex. 3)

20.   In July 2018, Professor Smith sued Defendant for a second time because she believed the 2016 Schedule of Adjustments violated the Equal Pay Act and Title VII ("Smith II") and the issue was unique.

21.   Smith II ended with the trial court awarding summary judgment to the Defendant, but the Court refused to award Defendant attorney's fees.

22.   On August 9, 2021, Defendant hired a male professor named Ewanrinareto "Areto" Imoukhuede ("Comparator") to perform a similar position to the position held by Professor Smith – tenured Full Professor.

23.   Professor Smith and Comparator performed and perform substantially equal work in terms of skill, effort, and responsibility, under similar working conditions. Former Dean Pernell previously testified that this is the case for all faculty at the law school, irrespective of subject matter.  Pernell Deposition, p.40, ll. 4-25; pp.41-44; Pernell Deposition, p.41, ll. 3-25; p. 42, ll. 1-

4

7; Pernell Deposition, pp.44-45, ll. 1-3.; Pernell Deposition, p.46, ll. 18-25 (Ex. 4).

24.     Despite performing substantially equal work, Professor Smith is paid nearly $25,000.00 less than Comparator for performing the same or similar job duties.

25.     The Comparator's pay is nearly $25,000.00 greater than the 2016 Salary Structure Defendant created.

26.     The increased pay that Comparator received and receives has not been based on superior skill, education, or experience or any other legitimate factor.

27.     The EPA, 29 U.S.C. § 206 et seq., prohibits employers from paying employees of one sex less than employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, under similar working conditions.

28.     Defendant violated the EPA by paying Professor Smith less than Comparator for performing substantially equal work.

29.     On May 9, 2022, Professor Smith wrote the president of the University, Dr. Larry Robinson, about the disparity in pay between her and Comparator.

30.     On June 28, 2022, Professor Smith filed an informal gender equity complaint with Defendant's Equal Opportunity Program ("EOP").

31.     On September 22, 2022, Defendant's EOP department sent its investigative report to Professor Smith, denying any pay inequities without any rationale for paying Comparator more than Professor Smith.

32.     On October 18, 2022, Professor Smith filed a Charge of Discrimination with the EEOC under the Equal Pay Act.

33.     On December 12, 2022, Defendant submitted its position statement to the EEOC addressing Professor Smith's Charge of Discrimination.

34. On January 10, 2023, Professor Smith submitted her rebuttal to the EEOC concerning Defendant's position statement on equal pay, indicated that Defendant admitted it underpaid Professor Smith.

35. On January 26, 2023, Defendant surprised Professor Smith by initiating an investigation into Professor Smith of a stale student complaint against Professor Smith, which was filed nearly one hundred days earlier and was never mentioned to Professor Smith, and ignoring the complaint Professor Smith had filed against the student on the day of the incident.

36. The facts, circumstances, and timeline concerning Professor Smith's Complaint and the earlier-filed student complaint are as follows:

a. On October 18, 2022, Professor Smith filed a Charge of Discrimination with the EEOC under the Equal Pay Act.

b. On October 20, 2022 at precisely 10:30 am, Professor Smith reported a violation of the Code of Conduct to Associate Dean of Students Reginald Green via text message, pertaining to an incident involving an unidentified female student, later identified as MW, for intentionally disrupting Professor Smith's class.

c. Defendant never investigated Professor Smith's complaint that came two days after her charge was filed to the EEOC.

d. Professor Smith alleged that MW displayed deliberate, aggressive, and confrontational behavior, specifically described as "so rude" and "aggressively rude," by barging into a class session in which she was not enrolled, fully aware that the classroom was being used by Professor Smith, as evidenced by a crowd of over 40 students gathered in the hallway, respectfully awaiting the conclusion of the ongoing class.

e. The incident unfolded when MW entered the classroom through the back door and declared that her professor, Maritza Reyes ("Prof. Reyes") told MW that she needed to sit down to get ready for the next class starting at 10:30 am.

