## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

JENNIFER SMITH,

     Plaintiff,

v.                                                                  Case No. 6:24-cv-00457-PGB-RMN

FLORIDA A&M UNIVERSITY
BOARD OF TRUSTEES; ALLYSON
WATSON, individually and in her
official capacity; D. DENISE
WALLACE, individually and in her
official capacity; LATONYA
BAKER, individually and in her
official capacity; LATRECHA
SCOTT, individually and in her
official capacity; RICA CALHOUN,
individually and in her official
capacity; GRAY ROBINSON, P.A.;
JULIE ZOLTY; RICHARD E.
MITCHELL, and SARAH REINER,

     Defendants.

_____

## <u>SECOND AMENDED COMPLAINT</u>

     Plaintiff, Jennifer Smith ("Professor Smith"), makes the following allegations

against Defendants Florida Agricultural & Mechanical University Board of Trustees

("Defendant FAMU" or "FAMU"), Allyson Watson ("Defendant Watson"), D. Denise

Wallace ("Defendant Wallace"), Gray Robinson, P.A. ("Defendant Gray Robinson"),

Latrecha Scott ("Defendant Scott"), Rica Calhoun ("Defendant Calhoun"), Julie Zolty

("Defendant Zolty"), Sarah Reiner ("Defendant Reiner"), and Richard E. Mitchell

("Defendant Mitchell").

## **INTRODUCTION**

Over the past decade, school violence against faculty has emerged as a growing concern, with numerous incidents highlighting the vulnerability of educators. Reports indicate a troubling increase in physical assaults, verbal threats, and acts of intimidation directed at teachers and administrative staff.[1] University professors are not exempted from the increasing number of violent acts, intimidation, harassment or threats that students have displayed in recent years.[2]

Amid these growing concerns, on October 20, 2022, an unprovoked and enraged student, then-unknown to Professor Smith, barged into Professor Smith's class in progress to demand that she be allowed to sit to prepare for another class scheduled later that morning. Professor Smith reported the then-unidentified student's conduct to

---

[1] Susan D. McMahon et al., *Violence Against Educators and School Personnel: Crisis During COVID* Technical Report, AMERICAN PSYCHOLOGICAL ASSOCIATION (2022), https://www.apa.org/education-career/k12/violence-educators-technical-report.pdf.

[2] Claudia Lampman, Women Faculty at Risk: U.S. Professors Report on their Experiences with Student Incivility, Bullying, Aggression, and Sexual Attention, 5 NASPA J. ABOUT WOMEN IN HIGHER EDUC. 184, 184 (2012) ("In this study of a random sample of 524 professors . . . from 100 colleges and universities across the United States, 91% reported at least one act of student incivility/bullying, 25% experienced at least one sexual behavior from a student, and 1–2% said a student had used or threatened them with violence in the past year."); Colleen Flaherty, *Shattered: A Professor's Murder at the University of Arizona, Apparently by a Former Student, Raises Urgent Concerns About Campus Safety. He Wasn't the First Professor Killed At Work, Either.*, INSIDE HIGHER ED (Oct. 12, 2022), https://www.insidehighered.com/news/2022/10/13/professors-murder-campus-raises-urgent-safety-questions (detailing several university professors who were killed by students); *see also* Thyrie Bland, *FSW Professor Granted Temporary Restraining Order Against Student*, NEWS-PRESS (Mar. 2, 2018), https://www.news-press.com/story/news/education/2018/03/02/fsw-professor-granted-temporary-restraining-order-against-student/389244002/; Nadine El-Bawab, *UNC Chapel Hill Professor Killed in Office was Shot 7 Times, Medical Examiner Says*, ABC NEWS (Oct. 6, 2023), https://abcnews.go.com/US/unc-chapel-hill-professor-killed-office-shot-7/story?id=103780698.

Associate Dean of Students, Reginald Green. Instead of following FAMU Regulations and forwarding the reported complaint to FAMU's Compliance & Ethics department or investigating the complaint pursuant to the Florida A&M University College of Law's Student Code of Conduct, Associate Dean Green did nothing, not even preserve the video surveillance footage of the incident. Nearly 100 days passed since the student encounter, still FAMU had not acted. It was not until shortly after Professor Smith submitted a response to the U.S. Equal Employment Opportunity Commission's ("EEOC") investigation of equal pay allegations that FAMU initiated a retaliatory investigation targeting only Professor Smith for the student's intrusion. This employment discrimination and civil rights case was initially centered on a retaliatory investigation precipitated by Professor Smith's campaign for equal pay for women at the FAMU College of Law. Finding the enraged student's version of the classroom encounter completely baseless, FAMU independently manufactured a claim of retaliation to fabricate cause to terminate Professor Smith. This unlawful termination and blatant retaliation implicate several contractual and previously unpled civil rights issues transforming this case into a much more serious action, requiring judicial intervention.

Professor Smith asserts the following allegations upon information, belief, and investigation of counsel:

## JURISDICTION AND VENUE

1.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and 1343. Jurisdiction is also based on federal questions under Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963, the First and Fourteenth Amendments to the U.S. Constitution, and 42. U.S.C. § § 1983, 1985 and 1986.

2.      Venue is proper in this district under 28 U.S.C. § 1441 because Defendant FAMU removed from the Ninth Judicial Circuit Court in and for Orange County, and the Orlando Division of the Middle District of Florida is the "district court of the United States for the district and division embracing the place where such action [wa]s pending." Moreover, the locus of operative facts and many of the witnesses and parties are located or operate in this district consistent with the command of § 1391.

## ADMINISTRATIVE PREREQUISITES

3.      All conditions precedent to bringing this action have occurred.

## PARTIES

4.      Professor Smith is a woman, United States citizen, and resident of Orange County, Florida.

5.      Defendant FAMU is a state university within the Florida state university system headquartered in Tallahassee, Florida. Defendant FAMU operates a law school in Orlando, Florida (the "College of Law" or "COL").

6.      Defendant Watson is the Provost and Vice President for Academic Affairs

at FAMU. Defendant Watson is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

7.     Defendant Wallace is the General Counsel of FAMU. Defendant Wallace is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

8.     Defendant Baker is the Director of Compliance and Chief Privacy Officer for FAMU. Defendant Baker is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

9.     Defendant Scott is the Director of Equal Opportunity Programs (EOP) for FAMU. Defendant Scott is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

10.     Defendant Calhoun is the Chief Compliance & Ethics officer for FAMU. Defendant Calhoun is sued in her individual capacity for the actions taken outside the scope of her official duties and in her official capacity for the actions in accord with her role at the university.

11.     Defendants Watson, Wallace, Baker, Scott, and Calhoun are collectively referred to as the "University Employee Defendants."

12.     Defendant Mitchell is of counsel for Gray Robinson and serves as outside counsel to FAMU.

13.     Defendant Zolty is an associate attorney with Gray Robinson and serves as outside counsel to FAMU.

14.     Defendant Sarah Reiner is a partner with Gray Robinson and is outside counsel to FAMU.

15.     Defendant Gray Robinson is a Florida law firm that serves clients nationally from 15 offices across Florida and Washington, D.C.

16.     Defendants Mitchell, Zolty, Reiner and Gray Robinson are collectively referred to as the "Gray Robinson Defendants."

## GENERAL ALLEGATIONS

17.     Professor Smith was employed by FAMU from 2004 up through and including at least April 2024 when she received monies from FAMU, and she had an exemplary record of service.

18.     In May 2004, Professor Smith started working voluntarily for Defendant FAMU at the COL based on a fulfilled promise by then-Dean Percy Luney that she would be paid in the future for her efforts in establishing the law clinics at the new law school. Her official start date as a law professor was August 8, 2004. (Ex. 21)

19.     Professor Smith performed the duties of a law professor, which include teaching, scholarship and service, and she was subject to the direction and control of

Defendant FAMU at all times relevant to this litigation. (Ex. 9)

20.    Defendant FAMU has neither changed the duties and responsibilities of law professors, nor the skill or expertise required of law professors from 2004 to date. Professors at the COL perform substantially equal work in terms of skill, effort, and responsibility, under similar working conditions. Former Dean Pernell previously testified that this is the case for all professors at the law school, irrespective of subject matter.  (Exs. 4 (Pernell Depo), 9).

21.    Defendant FAMU does not use subject matter "specialists" to classify law professors or change job descriptions as Defendant FAMU had misrepresented to the EEOC on December 12, 2022 (Ex. 18, p. 6), but later admitted on May 5, 2023. (Ex. 1, p. 3)

22.    Defendant FAMU has neither employed nor maintained any logical or consistent approach in assigning law professors to teach courses.

23.    Professor Smith was a tenured full professor from 2016 until her unlawful, purported termination.

24.    On August 16, 2013, then Dean Pernell, Professor Smith's immediate supervisor, evaluated her in her duties as excellent in teaching, scholarship and service for the 2012-13 academic year. (Ex. 21)

25.    In May 2014 for the year 2013-14, then Dean Pernell evaluated Professor Smith in her duties as excellent in teaching, scholarship and service for the 2013-14

academic year. (Ex. 21)

26.    Law faculty were not re-evaluated again for nearly a decade until Professor Smith reported that to BOT board members at a meeting with the faculty at the College of Law.