f. After being instructed to leave by Professor Smith, MW, now very irate, positioned herself outside the front door of the classroom to await a second opportunity to confront Professor Smith about Smith's use of the classroom.[2]

_____

[2] Law Faculty can reserve classrooms for makeup courses, as ABA standard 311 requires that at least 64 of the required credit hours for the Juris Doctor degree must be earned "in courses that require attendance in regularly scheduled classroom sessions or direct faculty instruction." Students are free to enter law school classrooms during their assigned courses and prohibited from entering law school classrooms outside of their scheduled courses. For the purposes of

    g.     Professor Smith never encountered MW before this occurrence at the law school and could not otherwise identify the student or even if she was really a student.

    h.     Sometime later, Professor Smith learned from another professor, Patricia Broussard, how remorseful and ashamed MW was said to be, specifically because MW was a summer associate at the firm where Professor Smith had been a partner.

    i.     On December 18, 2022, Professor Smith sent MW the following email to give MW peace about her employment opportunities:

> Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.
>
> Best,
>
> Prof. Smith

    MW did not respond and later alleged that she felt the email from Professor Smith was a threat.

    j.     Professor Smith heard nothing else from Associate Dean Reginald Green, so she believed the issue was not to a level the Defendant felt needed to be investigated. According to Compliance, Associate Dean Green failed to send Professor Smith's complaint to Compliance. Associate Dean Green also failed to follow the Law School's Student Handbook or Faculty Handbook, which directed him to investigate student codes of conduct violations. (Exs., 9, 10)

    k.     On January 26, 2023, nearly 100 days after the incident, Professor Smith received emails from Compliance.

    l.     Defendant contacted Professor Smith to begin an investigation into the MW incident.

    m.     But even more surprising, Defendant's investigation made Professor Smith the target of the investigation, notwithstanding Associate Dean Green's assurance that he would look into the incident according to his email to her on the day of the incident. (Ex. 5)

    n.     Also on January 26, 2023, Defendant notified Professor Smith that the

---

this paragraph, Professor Smith reserved the classroom on October 6, 2022 date. Therefore, MW was prohibited from entering the classroom at the time of Professor Smith's direct faculty instruction.

outcome of the investigation could be her termination – an outcome that would also terminate Professor Smith's EEOC complaint. This was the first time that Professor Smith learned that a complaint had ever been filed against her by MW, including the severity of MW's allegations and the blatant and obvious falsities contained therein.

37. Defendant carried on its investigation from January 26, 2023 until June 5, 2023.

38. Defendant's sudden interest in reviving MW's complaint in lieu of Professor Smith's early filed complaint ultimately proved MW's assertions were meritless and the entire investigation was unwarranted.

39. MW was the admitted instigator who, on both occasions on the day of the incident, purposefully confronted Professor Smith then MW falsely claimed that she was in fear of her safety with over 40 students in the hallway after MW's repeated voluntary and intentional confrontations with Professor Smith, who had no idea who this person was.

40. On February 15, 2023, Prof. Reyes sent an email to Professor Smith and Deans Keller and Cooper, providing great insight into MW's deliberate disruption of Professor Smith's class on October 20, 2022. In the email, Reyes stated:

> Last semester (fall 2022), you harassed a student in my evidence course after the student reminded you that I was about to start class in the classroom where you were conducting one-on-one sessions with students from your civil procedure course. You were not supposed to be in that classroom when the student reminded you that I was going to start class in a few minutes. You were assigned to teach civil procedure in the classroom next door, yet you chose to remain in the classroom where I was due to start teaching evidence to disrupt my class, which you did. You engaged in unprofessional, rude, and harassing behavior in full view of the students in your civil procedure course and my evidence course who were waiting in the hallway.

41. Clearly, MW knew Professor Smith was in the classroom, which Professor Smith had reserved on October 6, 2022; MW deliberately disrupted [Professor Smith's] class; and MW was the admitted instigator both times she ambushed Professor Smith on October 20, 2022.