27.    In 2015 after Professor Smith sued for equal pay, Defendant FAMU recognized there was gender inequity of up to $20k in its law faculty salaries in "*An Analysis of Instructional Faculty Salary Equity in the Florida Agricultural and Mechanical University College of Law*," prepared by the Florida A&M University Office of Institutional Research (August 2015) (Ex. 2), which found that for tenured full professors:

a)  Average and median salaries for instructional faculty in the college were computed by gender and rank. As Table 2 shows, for the 2014-15 academic year the average and median salaries for male College of Law instructional faculty exceeded those of female instructional faculty at both the Professor and Associate Professor ranks. The average salary for males holding the rank of Professor exceeded the average for females at the same rank by $17,691. (p. 3)

b)  The model estimated that on average, when controlling for other factors male faculty in the College of Law at the rank of Professor earned $20,199 more than their female colleagues. (p. 10)

c)  Focusing exclusively on College of Law faculty at the Professor rank, the results from Model 2 suggest that in general female faculty at the Professor rank in the FAMU of College earned less than their male counterparts. (p. 13)

## EQUAL PAY ALLEGATIONS

28.    In 2016, Defendant FAMU informally or formally created a "lockstep" salary structure whereby associate professors were set at a base salary of $120,000 and full professors were set at a base salary of $140,000, subject to nominal increases based on that person's year at the particular rank, tenure status, and years tenured. (Ex. 12)

29.    On August 9, 2021, Defendant FAMU hired Ewanrinareto "Areto" Imoukhuede ("Comparator"), a male professor to the same or similar position as Professor Smith – tenured full professor at the College of Law. Comparator has the same core and essential duties, which are teaching, scholarship and service. (Ex. 9, pp. 49, 52-53)

30.    Professor Smith and Comparator performed substantially equal work in terms of skill, effort, and responsibility, under similar working conditions as tenured law professors at the COL. (Ex. 4; Ex. 9, pp. 49, 52-53)

31.    Despite performing substantially equal work, Defendant FAMU paid Professor Smith nearly $25,000.00 less than Comparator for performing the same or similar job duties when Professor Smith has ten years more legal experience than Comparator.

32.    Comparator's pay at the time he was hired is about $25,000.00 greater than the 2016 "lockstep" structure.

33.    The increased pay that Comparator received and receives has not been

based on superior skill, education, or experience or any other legitimate factor.

34.     The Fair Labor Standards Act, as amended by the Equal Pay Act ("EPA"), 29 U.S.C. § 206 et seq., prohibits employers from paying employees of one sex less than employees of the opposite sex for equal work on jobs requiring equal skill, effort, and responsibility, under similar working conditions.

35.     Defendant FAMU has discriminated against Professor Smith on the basis of sex by paying her a lower wage rate than Comparator for equal work on jobs requiring equal skill, effort and responsibility, performed under similar working conditions, in violation of the Equal Pay Act.

36.     Defendant FAMU violated the EPA by paying Professor Smith less than Comparator for performing substantially equal work.

37.     As a result of Defendant FAMU's unlawful conduct, Professor Smith has suffered lost compensation and other damages, and is entitled to attorney's fees and costs.

## SPECIFIC ALLEGATIONS

38.     On May 9, 2022, Professor Smith emailed the president of FAMU, Dr. Larry Robinson, about the disparity in pay between her and Comparator. Given the history of litigation and the media attention it garnered,[3] resulting in FAMU's 2015

---

[3]Professor Files Gender-Discrimination Suit Against FAMU, https://www.tallahassee.com/story/news/local/2014/08/07/professor-files-suit-against-famu-college-of-law/13725423/.

salary Study (Ex. 2),[4] Professor Smith reasonably believed that notifying the FAMU President that women were still underpaid at the law school would invoke swift change.

39.    On June 28, 2022, Professor Smith filed an informal gender equity complaint with Defendant FAMU's Equal Opportunity Program ("EOP").

40.    On September 22, 2022, Defendant FAMU's EOP department sent its investigative report to Professor Smith (2022-FAMU-F-05-005), denying any pay inequities without any rationale for paying the Comparator more than Professor Smith. From this point, Defendant FAMU and University Employee Defendants began a campaign of retaliatory acts based on Professor Smith's statutorily protected activity.

41.    On October 18, 2022, Professor Smith filed a Charge of Discrimination with the EEOC under the Equal Pay Act.

42.    October 20, 2022, at precisely 10:30 am, Professor Smith reported a violation of the Code of Conduct to Associate Dean of Students Reginald Green via text message, pertaining to an incident involving an incensed, entitled and unidentified female student, later identified as Michelle Wanamaker ("MW"), whose is now known as Michelle Sadiki. Professor Smith regularly reported conduct violations to Green via text message because she chaired the Student Conduct & Disciplinary Committee for several years, and Green was a member of the Committee as Associate Dean of Students.

---

[4] "The study was conducted at the request of the university's Provost, and in response to recently raised concerns about potential salary inequities within the college." (Ex. 2, p. 2).

43.     Professor Smith reported, in a text message to Reginald Green immediately after the incident, that MW displayed deliberate, aggressive, and confrontational behavior toward Professor Smith. Professor Smith specifically described MW as "so rude" and "aggressively rude," because MW barged into an ongoing class session that she was not enrolled in, despite MW being fully aware that the classroom was in use by Professor Smith as there was  a crowd of over 40 students gathered in the hallway, respectfully waiting for permission to enter. MW confirmed she knew Professor Smith's class was in session when MW alleged in a facially baseless complaint she filed against Professor Smith a week later that stated:

> MW was "visibly and audibly upset about [her] inability to enter [the] class and adequately prepare for lecture… [MW] was anxious to enter [the] classroom… Professor Smith was on notice that **[students in the hallway] were anxiously awaiting entrance to prepare for our class**… [Professor Smith's] adjacent classroom was open and available, but she chose to remain in our class until seconds before our class start time. Jennifer Smith was knowingly interfering with our ability to be prepared for Professor [Maritza] Reyes' Evidence class.

(Ex. 6, p. 24) (emphasis added).

44.     Notwithstanding a hallway full of her classmates, MW deliberately and intentionally entered the classroom through the **back door** and declared that her professor told her that she needed to sit down to get ready for the next class starting at 10:30am.

45.     After being instructed to leave by Professor Smith, MW became even more furious and positioned herself outside the **front door** of the classroom, awaiting an

opportunity to re-confront Professor Smith about Professor Smith using the classroom, which Professor Smith had reserved a few weeks earlier for a make-up class. (Ex. 3) Professor Smith had never encountered or seen MW before this occurrence at the law school and had no idea who this unhinged person was. Yet a week after the incident and unbeknownst to Professor Smith, MW filed a complaint against Professor Smith in which MW blatantly and falsely mischaracterized her encounter with Professor Smith, shamelessly and recklessley distorting the truth so that MW would  evade liability:

> I am utterly sickened and discouraged by this violent encounter within the walls of our law school Jennifer Smith was threatening in her proximity to my body, in her elevated tone, as well as her insults. She was so close to my face that I could feel the warmth of her breath. I felt assaulted. She degraded and embarrassed me in front of my colleagues. She bullied me and created a hostile environment for me at my law school. I have never engaged in a conversation with Jennifer Smith before today. Her verbal and physical aggressions were completely unprovoked. I do not feel safe in her presence.

46.     On November 1, 2022, Professor Smith went to follow up on the October 20, 2022 complaint she filed against MW by visiting Associate Dean Green's office. Professor Smith was told by his assistant, Teresa Pissini, that Associate Dean Green was on vacation, so his assistant emailed Professor Smith acknowledging Professor Smith's visit and said that she would let Associate Dean Green know.

47.     Classes ended for the semester 17 days later on November 18, 2022.

48.     Sometime later, Professor Smith learned from another professor, Patricia Broussard, how remorseful and ashamed MW was said to be, specifically because MW

did not know that she was clerking for the firm where Professor Smith had been a partner. So, on December 18, 2022, Professor Smith sent MW the following email to give MW peace about her employment opportunities and job security with the firm:

> *Hi. I am the professor who you met accidentally in the hallway several weeks ago (late Oct) when I was doing makeup exams in the classroom on the second floor. I was a partner with H&K where you will work this summer. I am proud of you and would not do anything to interfere with a student's career. I wish you the best, and if I can ever help you in any way, please reach out.*
>
> *Best,*
>
> *Prof. Smith*

49.     MW did not respond and later she claimed Professor Smith's email was sent to intimidate her. (Ex. 6, p. 33)

50.     Professor Smith heard nothing else from Associate Dean Green, so she believed Defendant FAMU believed her complaint was not investigation-worthy. However, within days of learning of the complaint, Associate Dean Green had been copied on an email from then-Provost Maurice Edington to Defendant Scott (EOP) for her to "please review and take appropriate action." (Ex. 6, pp. 28-29). Despite specific and immediate obligations and procedures that state universities must follow when a student alleges violent behavior against a faculty member guided by state laws, federal laws, and university policies, Defendant FAMU did nothing for over three months.

51.     According to Defendant Baker, Associate Dean Green violated FAMU Regulations by failing to send Professor Smith's complaint to FAMU's Compliance

Department ("Compliance") to be investigated. (Ex. 5) Thus, the Compliance report dated June 5, 2023, recommended that Provost Watson and Dean Keller "[c]onsider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices." (Ex. 6, p. 36)

52.     Associate Dean Green also failed to follow the College of Law's Student Handbook or Faculty Handbook, which directed him to investigate student codes of conduct violations, which he normally did when Professor Smith sent him texts or emails as chair of the Student Disciplinary & Conduct Committee. (Exs. 9, 10) To cover his violation of FAMU Regulations and COL Codes of Conduct, Associate Dean Green later changed his testimony in the middle of the Compliance investigation. Initially, Green stated, on the date of the incident, that he would "try and identify the student tomorrow… feel free to send me an email detailing the interaction … Thanks for the notification." (Ex. 5) Then acknowledged in an email to Professor Smith on February 1, 2023 that he indeed did consider her text about the incident a complaint requiring an investigation. (Ex. 5) "In a subsequent [undated but seems to be after March 13, 2023] statement, Associate Dean Green maintained that he did not consider Professor Smith's text message as a complaint." (Ex. 6, pp. 28-29, 34)

53.     To Professor Smith's surprise and merely 16 days after she submitted her rebuttal to the EEOC concerning Defendant FAMU's position statement on equal pay, which admitted that Professor Smith was underpaid, Professor Smith learned that

15

Defendant FAMU had begun an investigation in which she was the subject of the investigation. (Exs. 19, 20)

54.    On January 26, 2023, nearly 100 days after Professor Smith initially reported the MW incident, Defendant FAMU contacted Professor Smith to begin an investigation into the MW incident because of Professor Smith's protected activity in seeking equal pay. But even more surprising, Defendant FAMU's investigation made Professor Smith the target, even though Defendant FAMU had assured Professor Smith it would look into the incident based on her complaint by text to Associate Dean Green.