Professor Smith was in the adjacent classroom to teach civil procedure at 10:30 am, and thus Professor Smith could not have disrupted Prof. Reyes' class, which started at 10:30 am.

42. Defendant's unwarranted and illogical investigation was conducted negligently, without any lawful purpose, and it was unduly and unreasonably delayed over 130 days from January 26, 2023, to June 5, 2023 to intentionally cause needless disruption to Professor Smith.

43. As evidence of Defendant's negligence in carrying out the unwarranted and illogical investigation, Defendant failed to promptly investigate the incident or even request or preserve key surveillance video evidence for 104 days (from October 20, 2022 to January 31, 2023) to ensure key evidence that would have immediately exonerated Professor Smith no longer existed. Defendant failed to follow its own internal regulations, ergo the Code of Conduct; failed to investigate Professor Smith's complaint against the student; and intentionally disregarded evidence supporting Professor Smith's allegations of deliberately disruptive conduct by MW.

44. Because Compliance informed Professor Smith that Associate Dean Green failed to follow University regulations and its code of conduct when he did not forward her complaint to Compliance or file it through the Compliance Hotline, Professor Smith re-filed her initial complaint, but this time through the Compliance Hotline on March 9, 2023.

45. Compliance immediately deleted the complaint and wrote a memorandum instructing the deans to counsel Professor Smith about retaliation based on her now proper resubmission of the initial complaint.

46. In addition to Associate Dean Green not following University regulations, Defendant did not follow its own procedures in several ways. First, University Code of Conduct 1.019 (20) states: *Investigation. Preliminary Review and Investigation. University offices tasked with investigation take every reported concern seriously. All concerns will be assessed through*

*intake to determine the appropriate course of action. If an investigation is warranted, such initial investigation will be completed within a reasonable timeframe.* Defendant did not take the complaint from Professor Smith or the student seriously because it delayed investigating either one for nearly 100 days.

47.     This investigation continued well beyond the duration of the spring semester, which is both unreasonable and caused Professor Smith significant distress and anxiety.

48.     On April 28, 2023, approximately 90 days after the initiation of the investigation in January 2023 and nearly 180 days after the incident took place, Professor Smith reached out to the investigator via email to inquire about the progress of the investigation.

49.     In response, the investigator stated, "The investigation is still ongoing. You will be notified once the report has been completed."

50.     On June 5, 2023, Compliance emailed copies of a June 5, 2023 Investigative Report to the FAMU Board of Trustees, Executive Vice President & Chief Operating Officer, Vice President and General Counsel; Dean of the College of Law, Interim Provost, Vice President of Audit, Chief Human Resources Officer, Professor Smith, and the student.

51.     Following the investigation, Defendant falsely accused Professor Smith of retaliation to discredit Professor Smith's legitimate complaints against MW and protect Defendant from potential liability.

52.     Defendant recommended the re-imposition of an additional unspecified penalty in its report emailed to Professor Smith on June 5, 2023 ("Report") after Defendant had already instructed the deans to speak with Professor Smith about potential retaliation in March 2023, which had been done albeit half-heartedly, thus duplicating the penalty for the same alleged retaliation.

53.     Professor Smith assumed the investigation ended as per La'Tonya Baker,

10

Compliance employee and preparer of the Investigative Report.

54.    Unbeknownst to Professor Smith, Defendant never closed or had re-opened the unwarranted and illogical investigation, then transformed it into a witch hunt to manufacture misconduct down the road – which is exactly what happened.

55.    Second, Defendant did not follow University Code of Conduct 1.019 (18b), which states: *"Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the University's Compliance and Ethics Hotline."*

56.    Defendant did not follow this procedure and then blamed Professor Smith when she properly re-filed the complaint.

57.    Third, Defendant did not follow University Code of Conduct 1.019 (20b), which states: *Confidentiality will be maintained to the extent legal and practicable, informing only those personnel who have a need to know such information.* Defendant also failed to maintain the confidentiality of the investigation, thereby exposing Professor Smith's protected activity or the details of her complaint to other employees, then falsely alleged another employee (the professor who MW said instructed her to interrupt the class) had filed a complaint against Professor Smith because of Defendant's breach of confidentiality.