55.    Defendant Baker was secretive about the details of the investigation, so Professor Smith emailed Defendant Wallace, FAMU's General Counsel. Finally, on January 27, 2023, Professor Smith first learned that the complaint filed against her was made by MW; that MW's claims of violations of university policy, if substantiated, were severe enough to warrant Professor Smith's termination; and that the allegations supporting those claims were blatantly and obviously false. Yet, Associate Dean Cooper received MW's complaint on October 25, 2022, knew of the atrocious allegations (involving claims of "hostile environment and fear", which Defendant FAMU as an educational institution must immediately address, but did not), and forwarded MW's complaint to EOP on October 26, 2022. On November 2, 2022, Cooper emailed MW to let her know that someone in EOP would reach out to her – one day after Professor Smith had gone to Associate Dean Green's office to further discuss her complaint against MW.

(Ex. 6, pp. 28-30) Still, Defendant FAMU had done nothing about the incident, which timing concerned Professor Smith. (Ex. 20)

56.     By suddenly reviving MW's stale and delayed complaint, Defendant FAMU failed to request or preserve key surveillance video evidence, delayed requesting the surveillance video for 104 days (from October 20, 2022 to January 31, 2023) to destroy key evidence that would have immediately exonerated Professor Smith, failed to follow its own Code of Conduct and Regulations and state and federal law requiring an investigation, failed to investigate Professor Smith's complaint against the student, and intentionally disregarded evidence supporting Professor Smith's allegations of deliberate hostile and disruptive conduct by MW. These failures demonstrate that the true motivation for the investigation was not the student's reported concern but rather to strike back at Professor Smith for her EEOC activity. Associate Dean Green's email confirms this because, despite the blatant falsities and implausibilities within the student complaint that, if Defendant FAMU believed, it was obligated to investigate immediately under state law, federal law and FAMU Regulations. FAMU nevertheless decided to proceed with a facially meritless complaint to use it as pretext to terminate Professor Smith, in retaliation for her protected activity.

57.     Defendant FAMU then carried on a clearly unwarranted investigation from January 26, 2023 until June 5, 2023, ultimately finding all of MW's allegations to be absolutely meritless. FAMU also independently manufactured a finding of retaliation,

which was subterfuge to create a false disciplinary record against Professor Smith and to punish her for again seeking equal pay.

58.    MW was the admitted instigator who, on both occasions on the day of the incident, purposefully confronted Professor Smith, interrupted and disrupted her class, then MW falsely claimed that she was in fear of her safety with over 40 students in the hallway after MW's repeated voluntary and intentional confrontations with Professor Smith, who had no idea who this person was or the cause of MW's unprovoked hostility.

59.    On February 15, 2023, another FAMU law professor, Maritza Reyes sent an email providing great insight into MW's deliberate disruption of Professor Smith's class on October 20, 2022. In the email, Professor Reyes stated that MW entered Professor Smith's class that day to "remind [Professor Smith] that [Reyes] was about to start class in the classroom where [Professor Smith was] conducting one-on-one sessions with students from [her] civil procedure course. [Professor Smith was] not supposed to be in that classroom where [Reyes] was going to start class in a few minutes. [Professor Smith was] assigned to teach civil procedure in the classroom next door, yet [she] chose to remain in the classroom where [Reyes] was due to start teaching evidence to disrupt [Reyes'] class, which [Professor Smith] did."

60.    It became clear from this email that MW knew Professor Smith was in the classroom; that MW deliberately disrupted [Professor Smith's] class (Ex. 6, p. 24); and that MW was the admitted instigator both times she ambushed Professor Smith on

October 20, 2022.

61.     Furthermore, Professor Smith was in her classroom next door to teach civil procedure at 10:30am, and thus could not have disrupted Professor Reyes' class, which started at 10:30am.

62.     Professor Reyes was late to class that day, so she could not have possibly observed the incident to write such a detailed email. Professor Smith had reserved the particular classroom through all the proper channels at the COL to use on October 20, 2022 until 10:30am. (Ex. 3)

63.     On February 20, 2023, Defendant Scott emailed Professor Smith to inform her that Professor Reyes filed a complaint against Professor Smith and that FAMU EOP was opening an investigation. Not only was that false, but Scott had requested Professor Reyes to file a complaint against Professor Smith, which Professor Reyes declined to do, and Defendant Scott encouraged Professor Smith to do the same against Professor Reyes.

64.     On March 9, 2023, Professor Smith re-filed her original complaint that she had initially texted to Associate Dean Green on October 20, 2022, but this time Professor Smith followed the process Green did not, and she submitted it via the Compliance hotline. Professor Smith did so because she was advised that her original complaint was not properly submitted by Associate Dean Green to Compliance per FAMU Regulations.

65.     On March 10, 2023, the Compliance department immediately deleted

Professor Smith's resubmission. Defendant Baker then emailed Professor Smith, stating that Compliance's report would include her statement about the October 20, 2022 incident in the ongoing investigation. However, Defendant Baker's email did not address Professor Smith's complaint reported on October 20, 2022, predating the student's complaint, and instead the student's complaint was the only focus of the investigation.

66.     On March 10, 2023, Professor Smith tried to gain clarity by email that Defendant FAMU would be investigating her October 20, 2022 complaint as well as MW's October 27, 2022 complaint.

67.     To date, Defendant FAMU has not investigated Professor Smith's October 20, 2022 complaint as it is completely ignored in the final reports and in the two notices of termination, despite the serious concerning allegations Professor Smith made against MW, a student.

68.     On March 13, 2023, Compliance wrote an email and asked the law school leadership to meet with Professor Smith concerning the March 9, 2023 re-submission of her complaint, which Compliance claimed was a new filing of a complaint. Surprisingly, this was the same time that Associate Dean Green submitted a statement that he never considered Professor Smith's October 20, 2022 text to him about the MW incident as a complaint, and he doubled down on this in a subsequent and undated statement.

69.     On March 23, 2023, Professor Smith, then-dean Deidre Keller, and Associate Dean Cooper had a short meeting sometime thereafter. During that meeting,

Keller expressed her confusion on what Compliance wanted, and Associate Dean Cooper sat quietly as though she knew nothing.

70.    The investigation was conducted with undue and unreasonable delay, and extended over 130 days from January 26, 2023 to June 5, 2023 to cause needless stress to Professor Smith.   The investigation found every allegation made by MW to be meritless.

71.    Following the investigation precipitated by Professor Smith's protected activity, Defendant FAMU then independently manufactured a retaliation finding against Professor Smith to discredit Professor Smith's legitimate complaints against MW, protect Defendant FAMU from potential liability, and retaliate against Professor Smith for her equal pay allegations, which is what was the trigger to revive the initial investigation.

72.    Then, Defendant FAMU recommended the re-imposition of an additional unspecified penalty in its report emailed to Professor Smith on June 5, 2023 ("Report"). Defendant FAMU had already instructed the deans to speak with Professor Smith about potential retaliation in March 2023, which had been done; thus duplicating the penalty for the same alleged retaliation. But Professor Smith did not hear from the University again on this matter until December 5, 2023 when she was notified of her impending termination.

73.    Professor Smith did not receive anything tangible or written defining

retaliation, and "retaliation" is not defined in any FAMU Regulations. When asked for the source of the definition of retaliation and how Professor Smith's actions identified in the December 5, 2023 Notice of Termination met that definition, FAMU revealed for the first time, in litigation and by way of discovery, that "[t]he University uses the ordinary meaning of the term and the letter speaks for itself." (Ex. 13, FAMU Interrogatory Answers May 23, 2024, #13) Defendant FAMU could not answer how Professor Smith's actions could have resulted in her termination under Defendant FAMU's undefined term, "retaliation," because her actions do not meet any definition of "retaliation," and her termination was pretext for her relentless pursuit of equal pay.

74.    On April 12, 2023, Professor Smith signed her next school term's employment contract listing the appointment dates from August 7, 2023 to May 10, 2024. (Ex. 8) However, and because Professor Smith has tenure, the signing of a contract is merely ceremonial as the contract itself provides that:

> This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution and laws of the State of Florida as constitutionally permissible, and the policies and regulations, procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated… Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU.

Thus, for tenure holding faculty as Professor Smith was, FAMU and Professor Smith had contractual obligations to follow FAMU Regulations, which provide for *inter alia*

tenure protections that established her annual entitlement to a renewed contract.

75.    On April 28, 2023, approximately 90 days after the initiation of the investigation in January 2023 and nearly 180 days after the incident took place, Professor Smith reached out to the Defendant Baker via email to inquire about the progress of the investigation. In response, Defendant Baker stated, "The investigation is still ongoing. You will be notified once the report has been completed." This delayed investigation of any complaint by Defendant FAMU for nearly 100 days further compounded the frustration and uncertainty Professor Smith experienced throughout this process. The prolonged duration of the investigation, coupled with the lack of timely updates and adequate information of the student allegations, caused significant distress.

76.    On April 30, 2023, Professor Smith supplemented her complaint to the EEOC including Defendant FAMU's new retaliation.

77.    On June 5, 2023, Compliance finally emailed the report from the investigation to Professor Smith. Professor Smith assumed the investigation ended at this time as per Defendant Baker. However, Defendant FAMU was still clandestinely dragging the investigation on and keeping the investigation open so that it could use this investigation pretextually against Professor Smith with post-hoc and manufactured misconduct down the road – which is exactly what happened and has prompted revisions to her pleadings.