58.    On February 16, 2023, Professor Smith sent a memorandum to Ms. Baker, providing details about MW's intention to disrupt my class and requested an investigation into MW's intentional and hostile conduct towards me. Professor Smith also highlighted her concerns about Prof. Reyes, believing Prof. Reyes (who Professor Smith had recommended to the University for hire knowing she was unable to perform adequately at the law firm but hoping Reyes would thrive in a different environment) to be a "danger to me and other faculty at this law school."

11

59.     Just four days later, on February 20, 2023, Professor Smith received an email from Ms. L. Scott of the Equal Opportunity Program (EOP) where Professor Smith had filed her equal pay complaint months before, notifying me that Professor Reyes had filed a complaint against Professor Smith. Not only was this a false allegation by EOP seems to have used this to entice Professor Smith to file a complaint against Reyes -- this incident revealed a breach of confidentiality, as it became apparent that EOP and Compliance were divulging information to Prof. Reyes and engaging in what appeared to be "selective investigations."

60.     On February 28, 2023, Professor Smith emailed General Counsel Denise Wallace about Prof. Reyes because Professor Smith was increasingly concerned about Professor Reyes' behavior and Professor Smith's own safety. Ms. Wallace never responded.

61.     After receiving the June 5, 2023 report, on June 12, 2023, Professor Smith sent a memorandum addressed to Rica Calhoun (Compliance), Denise Wallace (General Counsel), and Craig Reed (BOT), also copied to Allyson Waston (Provost) herein incorporated by reference about the retaliatory actions of the Defendant, and demanded: 1) immediate rescission of the Report, 2) removal of the Report from her file, 3) an immediate investigation of the Code of Conduct violations she initially reported on October 20, 2022 (the date of the incident) against MW, and 4) an investigation into Compliance for its failure to follow its own guidelines, for the reasons herein. (Ex. 11)

62.     Professor Smith never received a response from the Defendant regarding her memorandum nor any of her demands.

63.     On July 6, 2023, Compliance Officer Rica Calhoun emailed a "secret" supplemental report ("Secret Supplemental Report") to the unwarranted and illogical investigation.

64.     While the Secret Supplemental Report is dated July 6, 2023, it is evident the report

12

was created in response to Professor Smith's June 12, 2023 memorandum.

65.     Compliance emailed the Secret Supplemental Report to the Executive Vice President & Chief Operating Officer, Vice President and General Counsel; Dean of the College of Law, Provost, Vice President of Audit, Director of EOP, and Associate Vice President of Human Resources.

66.     Professor Smith was not copied on this correspondence.

67.     Additionally, EOP (where Professor Smith initially filed her equal pay complaint) was copied on this supplemental report though it had not previously been copied on the June 5, 2023 Investigative Report.

68.     Professor Smith assumed that the investigation ended with the June 5, 2023 Investigative Report from Compliance.

69.     Professor Smith received a notice of right to sue letter from the EEOC on July 25, 2023.

70.     On October 5, 2023, Professor Smith wrote a memorandum to Compliance and the General Counsel about MW's concerning the student's concerning behavior regarding the settled matter that occurred a year before.

71.     Professor Smith indicated continuing concerns about her personal safety with a student who seemed completely engrossed with Professor Smith for the entire year and that she believed she was obligated to report MW's conduct to the Florida Bar, but Professor Smith never reported the student's conduct.

72.     Drafting a memorandum and querying the responsibility to report disruptive student conduct to the Florida Bar is not retaliation.

73.     The University never responded to Professor Smith's memorandum dated October

5, 2023.

74. On October 12, 2023, Professor Smith received a three percent performance-based increase, which is the highest any employee could receive.