78.    Defendant FAMU failed to follow its own procedures (Code of Conduct),

including FAMU Code of Conduct 1.019 (18b), which states: "Managers/Supervisors are responsible for reporting complaints received to the Office of Compliance and Ethics, either directly or through the FAMU Compliance and Ethics Hotline." Defendant FAMU did not follow this then blamed Professor Smith. Professor Smith reported a complaint to a supervising dean, Associate Dean Green, on October 20, 2022. Pursuant to this regulation, he was responsible for reporting her complaint to Compliance. Instead, Associate Dean Green told Professor Smith he would investigate her complaint then later told Compliance that he did not take Professor Smith's complaint as a real complaint. Thus, when Professor Smith properly **re-filed** her original October 20, 2022 complaint to the Compliance hotline in March 2023, Defendant FAMU then accused Professor Smith of retaliating against the student for the filing of a **first-time** complaint in its June 5, 2023 report.[5]

79.   Furthermore, FAMU Regulations conflict with the COL's Student Code of Conduct, which was evidenced by the recommendation of the June 5, 2023 report (Ex. 6, p. 36), stating: "Consider if additional processes need to be implemented to address internal complaints to the law school and the transfer of complaints to investigative University offices."

80.   Defendant FAMU failed to maintain the confidentiality of the investigation,

---

[5] FAMU Regulations also provide faculty with rights to report violations of the University code of conduct. Defendant FAMU also violated this guarantee by failing to ever address Professor Smith's complaint against MW.

thereby exposing Professor Smith's protected activity and the details of her complaint to other employees including Professor Reyes. As further evidence of the breach or complete lack of confidentiality, Defendant Scott lied to Professor Smith by stating Professor Reyes had filed a complaint against Professor Smith. Defendant Scott did so because she was manufacturing a negative disciplinary record on Professor Smith and laying the foundation to say a "rivalry" existed amongst Professors Smith and Reyes to later use down the line and pretextually for Professor Smith's termination, which Defendant FAMU did as explained in more detail below.

81.   On June 12, 2023, Professor Smith sent a memorandum addressed to Defendant Calhoun (Compliance), Defendant Wallace (General Counsel), and Craig Reed (BOT) and copied to Defendant Waston (Provost) about the retaliatory actions of Defendant FAMU, and Professor Smith demanded: 1) immediate rescission of the Report, 2) removal of the Report from her file, 3) an immediate investigation of the Code of Conduct violations she initially reported on October 20, 2022 (the date of the incident) against MW, and 4) an investigation into Compliance for its failure to follow its own guidelines, for the reasons herein. Professor Smith never received a response from Defendant FAMU or the University Employee Defendants regarding her memorandum nor any of her demands. (Ex. 11)

82.   On June 13, 2023, Professor Smith supplemented her complaint to the EEOC including Defendant FAMU's new retaliation.

83.    Not even one month after supplementing her EEOC complaint, on July 6, 2023, Defendants Baker and Calhoun (Compliance) authored a "secret" supplemental report on the investigation and copied Defendant Scott (EOP), the person who Professor Smith had filed her informal equal pay complaint to in 2022. (Ex. 6, p. 37) The secret report also copied Defendant Watson, Defendant Wallace, and others. Defendants Baker and Calhoun did not send a copy to Professor Smith. Importantly, the secret report maintained only the independently manufactured finding of retaliation without finding any new violations of FAMU policy, though the FAMU departments purported to manufacture others by evaluating and considering other university policies, previously unconsidered, that existed at the time of the initial investigation, but the report ultimately concluded that nothing rose "to the level of a policy violation." (Ex. 6, p. 40)

84.    Professor Smith assumed that the investigation ended with the June 5, 2023 report from Compliance, but unbeknownst to her, Defendant FAMU and the University Employee Defendants were secretly engaged in a continual retaliation campaign against Professor Smith.

85.    Professor Smith received a notice of right to sue letter from the EEOC on July 25, 2023.

86.    On October 5, 2023, Professor Smith sent a memorandum to Compliance concerning MW's continued fixation on Professor Smith and relentless obsession with ruining Professor Smith's reputation. Professor Smith stated that she was "increasingly

uneasy about a student [MW] who remains severely fixated on an incident that transpired nearly a year ago. [MW], a stranger to me, continues to try to have me professionally harmed, and perhaps personally as well. I have reservations both about the student's mental well-being and my own personal safety. Notably, the student has also begun to exhibit unusual behavior of towards Professor Broussard (one my witnesses regarding the incident), who knew the student before the incident." (Ex. 6, p. 57) Professor Smith clarified that through the memo she "wish[ed] to formally express [her] concern regarding MW's persistent and unsettling behavior towards [Professor Smith]" citing post-March 2023 incidents of MW's fixation with Professor Smith. Professor Smith did not submit said concern through the hotline portal or any other reporting authority.

87.    While Professor Smith's October 5, 2023 memo indicated she believed she was obligated to report MW to The Florida Bar, Professor Smith neither indicated that she planned to nor that she had already followed through on the actions. (Ex. 6, p. 56)

88.    Neither Defendant FAMU nor the University Employee Defendants responded to the October 5 memo.

89.    On October 12, 2023, Defendant FAMU notified Professor Smith that she received "a three (3%) percent performance-based increase," which was the highest increase that any employee could receive.

90.    On October 17, 2023, Professor Smith filed her equal pay and retaliation

complaint in state court, but she did not attempt to serve Defendant FAMU until 2024.

91.     On November 13, 2023, Professor Reyes, who had an active lawsuit against Defendant FAMU (*Reyes v. FAMU*, No.: 6:22-cv-1525-WWB-DCI (M.D. Fla. 2022)), notified the Gray Defendants of Professor Smith's complaint in Professor Reyes' federal court filing entitled, "Plaintiff's Response to Defendant's Motion to Dismiss with Prejudice Plaintiff's Second Amended Complaint, Or in the Alternative, Motion to Strike" on page 12.

92.     Defendants then began the process to terminate Professor Smith.

93.     Specifically, on or around November 13, 2023, the Gray Defendants contacted Defendant Wallace and informed her of Professor Smith's unserved lawsuit raising equal pay and constitutional rights violations. Defendant FAMU did not retain the Gray Defendants at this time.

94.     The Gray Defendants did not advise Defendant Wallace not to act in response to the information they had given her. Nor have they attempted to stop or mitigate Defendant Wallace's conduct.

95.     At all relevant times, the Gray Defendants were aware Professor Smith's unserved complaint concerned equal pay, women's rights, and constitutional rights issues.

96.     The Gray Defendants are seasoned lawyers and based on their skill, expertise, and experience knew or should have known that Defendant Wallace would

act or in fact that she planned to act on the information told to her. Accordingly, the Gray Defendants and Defendant Wallace entered a formal or informal agreement to carry out Professor Smith's termination based on her equal pay lawsuit in violation of federal statutory and constitutional law.

97.    Sometime shortly after learning of Professor Smith's lawsuit, Defendant Wallace met separately or together with Defendants Watson, Scott, Calhoun, and Baker. During those meetings and communication, Defendant Wallace informally or formally spearheaded, encouraged, and commanded Defendant Watson and the remaining University Employee Defendants to support Professor Smith's termination.

98.    The University Employee Defendants each complied and independently agreed to carry out Defendant Wallace's plan for Professor Smith's termination.

99.    Specifically, Defendants Baker, Calhoun, and Scott gathered documents and submitted materials in support of Professor Smith's termination.

100.    Defendants Baker, Calhoun, and Scott also compiled and arranged materials to fabricate a rivalry between Professors Smith and Reyes, without realizing Professor Smith had recommended Professor Reyes to FAMU COL for hire in 2009, even knowing Reyes had underperformed in her short stint at the law firm where they both had worked years prior because Professor Smith believed Reyes may thrive in a different work environment.

101.    Defendant Watson specifically met with, continued to consult, and acted

alongside Defendants Baker, Calhoun, and Scott to serve as the cat's paw for Defendant Wallace from November 13, 2023 to date about Professor Smith's termination.

102.   Then, on December 5, 2023, Defendant Watson acted on Defendant Wallace's encouragement, command, or suggestion, and Watson emailed Professor Smith a notice of intent to terminate her that would become effective on January 19, 2024 and that provided limited procedures for a hearing/conference on January 11, 2024. (Ex. 6) Defendant FAMU through Defendant Watson emailed this notice to Professor Smith on December 5, 2023 based on an alleged memorandum she wrote on October 5, 2023, describing her continued personal safety concerns with a student who continued to demonstrate unsettling, irregular and suspect behavior toward Professor Smith, even though FAMU Defendant rewarded Professor Smith with the highest salary performance-based salary increase on October 12, 2023. Defendant FAMU's purported reason for terminating Professor Smith is a sham and subterfuge for the real reason – Professor Smith's protected conduct alleged herein.

103.   Defendant FAMU has not terminated any male law professor (such as Professors Ronald Griffin, Jeremy Levitt, Darryll Jones, Ewanrinareto "Areto" Imoukhuede) for similar or more severe violations of FAMU policies, specifically male professors are irregularly investigated; but when male law professors are investigated, the male professors have been found to have engaged in malfeasance/nonfeasance, including harassing women faculty, female students, and LGBTQIA-identifying

students, being inappropriate with female staff, missing numerous classes and attending classes 20-30 minutes late, but no male faculty have been terminated for that conduct.

104.   Spring 2024 classes were set to start on January 8, 2024, so clearly Professor Smith was not expected to teach in the spring semester.

105.   At some point shortly between November 17, 2023 and December 5, 2023, Defendant Wallace met with the Gray Defendants to inform them of her decision to terminate Professor Smith. The Gray Defendants neither objected nor attempted to prevent said action.

106.   On December 12, 2023, Professor Smith noticed Defendant FAMU for a conference pursuant to Regulation 10.120 (3).

107.   Professor Smith also requested any all evidence against her. Defendant FAMU neither provided any additional documents nor withheld any on the basis of confidentiality or a privilege.

108.   Between December 12, 2023 and January 11, 2024, Defendants Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a conference including who to strategically place on that conference panel.

109.   The University Employee Defendants eventually settled on three employees, one of which served on the FAMU DRS board alongside Defendant Watson, with the informal or formal assistance, guidance, command or encouragement of

31

Defendant Wallace.