75. On November 13, 2023, another COL professor, Reyes, notified Defendant of Professor Smith's unserved complaint in Reyes's own federal court filing entitled "Plaintiff's Response to Defendant's Motion to Dismiss with Prejudice Plaintiff's Second Amended Complaint, Or in the Alternative, Motion to Strike." *See Reyes v. FAMU BOT*, 6:22-cv-1525-WWB-DCI, 2023 WL 9283741, ECF No. 36 at 12 (M.D. Fla. 2022). Defendant, through that filing, learned Professor Smith had filed a state court complaint for equal pay and retaliation.

76. Within a few weeks, the Defendant sent Professor Smith a Notice to Terminate on December 5, 2023. This was the first time she saw the July 6, 2023 "Secret" memorandum. (Ex. 6)

77. The Defendant's conduct is blatant retaliation because the proposed discipline for Professor Smith's alleged misconduct based on a closed investigation is extreme, University regulations provide many other lesser options than termination, and none of her conduct the University points to can be considered an adverse action or retaliation against MW.

78. Professor Smith received a notice of termination ostensibly for retaliation by 1) re-filing her complaint against a student in the proper channels, 2) sending descriptive texts/emails to another faculty member and former student about the October 20, 2022, incident and provided to the University on February 9, 2023 in the investigation and 3) sending an October 5, 2023, memorandum to Defendant indicating her safety concern about MW who, for a year, seemed overly preoccupied with Professor Smith, who had never seen the student before the day of the incident in October 20, 2022. (Ex. 6)

14

79. According to FAMU Regulation 10.205, "The employee may be dismissed during the term of the employment contract for just cause, regardless of tenure status where it appears to the President or President's designee that an **employee's actions adversely affect the functioning of the University or jeopardize the safety or welfare of the employee, other employees or students**." [Emphasis added]

80. The Notice indicated appeal procedures available to Professor Smith and that the effective date of her termination would be January 19, 2024, if Defendant did not rescind the Notice of Termination.

81. Professor Smith timely notified Defendant that she wanted to have a hearing, which took place on ZOOM on January 11, 2024, before three (3) panel members chosen by Defendant. The panel members were all lawyers: Bryan Smith, Associate VP for Student Affairs; Andrea Nelson, School of Business and Industry; and Patricia West, FAMU Developmental Research School. After the hearing, the panel produced a report dated January 12, 2024.

82. The panel's report on January 12, 2024, unanimously recommended that Defendant rescind its intent to terminate and stated the following:

> Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.
>
> FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."
>
> The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university

15

employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". **After careful and thorough deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation** [emphasis added]. (Ex. 7)

83.     Of note, the panel/lawyers only addressed the allegation of the re-filing of the complaint because the other two allegations (texts/emails predating the student complaint or her knowledge of it, and the October 5, 2023, memorandum about her personal safety concerns) clearly cannot satisfy any definition of retaliation.

84.     According to Regulation 10.120(3): "After the conference is conducted, the employee **shall be notified**, by the President or President's designee of the University's decision (emphasis added)."

85.     According to Regulation 10.120(4): "If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee **shall be notified within five workdays prior to the date the action is effective (emphasis added)."**

86.     According to Regulation 10.120(1), Defendant shall give written notice to the employee of the proposed action. According to Regulation 10.120(2): "The notice shall include the following information: (a) **The effective date of the University's proposed final action** (emphasis added)."

87.     The effective date of the proposed final action contained in Defendant's written notice to Professor Smith was listed as January 19, 2024.

88.     Defendant did not notify Professor Smith by January 18, 2024, of its intent to proceed with her termination.

89.     Given Defendant's inaction and refusal to timely respond to her email dated

16

January 18, 2024, Professor Smith believed the Notice to Terminate had been withdrawn, waiving

its ability to terminate her via the reasons listed in the December 5, 2023 Notice to Terminate.