110.   On January 11, 2024, a conference took place before a three (3) person panel selected by Provost Watson on ZOOM. The panel members were all lawyers: Bryan Smith, J.D., Associate VP for Student Affairs; Andrea Nelson, Esq., School of Business and Industry; and Patricia West, Esq., FAMU Developmental Research School.

111.   At the conclusion of the hearing, Associate Provost Dr. Reginald Perry, who was over the process, indicated that a report would be produced by close of business on January 12, 2024.

112.   The panel's report on January 12, 2024 recommended that Defendant FAMU rescind its intent to terminate and stated the following:

> Pursuant to Florida Agricultural and Mechanical University ("FAMU") Board of Trustees Regulation 10.120, university employee, Jennifer M. Smith, duly requested a conference to hear employee's response to a "Notice of Intent to Dismiss from Employment" letter, dated December 5, 2023, that was tendered to the employee.
>
> FAMU Regulation 10.120 (3)(a) reads as follows, "The purpose of the conference shall be to hear the employee's response to the charges in order to protect the employee from erroneous or arbitrary adverse action; to afford the University an opportunity to reevaluate its position after reviewing the information presented by the employee, and to thereafter make a recommendation to affirm or alter the disciplinary action as may be warranted."
>
> The Panel that was chosen to facilitate the January 11, 2024 conference, convened on behalf of Jennifer M. Smith, consisted of university employees Andrea Nelson, Bryan F. Smith, and Patricia West. The Panel convened to determine whether or not it would make a recommendation to affirm the university's "Notice of Intent to Dismiss from Employment". **After careful and thorough**

**deliberation, the Panel unanimously recommends the "Notice of Intent to Dismiss from Employment" be rescinded as this Panel does not find the employee's "re-filing" of what was believed to be a previously filed complaint to be an act of retaliation.**

In conclusion, the diligent efforts of our panel have now been completed.

(emphasis added)

113.   However, Dr. Perry did not forward the report to Professor Smith because it did not conclude what any of the Defendants wanted it to conclude – uphold terminating Professor Smith. At some point between the conclusion of the conference on January 11, 2024, Defendant Watson consulted with Defendant Wallace to discuss terminating Professor Smith notwithstanding the conference panel's recommendation. Professor Smith would soon learn, albeit late and in violation of FAMU Regulations, that Provost Watson declined to accept the panel's well-reasoned, unanimous recommendation.

114.   On Thursday, January 18, 2024, Professor Smith emailed Dr. Perry because she had not received any notice from FAMU thus far. According to Regulation 10.120(3): "After the conference is conducted, the employee shall be notified, by the President or President's designee of the University's decision."

115.   According to Regulation 10.120(4): "If the University determines after the conference that it will proceed with the proposed disciplinary action, the employee shall be notified within five workdays prior to the date the action is effective."

116.   According to Regulation 10.120(1), the Defendant FAMU shall give written notice to the employee of the proposed action. According to Regulation 10.120(2): "The notice shall include the following information: (a) The effective date of the University's proposed final action." This date of the proposed final action in the Defendant's written notice was listed as January 19, 2024.

117.   Defendant FAMU missed notifying Professor Smith by January 18, 2024 of its intent to proceed with her termination.

118.   At some point shortly between January 12, 2024 and January 23, 2024, Defendant Wallace met with the Gray Defendants to inform them of the decision to uphold Professor Smith's termination. The Gray Defendants neither objected nor attempted to prevent said action.

119.   On January 23, 2024 at 4:56 p.m., Professor Smith received an email with notice of Defendant FAMU's intent to terminate her, stating:

> After reviewing all documentation and considering the totality of circumstances related to this matter, the University's decision to dismiss you from employment remains in effect. Pursuant to Florida A&M University Board of Trustees (University) Regulation 10.205, you are hereby notified that your current employment with the University will end at the close of business on Tuesday, January 30, 2024. You will remain on Administrative Leave with Pay until this date. In the interim, please refrain from reporting to work or visiting the area(s) related to your current work assignments unless otherwise notified by this Office. The reason for this employment action has been outlined in the "Notice of Intent to Dismiss from Employment" delivered to you on December 5, 2023. (Ex. 7)

120.   To circumvent missing its notification timeframe by FAMU Regulations,

Defendant FAMU admits it changed the effective date of the proposed termination that was in the Notice of Intent to Dismiss from Employment from January 19, 2024 to January 30, 2024. The plain language of FAMU Regulations does not authorize the University to change the effective date.

121.   Defendant FAMU then outlined the procedures that Professor Smith should follow to appeal the decision.

122.   After Defendant FAMU ignored its panel's recommended finding that Professor Smith did not retaliate and that the termination notice should be rescinded, Professor Smith has and had no reason to believe that she will receive due process in any appeal process. Professor Smith nevertheless continued with her internal appeals so as not to have been considered to consent to the University's decision.

123.   On February 28, 2024, Professor Smith emailed her complaint and request for a Step One hearing pursuant to FAMU Regulation 10.206 to Dr. Perry .

124.   Soon after, Defendant Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a Step One hearing, including who to strategically select as the Step One Reviewer.

125.   Defendants Wallace and Watson agreed to place Antoneia Roe as the Step One Reviewer to influence and obtain their desired outcome based on Roe's employment history with General Counsel's office as counsel. Defendants Wallace and Watson therefore instructed Roe to contact Professor Smith via the FAMU email account

belonging to Professor Smith that Defendant FAMU had shut down shortly prior.

126.   On March 13, 2024, Professor Smith inquired to Associate Provost Reginald Perry whether Defendant FAMU intended to move forward with a Step One hearing because she had not heard from Defendant FAMU since she submitted her Step One complaint.

127.   At 10:46am on March 13, 2024, Dr. Perry responded to Professor Smith indicating that Defendant FAMU intended to move forward with a Step One hearing.

128.   On many occasions between March 11, 2024 and April 12, 2024, the Gray Defendants reached out to, drafted, and consulted with Defendants Wallace and Watson concerning Professor Smith's termination, the status of any internal appeals, and the progress of same. Specifically, the Gray Defendants doctored Wallace's and Watson's declarations to mask the firm and attorneys' unlawful activity. Furthermore, the Gray Defendants argued inconsistent positions to Defendant Watson's declarations, indicating that Defendant Watson has only served as a puppet for Defendant Wallace and the Gray Defendant's unlawful agreement. Even at this point, not one Gray Defendant attempted to prevent or counsel Defendant Wallace against continuing with the unlawful termination.

129.   Specifically, the inconsistent reasons for Professor Smith's termination are:

   a.   The initial notice from December 5, 2023 states:

        The reason for this employment action is the **substantiated <u>finding of</u>**

**retaliation** documented in the FAMU Division of Audit and Compliance Investigative Report 2022-11-117, dated June 5, 2023, and Supplemental Report 2022-11-117, dated July 6, 2023, which are attached and incorporated in this Notice of Intent to Dismiss from Employment ("Notice"). Subsequent to the referenced reports, you continued to engage in behavior which you were advised was retaliatory, as evidenced by your **memo dated October 5, 2023**, also attached and incorporated in this Notice. (Ex. 6) (emphasis added)

b.  The Notice of Termination dated January 23, 2024, the University's reason for termination was: "After reviewing all documentation and considering the **totality of circumstances** related to this matter, the University's decision to dismiss you from employment remains in effect." This new rationale is inconsistent with the December 5, 2023 reasons, and FAMU Regulations require that any reasons be "specific." (Ex. 7) (emphasis added)

c. However, on March 25, 2024, Provost Watson stated, under penalty of perjury in her initial declaration, that, "My decision to termination (sic) Ms. Smith's employment was based on **her unprofessional and inappropriate behavior towards students as articulated in the Investigative Reports.**" (Ex. 14 filed in Doc 27) (emphasis added)

d. Then, on March 25, 2024, The Gray Defendants advanced their own more descriptive version of the above reason for termination in a court filing in "Defendant's Response In Opposition To Plaintiff's Motion For Preliminary Injunction And Supporting Memorandum," stating: "**Defendant's supplemental investigation also found that <u>Plaintiff was unprofessional and inappropriate with students</u> regarding the confrontation between Plaintiff and the student from the original report, and that her <u>rivalry with a fellow College of Law professor was being internalized by students and creating a distraction</u>.**" (Ex. 16, p. 11) **Plaintiff is not an educator of 'impeccable character,' rather, she was found to be retaliatory, <u>unprofessional, and inappropriate with students, dragging them into her "rivalry" with another law professor</u>.**[6] (emphasis added)

e. After Professor Smith served a Rule 11 sanctions motion to Gray Defendants on the FAMU Defendant because of the blatantly false first declaration signed by Provost Watson, on March 25, 2024, Provost Watson signed an amended declaration under penalty of perjury date

---

[6] Defense Counsel deposed Professor Reyes from 9:31am to 5:36 pm in May 2024 in her case against Defendant FAMU, and not once did Reyes mention any rivalry between Professor Smith. Instead, Professor Reyes discussed her "interactions with the co-workers" and testified to having issues with almost all the law faculty, and although Reyes repeatedly mentioned another woman faculty with whom she had additional issues, it was not Professor Smith.  (Ex. 16)

April 11, 2024, stating that, "My decision to terminate Ms. Smith's employment was based on the **substantiated finding of retaliation documented in the Investigative Reports**." (Ex. 15 filed in Doc. 42) (emphasis added)

f.  Next, on April 12, 2024, in "Defendant's Response in Opposition to Plaintiff's Motion for Preliminary Injunction and Supporting Memorandum," Gray Defendants, trying again to creatively beef up the original rationale for termination, stated allegations clearly inconsistent with the initial reasons for termination and Gray Defendants' original version, "**Plaintiff's employment ended because she retaliated against a student for making a written complaint against her**. … **Plaintiff then filed a retaliatory complaint against the student** 'for the purpose of ensuring that [the student] would report that she was the subject of an investigation on her bar application.'[7] *Id.* This was fully investigated and substantiated by Defendant's Division of Audit and Compliance in Reports 2022-11-17 and 2022-11-117. *Id.* Defendant's supplemental investigation[8] also found that **Plaintiff was**

---

[7] This is written to appear that it is two separate acts, but that is false.
[8] This is the secret report of from dated July 6, 2023 that was intentionally never given to Plaintiff until she saw it in her termination notice in December 2023, but apparently the report was put in her employment file.