90.     On January 23, 2024, at 4:56 p.m., Professor Smith received an email with notice

of Defendant's intent to terminate her that stated:

> After reviewing all documentation and considering the totality of
> circumstances related to this matter, the University's decision to
> dismiss you from employment remains in effect. Pursuant to Florida
> A&M University Board of Trustees (University) Regulation 10.205,
> you are hereby notified that your current employment with the
> University will end at the close of business on Tuesday, January 30,
> 2024. You will remain on Administrative Leave with Pay until this
> date. In the interim, please refrain from reporting to work or visiting
> the area(s) related to your current work assignments unless otherwise
> notified by this Office. The reason for this employment action has been
> outlined in the "Notice of Intent to Dismiss from Employment"
> delivered to you on December 5, 2023.   (Ex. 7)

91.     To circumvent the notification timeframe outlined in FAMU Regulations, which

Defendant missed, Defendant changed the effective date of the proposed termination from January

19, 2024 (as indicated in the December 5, 2023 notice) to January 30, 2024 (the 10.120(4)

notification).

92.     Defendant then outlined the procedures that Professor Smith should follow to

appeal, again, Defendant's decision.

93.     Because Defendant has rejected the neutral predetermination hearing panel's

recommendation to rescind the Notice to Terminate, Professor Smith is convinced it would be

futile for her to proceed with any additional appeal process facilitated by Defendant when she

prevailed in the January 11, 2024, hearing.

94.     Defendant's decision to disregard the predetermination hearing panel's

recommendation demonstrates clear bias and lack of due process.

95.     After Professor Smith raised concerns about the pay disparity and expressed her

intention to exercise her rights under the EPA, Defendant engaged in the aforementioned retaliatory actions against Professor Smith.

96.     Defendant's retaliation against Professor Smith includes the adverse employment actions as described above.

97.     Defendant's retaliatory actions against Professor Smith were motivated by Plaintiff's exercise of her rights under the EPA, in violation of 29 U.S.C. § 215(a)(3).

**COUNT I**
**DISCRIMINATION IN COMPENSATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT 29 U.S.C. § 206, et seq.**

98.     The Plaintiff realleges paragraphs 1 through 97.

99.     Plaintiff belongs to a protected class; she is female.

100.    Plaintiff's job functions as a tenured full professor at FAMU have been of equal skill, effort, and responsibility to the job functions of the Comparator and were performed under the same or similar working conditions.

101.    During all relevant periods, Plaintiff received wages lower than the Comparator while performing the same or substantially more work than the Comparator.

102.    Plaintiff is qualified for and entitled to wages equal to or higher than her Comparator's wages performing the same or substantially more work than the Comparator.

103.    Defendant violated the Equal Pay Act (EPA), and Plaintiff is entitled to damages and equitable relief, including attorney's fees and costs.

**COUNT II**
**RETALIATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 215(a)(3)**

104.    The Plaintiff realleges paragraphs 1 through 97.

18

105. Defendant's retaliatory actions against Plaintiff, as alleged herein, constitute a violation of the EPA, 29 U.S.C. § 215(a)(3).

106. The retaliation described herein was based on Plaintiff's exercise of rights protected by law to resist and oppose gender discrimination and harassment and to participate in actions calculated to redress grievances.

107. Defendant's false and manufactured justifications for its actions are pretext based on the implausibilities, inconsistencies, incoherencies, and contradictions alleged above. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

108. As a result of Defendant's retaliatory actions in violation of the EPA, Plaintiff has suffered and is entitled to damages and equitable relief, including attorney's fees and costs.

## COUNT III
## BREACH OF CONTRACT

109. The Plaintiff realleges paragraphs 1 through 97.

110. The Defendant operates the law school.

111. The COL, Defendant's BOT, and faculty have all agreed to adhere to the terms of the Faculty Handbook, University Handbook, University Regulations and individual employment contracts.

112. Defendant, though the above noted documents, has made clear and unambiguous promises to Plaintiff including promises regarding tenure, retention of tenured faculty, governance of the COL, commitments to investigate faculty complaints, and termination of tenured faculty.