**unprofessional and inappropriate with students** regarding the confrontation between Plaintiff and the student from the original report, and that her <u>rivalry with a fellow College Law professor was being internalized by students and creating a distraction</u>."[9] "Plaintiff is not an educator of 'impeccable character,' rather, she was found to be retaliatory, **unprofessional, and <u>inappropriate with at least one student</u>, in addition to engaging in a <u>disruptive 'rivalry'</u> with another law professor**." (emphasis added)

130.    Defendant FAMU's inconsistent and ever-changing reasons and iterations for Professor Smith's termination demonstrate that it has no lawful reason for its conduct.

131.    On March 13, 2024 at 6:02pm, Antoneia Roe finally emailed Professor Smith's personal email with information concerning the Step One hearing to take place on March 15, 2024. March 15, 2024 was one day later than what is required by FAMU Regulation 10.206.

132.    Professor Smith again requested all documents, but only received the same documents already available in Defendant FAMU's notices for her termination. Specifically, on March 13, 2024, Antoneia Roe sent Professor Smith a dropbox link full of documents. Antoneia Roe did not indicate she withheld any documents on the basis

---

[9] See ftnt 6 above.

of confidentiality or a privilege.

133.   Professor Smith did not have time to research, find, and object to Antoneia Roe's selection as a reviewer until after the Step One hearing that took place on March 15, 2024.

134.   The Step One hearing lasted less than 8 minutes, and Antoneia Roe did not ask a single question because she already knew her assignment from the Defendants was to uphold Professor Smith's termination.

135.   On March 18, 2024, Professor Smith submitted a draft decision to Antoneia Roe, but that email went unanswered.

136.   Between March 15, 2024 and Antoneia Roe's decision, Defendants Watson, Wallace, Baker, Calhoun, and Scott met, spoke with, or otherwise consulted Antoneia Roe regarding Professor Smith's complaint.

137.   On April 14, 2024, Antoneia Roe emailed Professor Smith a copy of the five-page Step One decision indicating Professor Smith's termination would be upheld.

138.   On April 23, 2024, Professor Smith promptly filed an appeal of the Step One decision and requested a Step Two hearing.

139.   Between April 15, 2024 and May 2024, Defendants Watson consulted Defendant Wallace to discuss Professor Smith's termination and Professor Smith's request for a Step Two hearing, including who to strategically select as the Step Two Reviewer.

140.    Defendants Wallace and Watson agreed to place Dr. Valencia Matthews as the Step Two Reviewer to influence and obtain their desired outcome based on Matthews' history with Defendant Watson on the Dean's Advisory Council and based on the fact that Matthews is now a direct report to Provost Watson. Overturning Professor Smith's termination requires Dean Matthews, among other things, to find that her immediate supervisor, Defendant Watson violated FAMU Regulations.

141.    On May 1, 2024, Reginald Perry notified Professor Smith that Dr. Valencia Matthews would be the Step Two reviewer.

142.    On May 2, 2024, Professor Smith objected to Dr. Matthews's selection because Dr. Matthews is a direct report to Defendant Watson.

143.    On May 3, 2024, Dr. Perry responded by email indicating that the Provost's Office would consult with the General Counsel: "The Office of the Provost will need to consult with the General Counsel to discuss your request. I will contact you again next week."

144.    On May 7, 2024, the U.S. Department of Justice issued Professor Smith a Notice of Right to Sue under Title VII of the Civil Rights Act of 1964.

145.    On May 20, 2024, Dr. Perry emailed Professor Smith: "After further review, it has been determined that the University will move forward with the previously selected reviewer.   Therefore, Dean Matthews will be in contact with you to arrange for your Step Two meeting."

146.   On June 7, 2024, the Step Two hearing was scheduled with Dean Matthews in violation of FAMU Regulation 10.206, which required the Step Two hearing to be scheduled by May 8, 2024. It was scheduled for June 20, 2024, from 2-3pm; the hearing was held then on ZOOM, but no report has issued as of the date of the filing of this Second Amended Complaint. During the step-two meeting, Dr. Matthews consulted either Defendant Wallace or another University Employee Defendant about whether Professor Smith could have a representative give an opening, despite FAMU Regulation permitting same.

147.   After Professor Smith raised concerns about the pay disparity and expressed her intention to exercise her rights under the EPA, Defendant FAMU engaged in a campaign of retaliatory actions against Professor Smith and has continued to do so.

148.   Defendant FAMU's retaliation against Professor Smith includes the adverse employment actions as described above, including the baseless and one-sided investigation of the October 20, 2022 incident with MW, manufacturing conflicting allegations of misconduct to terminate Professor Smith, and ultimately terminating Professor Smith's employment. Since Professor Smith's termination (whenever the parties agree on a date), Defendant FAMU has withheld her salary and completely ignored her concerns about her salary disparities (Ex. 17), back dated her termination to her health insurance carrier so several healthcare claims submitted in the spring are no longer covered and are due and owing, failed to send her tax documents (even upon

request) that she could access as an employee, and eliminated her email access without changing the destination for email notifications about insurance coverage and claims.[10]

149.    Defendant FAMU's retaliatory actions against Professor Smith were motivated by Plaintiff's exercise of her rights under the EPA, in violation of 29 U.S.C. § 215(a)(3) and the other provisions of federal law as indicated below. Professor Smith is entitled to damages, attorney's fees and costs, and reinstatement to her tenured position as a law professor.

**COUNT I**
**DISCRIMINATION IN COMPENSATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT 29 U.S.C. § 206,** *et seq.*,
**AGAINST DEFENDANT FAMU**

150.    The Plaintiff realleges paragraphs 1 through 36.

151.    Plaintiff belongs to a protected class; she is female.

152.    Plaintiff's job functions as a tenured full professor at FAMU have been of equal skill, effort, and responsibility to the job functions of the Comparator, also a tenured full professor, and were performed under the same or similar working conditions. (Exs. 4, 9)

153.    During all relevant periods, Plaintiff received wages lower than the

---

[10] Each action happened at various times, but usually and immediately after Professor Smith noted in a court document that she was still employed because these instances were still in place. Thus, it is highly credible that after this pleading is filed, Defendant FAMU will contact the insurance provider to have her university email replaced with her personal email address.

Comparator while performing the same or substantially more work than the Comparator.

154.   Plaintiff is qualified for and entitled to wages equal to or higher than her Comparator's wages because she performed the same or substantially more work than the Comparator and she has more experience than the Comparator. The pay disparity was not based on any legitimate factor such as seniority, merit, or a system measuring earnings by quantity or quality of production.

155.   Defendant FAMU violated the Equal Pay Act (EPA), and Plaintiff is entitled to damages and equitable relief, including attorney's fees and costs, as described below.

**COUNT II**
**RETALIATION**
**EQUAL PAY ACT OF 1963, AS INCORPORATED INTO**
**THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 215(a)(3),**
**AGAINST DEFENDANT FAMU**

156.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 26 and 37 through 148.

157.   Defendant FAMU's retaliatory actions against Plaintiff, as alleged herein, and by its employees acting under of color of law constitute a violation of the EPA, 29 U.S.C. § 215(a)(3).

158.   Plaintiff engaged in protected activity by:

a)  Writing to FAMU's president on May 9, 2022 about the pay disparity between her and the male comparator;

b) Filing an informal gender equity complaint with FAMU's Equal Opportunity Program on June 28, 2022;

c) Filing a Charge of Discrimination with the EEOC under the Equal Pay Act on October 18, 2022 and the subsequent responses/replies/rebuttals to the EEOC in its investigation; and

d) Filing the equal pay lawsuit in state court in October 2023.

After Professor Smith engaged in this protected activity, FAMU took adverse employment actions against her, including:

a) Initiating an unwarranted investigation against her on January 26, 2023, shortly after she submitted a rebuttal to FAMU's position statement on equal pay to the EEOC;

b) Failing to follow proper procedures in the investigation;

c) Issuing a notice of intent to terminate her employment on December 5, 2023;

d) Terminating her; and

e) Upholding the decision to terminate her employment on January 23, 2024, despite a panel's recommendation to rescind the termination.

159. There is a causal connection between Professor Smith's protected activity and the adverse actions, as evidenced by the timing and sequence of events. The retaliation described herein was based on Plaintiff's exercise of rights protected by law, her resistance and opposition to gender discrimination and harassment and her right to

participate in actions calculated to redress grievances. Plaintiff's resistance to unlawful activity was both objectively and subjectively reasonable based on the timing of the Defendants actions and the lack of transparency and fairness throughout the process as explained in more detail above.

160.   FAMU's stated reasons for the adverse actions are pretextual, as detailed above. As a result of Defendant FAMU's retaliatory actions in violation of the EPA, Plaintiff has suffered and is entitled damages, including compensatory and punitive damages.

## COUNT III
## BREACH OF CONTRACT
## <u>AGAINST DEFENDANT FAMU</u>

161.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 26, 41-42, 49, 53-58, 69-70, 72-73, 78-79, 85-92, 99,101, 111-120, and 129.

162.   Defendant FAMU operates the law school at 201 FAMU LAW Lane, Orlando FL 32801.

163.   Each employment contract entered between Plaintiff and Defendant FAMU stated some variation of "Non-reappointment, separation or termination of employment for employees outside of the above-referenced categories will occur in accordance with FAMU regulation 10-207 and applicable regulations, policies and procedures of FAMU." The contract also stated: "This Employment Contract between Florida A&M University Board of Trustees (FAMU) and the Employee is subject to the Constitution

and laws of the State of Florida as constitutionally permissible, and the policies and regulations, procedures of U.S. and the Florida Board of Governors and FAMU, as now existing or hereafter promulgated." Thus, the COL, the Defendant's BOT, and faculty have all agreed to adhere to the terms of the Faculty Handbook, Student Handbook, FAMU Handbook, and FAMU Regulations by way of the individual employment contracts.