113. Plaintiff's employment letter (Ex. 8), together with the Faculty Handbook (attached

in part, Ex. 9), University Handbook and University Regulations are what form Plaintiff's employment contract.

114. Defendant has failed to meet its contractual obligations to Plaintiff. Defendant has allowed its employees to breach University regulations, breach confidentiality, and allege false allegations against Professor Smith to terminate her employment as a tenured full professor, thereby breaching her employment contract.

115. Defendant terminated Plaintiff's employment when without "just cause", thereby breaching the employment contract.

116. Through its actions and inactions, Defendant intentional, recklessly, and knowingly violated the provisions of the Faculty Handbook, University Handbook, University Regulations, and terms of Plaintiff's contract and her tenure.

117. As a result of Defendant's breach of contract, Plaintiff has suffered actual and consequential damages including loss of future wages, lost insurance and retirement benefits, and special damages, including the loss of future academic employment.

118. Plaintiff seeks actual, consequential, and special damages and pre-judgment and post-judgment interest for Defendant's wrongful breach of Plaintiff's employment contract.

**COUNT IV**
**FIRST AMENDMENT RETALIATION**
**UNITED STATES AND FLORIDA CONSTITUTIONS**

119. The Plaintiff realleges paragraphs 1-97.

120. By filing her state court complaint addressing issues of public concern that affect women nationwide, Plaintiff engaged in constitutionally protected activity. *See generally Adams*

20

*by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 820 (11th Cir. 2022) (Lagoa, J., concurring) (explaining that women's rights are issues of general public concern – Title IX context); *Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1555 (4th Cir. 1994) (recognizing women's rights as an issue of public concern).

121. Following Plaintiff's engagement in the constitutionally protected activity, Defendant took an adverse employment action against Plaintiff by endeavoring to terminate her through the notice of termination.

122. The adverse employment action was taken in retaliation for Plaintiff's exercise of her First Amendment rights and her engagement in constitutionally protected activity.

123. Defendant's conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights.

124. Defendant's adverse employment actions against Plaintiff, in response to her constitutionally protected activity, constitute unlawful retaliation in violation of the First Amendment to the United States Constitution.

125. Plaintiff suffers and will suffer damages as a result of Defendant's retaliatory actions, including but not limited to financial losses, emotional distress, harm to reputation, and other injuries.

**COUNT V**
**VIOLATION OF PROCEDURAL DUE PROCESS**
**42 U.S.C. § 1983**

126. The Plaintiff realleges paragraphs 1-97.

127. Plaintiff has a constitutionally protected interest in her employment as tenured full

professor at the College of Law.

128.    Defendant is a state actor for purposes of this statute.

129.    Plaintiff was denied due process of law when Defendant violated its regulations concerning the contents of the December 5, 2023 notice, thereby denying Plaintiff proper notice.

130.    Plaintiff was denied due process of law when Defendant employed a biased decisionmaker – Allyson Watson – to the review or adopt the panel decision concerning Plaintiff's termination, which denies Plaintiff a fair opportunity to be heard.

131.    The due process violations are complete because Defendant has refused to provide Plaintiff due process, as her memorandums opposing unlawful activity and other communications have asked for due process to no avail.

132.    Any further appeal or administrative remedy would be futile or inadequate because Defendant has demonstrated its bias and has the authority to select who hears all further appeals.

133.    Defendant, through Allyson Watson, has demonstrated its process is tainted with bias and any outcome is predetermined to conclude against Professor Smith. *See, e.g., McKinney v. Pate*, 20 F.3d 1550, 1562 (11th Cir. 1994) ("In the second scenario, the alleged bias is discovered after the proceeding has concluded; a contemporaneous objection therefore is impossible. Due process requires that the challenger have an opportunity to object to the alleged bias, and courts consequently have instituted procedures to address allegations of bias and to set aside bias-tainted outcomes. Typically, courts require that the challenger meet a threshold test of demonstrating harm or prejudice resulting from the alleged bias before they will reopen a closed case.").