164. Defendant FAMU, though the above noted documents, has made unambiguous promises to Plaintiff including promises regarding tenure, retention of tenured faculty, governance of the COL, commitments to investigate faculty complaints, and termination of tenured faculty.

165. Plaintiff's employment letter, together with the Faculty Handbook, FAMU Handbook and FAMU Regulations are what forms Plaintiff's employment contract.

166. Defendant FAMU has failed to meet its contractual obligations to Plaintiff because Defendant FAMU did not follow its own procedures as detailed above.

167. As a result of Defendant FAMU's breach of contract, Plaintiff has suffered actual and consequential damages including loss of future wages, lost insurance and retirement benefits, and special damages, including the loss of future academic employment and opportunities.

168. Plaintiff seeks damages, including actual, consequential, and special damages and pre-judgment and post-judgment interest for Defendant FAMU's wrongful

breach of Plaintiff's employment contract, as well as compensatory and punitive damages.

## COUNT IV
## FIRST AMENDMENT RETALIATION
## <u>AGAINST DEFENDANT FAMU</u>

169.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 26 and 52-56, 70, 89 through 148.

170.   By filing her EEOC and state court complaints for equal pay and speaking on issues of public concern, Plaintiff engaged in constitutionally protected activity. Specifically, it is well known that one litigant often serves as the catalyst for change in civil rights litigation.

171.   Following Plaintiff's engagement in the constitutionally protected activity, Defendant FAMU took adverse employment actions against Plaintiff.

172.   These adverse employment actions included baseless investigation of Plaintiff, manufacturing false claims to fire Plaintiff, fabricating their definition of just cause without due process of undefined terms, issuing a notice of termination against Plaintiff, and terminating her employment.

173.   These adverse employment actions were taken in retaliation for Plaintiff's exercise of her First Amendment rights and her engagement in constitutionally protected activity.

174.   Defendant FAMU's adverse employment actions against Plaintiff, in

response to her constitutionally protected activity, constitute unlawful retaliation in violation of the First Amendment to the United States Constitution.

175.   Defendant FAMU could not and would not have made the decision to terminate Plaintiff but for her protected activity as evidenced by its inability to provide a clear reason for the adverse action(s) taken against her.

176.   Plaintiff has suffered damages as a result of Defendant FAMU's retaliatory actions, including but not limited to financial losses, emotional distress, harm to reputation, and other injuries, as well as other compensatory damages and punitive damages.

**COUNT V**
**REQUEST FOR PRELIMINARY AND**
**PERMANENT INJUNCTIVE RELIEF**
**AGAINST DEFENDANT FAMU**

177.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 148.

178.   Defendant FAMU has terminated Plaintiff in violation of her tenure status, employment contract, and because of her pursuit of equal pay.

179.   Plaintiff has suffered and will suffer irreparable damage if her employment is terminated as noticed as she will be unable to find any similar employment as a tenured full professor in her area and her professional reputation will be seriously and permanently injured. Furthermore, Plaintiff has already suffered considerably

irreparable harm as she has been unable to continue her functions as a legal academician to complete promised law review articles and book projects.

180.   "In view of the uncertainty in admeasuring damages because of the indefinite duration of the contract, and the importance of the status of Plaintiffs in the milieu of the college teaching profession, it is evident that the remedy of damages at law would not be complete or adequate." *AAUP v. Bloomfield College*, 136 N.J. Super. 442, 448, 346 A.2d 615, 618 (1975); *Zisk v. The Charleston School of Law* (2015).

181.   Monetary damages cannot provide sufficient relief or compensation to Plaintiff because the loss of her position as a tenured full professor cannot be valued monetarily, and loss of tenure will have a significant detrimental impact on her legal and academic career. Moreover, Plaintiff cannot be compensated for lost career advancement at the College of Law. *Assaf v. v. University of Texas System,* 399 F. Supp. 1245, 1251 (S.D. Tex. 1975), *appeal dismissed and vacated on other grounds*, 435 U.S. 992 (1978) ("Not only will plaintiff suffer loss of income but also academic prestige and research resources which are a sheer necessity to an academician…. Clearly, money damages would be wholly inadequate to compensate plaintiff for his loss of standing in the academic community. Further, even a temporary deprivation of the cloak of professorial status which allows plaintiff to mingle as an equal in the academic milieu, can only be poorly replaced by money…. Under all the circumstances, in this court's view the anticipated harm must be characterized as irreparable.")

182.   Plaintiff is likely to prevail on the legal merits of her cause of action as set forth in this complaint.

183.   Plaintiff seeks a court order in the form of preliminary and permanent injunction compelling Defendant FAMU to honor her tenure status and employment contract thus restoring the status quo until this matter is resolved.

**COUNT VI**
**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964,**
**AS AMENDED, 42 U.S.C. §2000e et seq.**
**<u>AGAINST DEFENDANT FAMU</u>**

184.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 26 and 101 through 148.

185.   Plaintiff was employed by Defendant FAMU as a law professor from 2004 to 2024.

186.   On January 31, 2024, Defendant FAMU purported to terminate Plaintiff from her tenured law professor position for an alleged violation of FAMU policy.

187.   During the same 2004 to 2024 time period, male law professors working for Defendant FAMU committed similar or more serious violations of FAMU policy but were either never investigated or not terminated after a finding of having committed the violation.

188.   Defendant FAMU's stated reason for terminating Plaintiff was pretext for unlawful sex discrimination, as evidenced by many things including: the conflicting

reasons Counsel has argued to this Court, the decisionmaker-Defendant Watson's conflicting two declarations, and the disparate treatment of Plaintiff compared to similarly situated male law professors who were not terminated for similar or more serious violations.

189.   Plaintiff's termination was motivated by her sex and was retaliation for her resistance and opposition to Defendant FAMU's unlawful compensation practices under the Equal Pay Act, which constitutes protected activity under Title VII.

190.   By the conduct described above, Defendant FAMU discriminated against Plaintiff on the basis of her sex and retaliated against her for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., causing her to suffer damages, including compensatory and punitive damages.

## COUNT VII
## 42 U.S. C. § 1985(3) – CONSPIRACY TO INTERFERE
## WITH CIVIL RIGHTS
## AGAINST GRAY DEFENDANTS

191.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 26 and 89 through 148.

192.   The Gray Defendants and University Employee Defendants conspired to deprive Plaintiff of her constitutional rights to due process under the Due Process Clause of the U.S. Constitution and freedom against retaliation under the First Amendment, her

statutory right to freedom from discrimination under the EPA and Title VII, her statutory right to freedom from retaliation for exercising rights under the EPA, by agreeing to terminate Plaintiff's tenured employment in retaliation for her filing a lawsuit against Defendant FAMU citing EPA and constitutional claims as a woman professor.

193.   The Gray Defendants were not retained in this matter until 2024 and their representation of Defendant FAMU in one legal matter did not cover unrelated litigation.

194.   The purpose of the conspiracy was to deprive Plaintiff indirectly or directly of (1) equal privileges including her due process rights as a woman compared to men who have been accused of similar or more serious violations of FAMU policy and (2) equal protection under law as a woman. The conspiracy was motivated by a discriminatory animus against Plaintiff based on her gender and her engagement in protected activities, including her protected activity under the Equal Pay Act.

195.   The Gray Defendants' overt acts are detailed above but include their informing Defendant Wallace of Plaintiff's unserved lawsuit alleging EPA violations without any measure to ensure Wallace would not act upon that information. The Gray Defendants' notification caused the remaining Defendants to join in the conspiracy and engage in overt acts in furtherance of the conspiracy, including but not limited to:

> a. Defendants Wallace, Watson, Baker, Scott, and Calhoun met and communicated regularly to discuss and plan Plaintiff's termination in retaliation for her protected activities.

b. Defendants Wallace and Watson instructed other University Employee Defendants to gather and fabricate evidence to support false claims against Plaintiff.

c. Defendants Baker, Scott, and Calhoun prepared and submitted false reports and statements to justify Plaintiff's termination.

d. Gray Defendants advised and facilitated the unlawful actions of the University Employee Defendants, knowing the actions were in retaliation for Plaintiff's protected activities.

The Gray Defendants actions and inactions effectively established their role in the conspiracy as the advisers or consiglieres of the plan to terminate Plaintiff.

196.   Defendant Wallace acted upon the Gray Defendants' information, and she informally or formally encouraged, suggested, commanded or facilitated Defendant Watson to terminate Plaintiff in light of the learned information about Plaintiff's lawsuit.

197.   As a result of the conspiracy, Plaintiff was deprived of her constitutional rights, including her rights to equal protection and due process, as well as her right to be free from retaliation for exercising her First Amendment rights, and Plaintiff was wrongfully terminated, suffered and continues to suffer irreparable reputational damage, emotional distress, and other losses to her career as a legal academician, including loss of advancement and scholarship opportunities, compensatory and punitive damages.

**COUNT VIII**

## 42 U.S.C. § 1986 – FAILURE TO PREVENT CONSPIRACY
## AGAINST GRAY DEFENDANTS

198.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 26 and 89 through 148.

199.   On October 17, 2023, Plaintiff filed a complaint in the state court for equal pay and retaliation, alleging that Defendant FAMU violated her rights under the Equal Pay Act.

200.   Plaintiff did not attempt to serve the complaint until 2024.

201.   On or around November 13, 2023, Gray Defendants informed Defendant FAMU via Defendant Wallace about the filed but unserved equal pay state court complaint.

202.   Defendants, having knowledge of the complaint and the potential violation of Plaintiff's rights, conspired to terminate Plaintiff's employment to prevent her from pursuing her equal pay claim.

203.   On December 5, 2023, Plaintiff received a notice of intent to terminate her from her position at the COL, 22 days after the Gray Defendants learned of Plaintiff's equal pay state court complaint.