134.    Thus, Plaintiff will always be denied due process of law in any appeals scenario before Defendant as the decisionmaker.

135.    Plaintiff's only option for due process is judicial review and to set aside the Provost's decision to terminate Professor Smith.

## COUNT VI
## REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

136.    The Plaintiff realleged paragraphs 1-97.

137.    Defendant intends to terminate Plaintiff in violation of her tenure status because of her pursuit of equal pay.

138.    Plaintiff will suffer irreparable damage if her employment is terminated as noticed as she will be unable to find any similar employment as a tenured full professor in her area and her professional reputation will be seriously and permanently injured.

139.    "In view of the uncertainty in admeasuring damages because of the indefinite duration of the contract, and the importance of the status of Plaintiffs in the milieu of the college teaching profession, it is evident that the remedy of damages at law would not be complete or adequate." *AAUP v. Bloomfield College*, 136 N.J. Super. 442, 448, 346 A.2d 615, 618 (1975).

140.    Monetary damages cannot provide sufficient relief or compensation to Plaintiff as the loss of her position as a tenured full professor cannot be valued monetarily, and loss of tenure will have a significant detrimental impact on her legal and academic career.

141.    Plaintiff is likely to prevail on the legal merits of her cause of action as set forth in this complaint.

142.    Plaintiff seeks a court order in the form of preliminary and permanent injunction compelling Defendant to honor her tenure status and employment contract, thus maintaining the

23

status quo until this matter is resolved and expedited discovery to determine whether Professor

Smith engaged in retaliation so that she can be reinstated as a part of the faculty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a) An order granting preliminary and permanent injunctive relief;

b) An order declaring that Defendant has violated the Equal Pay Act, including retaliation provisions;

c) An order removing any negative references to the October 20, 2022 incident from Professor Smith's employment file;

d) An award of unpaid wages and other compensation due to Plaintiff as a result of Defendant's violation of the EPA, including interest;

e) An order setting aside the Provost's Notices to Terminate Professor Smith;

f) An order of reinstatement of her tenure, position and office;

g) An award of punitive damages, special damages, actual damages and consequential damages;

h) Judgment against Defendant and for Plaintiff awarding compensatory damages on all Counts for the Defendant's violations of law enumerated herein;

i) Judgment against Defendant and for Plaintiff equalizing her salary with her male counterpart, permanently enjoining Defendant from future violations of law enumerated herein and remedying all benefits of which Plaintiff has been unlawfully deprived w enumerated herein;

j) An award of liquidated damages in an amount equal to the unpaid wages and compensation due to Plaintiff;

k) Prejudgment interest;

l)      An award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b);

and any other basis; and

m)      Any other relief, including equitable relief, this Court deems just and proper.

### Jury Demand

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Jennifer Smith*
Jennifer Smith
Florida Bar No. 964514
Law Office of Jennifer Smith
13506 Summerport Village Pkwy.
Suite 108
Windermere, FL 34786
407-455-0712
407-442-3023 (facsimile)
jensmithesq@aol.com

January 2024

## VERIFICATION

Under penalty of perjury under the laws of the United States of America and the State of Florida, I declare that I have read the foregoing, and that the facts alleged therein are true and correct to the best of my knowledge and belief. I understand that a false statement in this Verification will subject me to penalties of perjury.

_____
Jennifer Smith, Plaintiff

STATE OF FLORIDA
COUNTY OF ORANGE

The foregoing instrument was acknowledged before me this 29 day of January, 2024, by Jennifer Smith, who is personally known to me [X] or who has produced Drivers License-FL as identification and who did take an oath.

Sworn to and subscribed before me this 29 day of January _____, 2024.

_____
Notary Public

Notary Public State of Florida
Nathan S. Flashman
My Commission GG 944349
Expires 02/01/2024