204.   Gray Defendants had the power to prevent the wrongful termination but neglected and or refused to do so.

205.   Gray Defendants had knowledge of the conspiracy to violate Plaintiff's civil

rights under 42 U.S.C. § 1985.

206.   The Gray Defendants knew or should have known that informing Defendant Wallace about Plaintiff's unserved equal pay complaint would likely result in retaliatory action against Plaintiff, given the ongoing pattern of retaliation alleged in this complaint and having worked with Defendant Wallace.

207.   Gray Defendants had the power to prevent the wrongful termination of Plaintiff. As legal counsel for Defendant FAMU, they had the professional responsibility and authority to:

a. Advise Defendant Wallace and other FAMU officials against taking retaliatory action;

b. Warn FAMU officials about the legal consequences of retaliating against Plaintiff;

c. Refuse to participate in or facilitate any retaliatory actions;

d. Report any planned unlawful actions to appropriate authorities within FAMU or other preventative actions, but neglected or refused to do so.

208.   The Gray Defendants' failure to act was not mere negligence, but a willful disregard of their professional and ethical obligations as attorneys.

209.   As a direct result of the Gray Defendants' failure to prevent the conspiracy, Plaintiff suffered damages, including compensatory and punitive damages, loss of tenure, loss of wages and benefits, damage to her professional reputation, emotional

distress and loss of future career opportunities. The Gray Defendants' failure to act was in reckless disregard of Professor Smith's federally protected rights. As experienced attorneys, they knew or should have known that retaliating against an employee for filing an Equal Pay Act lawsuit violates federal law.

## COUNT IX
## SECTION 1983 – CIVIL CONSPIRACY
## AGAINST THE UNIVERSITY EMPLOYEE DEFENDANTS

210.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 26 and 37 through 148.

211.   On October 17, 2023, Plaintiff filed a complaint in the state court for equal pay and retaliation, alleging that Defendant FAMU violated her rights under the Equal Pay Act.

212.   Plaintiff did not attempt to serve the complaint until 2024.

213.   On or around November 13, 2023, Gray Defendants informed Defendant about the filed but unserved complaint.

214.   On December 5, 2023, Plaintiff received a notice of termination that she would be terminated from her position at Defendant FAMU, 22 days after the Gray Defendants learned of Plaintiff's state court complaint filing.

215.   University Employee Defendants' actions were taken under color of state law or outside the scope of their official duties and deprived Plaintiff of her rights,

58

privileges, or immunities secured by the Constitution and laws of the United States, including her right to free speech, equal protection, and due process under the Fourteenth Amendment.

216.   After Defendant Wallace learned of Plaintiff's unserved equal pay lawsuit she regularly and consistently communicated with, encouraged, commanded, suggested and or facilitated Defendants Watson, Baker, Calhoun, and Scott (collectively the University Employee Defendants) to reach an agreement to carry out Plaintiff's termination in retaliation for Smith's lawsuit asserting EPA, first amendment, and procedural due process claims.

217.   In addition to the acts mentioned above, Defendants Baker, Calhoun, and Scott specifically acted in furtherance of this conspiracy when they collected written documents from their respective department files, prepared statements, compiled evidence, manufactured evidence, created false narratives, breached confidentiality, falsely represented the end of the investigation, failed to follow FAMU Regulations and policy, shielded documents under the guise of privilege or confidentiality, met with Defendants Watson and Wallace to support the ultimate decision to terminate Plaintiff, and communicated with reviewers in the process of Plaintiff's internal appeals to influence or otherwise suggest she be terminated.

218.   In addition to the acts mentioned above, Defendant Watson specifically acted in furtherance of this conspiracy by terminating Plaintiff and upholding the

termination after consistently consulting with Defendant Wallace; consulting Defendant Wallace on the predetermination conference panel members and biased Step One and Two reviewers; acting at the instruction of Defendant Watson, involving other FAMU employees and carrying out all other actions mentioned in the above paragraphs.

219.   The University Employee Defendants, acting under color of state law as officials and employees of FAMU, deprived Professor Smith of her clearly established constitutional rights, including: Her First Amendment right to free speech and to petition the government for redress of grievances, by retaliating against her for filing complaints about pay discrimination; Her Fourteenth Amendment right to equal protection of the laws, by intentionally discriminating against her on the basis of sex in pay and other employment actions; Her Fourteenth Amendment right to due process, by failing to follow established procedures in investigating complaints and terminating her employment.

220.   These University Employee Defendants also acted outside of the scope of their official duties and engaged in deliberate misconduct that violated clearly established rights to be free from retaliation and Plaintiff's constitutional rights by:

- Manufacturing false claims to fire Plaintiff

- Fabricating reasons for termination

- Manipulating internal processes to ensure her termination

- Conspiring to terminate Plaintiff for retaliatory reasons

- Deliberately manipulating evidence and processes to justify termination

- Lying to Plaintiff to create faculty controversy

- Failing to adhere to confidentiality

These actions were taken for purely personal reasons and were violations of FAMU regulations, protocols and procedures.

221.   As a direct and proximate result of the University Employee Defendants' actions, Plaintiff suffered damages, including loss of employment, lost wages and benefits, emotional distress, and other compensatory damages as well as punitive damages. These Defendants' conduct was willful, wanton, and in reckless disregard of Professor Smith's clearly established constitutional rights, justifying an award of punitive damages to deter such egregious misconduct in the future.

## COUNT X
## DUE PROCESS IN VIOLATION OF THE
## U.S. AND FLORIDA CONSTITUTIONS
## AGAINST DEFENDANT FAMU

222.   The Plaintiff realleges all relevant paragraphs including but not limited to 1 through 26 and 53-61, 66-69, 71-72,78-82, 89, 91 101 through 148.

223.   Plaintiff had a constitutionally protected property interest in her continued employment as a tenured law professor with FAMU.

224.   Defendant FAMU deprived Plaintiff of this property interest by terminating her employment. FAMU's termination procedures, as outlined in Regulation 10.120 and

others, created a legitimate expectation of due process before termination.

225.    In effecting Plaintiff's termination, Defendant FAMU deprived Professor Smith of her due process rights and failed to provide Plaintiff with adequate procedural due process protections, by: a) Employing biased and partial internal complaint reviewers who acted as the cat's paw for Defendants Wallace and Watson, who themselves had knowledge of Plaintiff's pending Equal Pay Act lawsuit, rendering any internal appeal futile and violating Plaintiff's right to an impartial decisionmaker; b) Failing to provide Plaintiff with the definition of "retaliation" used as the basis for her termination, which was vague, arbitrarily applied, and prevented Plaintiff from conforming her conduct, in violation of due process notice requirements; c) Failing to follow its own policies and procedures regarding the timing and appeals process for challenging the termination decision; d) Failing to provide timely notice of their intent to proceed with termination; e) Changing the effective date of termination to circumvent the notification timeframe required by FAMU regulations; and f) Failing to provide Professor Smith with all evidence against her, despite her requests; and others as detailed above.

226. Defendant FAMU's post-deprivation process was constitutionally inadequate to remedy the prejudicial pre-termination violations described above. These actions deprived Professor Smith of a meaningful opportunity to be heard and respond to the allegations against her before termination.

227. The defendants' conduct was arbitrary, capricious, and motivated by retaliation for Professor Smith's protected activities rather than any legitimate reason. As a direct and proximate result of Defendant FAMU's failure to provide adequate procedural due process protections, Plaintiff suffered damages, including loss of employment, lost wages and benefits, emotional distress, and profesional standing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

a) An order reinstating Plaintiff to her position as a tenured full law professor;

b) An order granting preliminary and permanent injunctive relief;

c) An order declaring that Defendant has violated the Equal Pay Act, including retaliation provisions;

d) An order declaring that Defendant FAMU has violated Title VII;

e) An order declaring that Defendant FAMU has violated the First Amendment and due process clause of the U.S. Constitution;

f) An order removing any negative references to the October 20, 2022 incident from Plaintiff's employment file;

g) An award of unpaid wages and other compensation due to Plaintiff as a result of Defendant's violation of the EPA, including interest;

h) A declaration that the Gray Defendants' actions violated 42 U.S.C. §§ 1985(3) and 1986 and an award of compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and any other relief this Court deems just and proper;

i) Judgment against the University Employee Defendants for compensatory damages, punitive damages, attorney's fees and costs under 42 U.S.C. § 1988, and any other relief this Court deems just and proper;

j) Punitive damages, special damages, actual damages and consequential damages;

k) Loss of future employment opportunities;

l) Front pay;

m) Judgment against Defendants and for Plaintiff awarding compensatory damages on all Counts for the Defendants' violations of law enumerated herein;

n) Judgment equalizing Plaintiff's salary with her male Comparator who was paid more for substantially equal work, and permanently enjoining Defendants from future violations of law enumerated herein and remedying all benefits of which Plaintiff has been unlawfully deprived (such as retirement contributions, insurance etc.) of as enumerated herein;

o) Restoring sick leave and other benefits;

p) Compensatory damages in the amount of the full pay differential between Plaintiff's salary and the Comparator's salary for the period she was underpaid, representing the appropriate compensation for her 10 years' greater experience performing substantially equal work;

q) An award of liquidated damages in an amount equal to the unpaid wages and compensation due to Plaintiff;

r) Prejudgment interest and post-judgment interest;

s) An award of reasonable attorneys' fees and costs pursuant to the statutory provisions referenced in the complaint, *e.g.:* Equal Pay Act, Title VII, § 1983, § 1985, and § 1986.

t) Any other relief, including equitable relief, this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.


Dated July <u>8</u>, 2024

       Respectfully submitted,

       <u>*/s/ Jennifer Smith*</u>
       Jennifer Smith
       Florida Bar No. 964514
       Law Office of Jennifer Smith
       13506 Summerport Village Pkwy.
       Suite 108
       Windermere, FL 34786
       407-455-0712
       407-442-3023 (f)
       jensmithesq@aol.com